IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI`I

| | |
|---|---|
| NA PALI HAWEO COMMUNITY ASSOCIATION, a Hawaii non-profit corporation,<br><br>    Plaintiff,<br><br>    vs.<br><br>ANTHONY CHARLES GRANDE; NARINDAR KAUR GRANDE; JOHN DOES 1-10; JANE DOES 1-10; DOE PARTNERSHIPS 1-10; DOE CORPORATIONS 1-10; DOE ENTITIES 1-10; AND DOE GOVERNMENTAL UNITS 1-10,<br><br>    Defendants.<br><br>ANTHONY CHARLES GRANDE and NARINDAR KAUR GRANDE,<br><br>    Counterclaim Plaintiffs,<br><br>    vs.<br><br>NA PALI HAWEO COMMUNITY ASSOCIATION; RONALD K. AWA and DOES 1-25,<br><br>    Counterclaim Defendants. | CIVIL NO. CV04-00413 DAE/LEK (Injunctive Relief)<br><br>MEMORANDUM IN SUPPORT OF MOTION |

<u>MEMORANDUM IN SUPPORT OF MOTION</u>

## I. <u>BACKGROUND</u>

Despite repeated written demands that they cease construction, Defendants ANTHONY CHARLES GRANDE and NARINDAR KAUR GRANDE (collectively "Defendants") constructed a dwelling on their property in violation the governing documents of NA PALI HAWEO COMMUNITY ASSOCIATION ("Association"). During construction of the roof above the garage/master bedroom, the Association discovered and notified Defendants that the second floor balcony columns, a roof beam and a portion of the front roof structure protruded beyond the "building envelope" in violation of the governing documents. Defendants had an opportunity to resolve the covenant violations at an early stage and at relatively minor expense, before sheathing and roof tiles were installed. However, Defendants instead completed construction of the dwelling, knowing that the dwelling violated the governing documents. In addition to the building envelope violation, the dwelling violates the following provisions of the governing documents:

1.    A portion of the dwelling is constructed too close to the street (within the 20 foot front yard setback);

2.    The type of skylights installed violate the governing documents;

3.    Air conditioning equipment that was not part of the approved plans is exposed at the rear yard, with no fence or screening;

4.    Roof vents do not meet the requirements of the Association's Design Guidelines and do not match the color of the roof;

5.   The front wall violates the height restrictions of the governing documents and the approved plans;

6.   The garage was constructed with less than the requisite 100 square feet of storage space;

7.   A sliding garage gate was not installed although shown on the approved plans;

8.   The front entry light fixtures on the entry column bases have exposed bulbs in violation of the governing documents;

9.   Exterior fenestrations as depicted on the approved plans have been modified or deleted, including without limitation, a roof eyebrow above the garage, an arched clerestory window above the entry door, arched corners within the garage wall opening, planters at the front entry, a metal railing at the balcony corner, windows on the left side of the house and roof elements over the entry and the master bedroom;

10.   The required concrete pad at the trash area is missing; and

11.   The roof line has been altered from the approved plans.

The conditions on the Property degrade the quality of the neighborhood, may reduce the value of surrounding properties, and reflect a complete disregard and lack of consideration for Defendants' neighbors and the community as a whole.

The Association seeks summary judgment compelling Defendants to correct the various violations in accordance with plans approved by the Association's Architectural Review Committee ("ARC") as set forth herein.

2

## II. FACTS

The Association is a non-profit corporation empowered to enforce the limitations, restrictions, covenants, conditions, and obligations imposed by the terms of the Declaration.[1] ("Declaration"). *See* Exhibit "A" at Article VI, §§ 6.1.1 and 6.7.11. The Declaration and its restrictions are binding upon each owner of property within the project. *See* Exhibit "A" at Article III, §§ 3.1 and 3.3.3.

Na Pali Haweo is an upscale subdivision located on the east end of Oahu on the summit of a ridge line of Hawaii Kai. The home sites range from 375 to 750 foot elevation above sea level, with views of the Hawaii Kai golf course, Maunalua Bay, Diamond Head, Koko Head Park and the neighboring islands of Molokai, Lanai and Maui. The minimum required floor area of a home within the subdivision is 2,000 square feet, although a typical house usually exceeds 3,000 square feet. Na Pali Haweo has been developed to allow access to views of the surrounding landscape, access to prevailing marine wind and sunshine, and access to open space. As a result, the three dimensional aspect of the house and its location within the lot is important to the community as a whole. Houses within Na Pali Haweo are subject to front yard setbacks equal to twice the distance mandated by the City and County of Honolulu Land Use Ordinance ("LUO"); the maximum lot coverage at Na Pali Haweo is

---

[1]The Declaration of Covenants, Conditions and Restrictions of Na Pali Haweo subdivision was recorded in the Bureau of Conveyances of the State of Hawaii as Document No. 91-049173 on April 18, 1991.

restricted to 1/3 of the lot area whereas the LUO allows lot coverage equal to ½ of the lot area; and some lots within Na Pali Haweo are subject to view channels and/or special height restrictions to maximize visual access to views from surrounding lots. *See* Affidavit of Ronald K. Awa, AIA ("Awa") at ¶ 22.

Defendants are the owners of a single family home ("Dwelling") and lot located at 1251 Kamehame Drive, also known as Lot No. 49 (Kamehame Ridge Subdivision, Unit II-Phase 2-A shown on file Plan Number 2028), Maunalua, Honolulu, Hawai`i 96825 (the "Property"). *See* Exhibit "C". The Property is subject to the Declaration and the Na Pali Haweo Design Guidelines ("Design Guidelines") *See* Exhibit "A", Article IV, Section 4.1 and Exhibit "B". (The Declaration and Design Guidelines are collectively referred to as "Governing Documents").

On March 9, 2000, the Property was conveyed to Defendants. *See* Exhibit "C". In October 2000, Defendants submitted construction plans for a four bedroom, three bath home of approximately 3,335 square feet to the ARC for review and approval (Exhibit "D"), along with a letter from their architect, Edward A. Resh ("Resh"), stating: "The owner and I acknowledge receipt of the Design Guidelines and have used them in the design of the residence stated above." *See* Exhibit "E" and Affidavit of Awa at ¶ 16. Defendants were required to submit plans "strictly in accordance with the Design Guidelines." *See* Exhibit "A" at Article IV, Section 4.1. The ARC approved the plans subject to a modification to the height of the trash enclosure and clarification as to the skylight design. On October 24, 2000, the ARC informed Resh that the plans were approved. *See* Exhibit "F" and Affidavit of Awa at ¶ 17.

4

Defendants inexplicably, and without notice to or approval by the ARC, submitted a different set of plans to the City and County of Honolulu, Department of Planning and Permitting. *See* Exhibit "G". A Building Permit was issued on September 6, 2001. Defendants did not provide the Association with the plans approved by the City. The plans approved by the City differed from the plans approved by the ARC in that the footprint of the dwelling had been altered, floor area increased, roof line revised, there was a toilet room in the garage instead of storage space, and exterior fenestrations were modified. *See* Affidavit of Awa at ¶ 18.

After construction started in 2003, the Association received complaints from Defendants' neighbors, Glen Y. Moribe and Sandra E. Moribe ("Moribes"), that the Dwelling, then in the initial stages of construction, had exceeded the height limit imposed by the Design Guidelines. *See* Exhibit "H" and Affidavit of Jeff Kloetzel ("Kloetzel") at ¶ 13.

On July 30, 2003, the Association's Project Manager, Jeff Kloetzel, sent a facsimile to Resh informing him of the complaints about the height of the Dwelling, and requesting that Resh certify construction was in accordance with the approved plans. Exhibit "I" and Affidavit of Kloetzel at ¶ 14. By letter dated August 8, 2003, Resh confirmed that all items had been verified to be the same as the approved plans. Exhibit "J" and Affidavit of Kloetzel at ¶ 15 and Affidavit of Awa at ¶ 20.

On August 15, 2003, ARC Chairman Ronald K. Awa, AIA, visually inspected the Dwelling and the work site plans. Mr. Awa did not have with him equipment to take actual measurements, and the roof framing above the master bedroom/garage had

5

not been completed. Nevertheless, based upon a visual inspection, Mr. Awa concluded that construction appeared to be in conformance with the approved plans and building setbacks and height envelopes. Mr. Awa noted that although not shown on the ARC approved plans, the jobsite plans called for plumbing fixtures within the garage storage room and, upon inspection, plumbing rough-ins were in place.   Mr. Awa's findings were summarized in an August 29, 2003, letter to Defendants. *See* Exhibit "K" and Affidavits of Kloetzel at ¶ 16 and Affidavit of Awa at ¶ 21.

On September 22, 2003, the Association advised Defendants that the Dwelling's height setback and front setback were continuing to be questioned by the Moribes and their attorney has "demanded actual 'as-built' measurements of the home proving that it is in full compliance with all regulations." The Association advised: "You may want to hire an impartial outside consultant to verify all as-built measurements in order to satisfy yourself as well as others." *See* Exhibit "L" and Affidavit of Kloetzel at ¶ 17.

The building envelope violation arose in the latter half of 2003.  The building envelope is a restriction on the maximum height, setback, and bulk of each house to effectuate the design concept for the Na Pali Haweo subdivision.  The purpose of the building envelope restriction is to reduce the apparent mass and scale of homes from the street level and neighboring lots and to promote access to views,  prevailing marine wind, sunshine and open space.  In the present case, the Dwelling violated the building envelope restriction because the roof beam, columns and more than 2 1/2 feet of roof structure were protruding beyond the building envelope. *See* Affidavit of Awa at ¶ 22.

On October 7, 2003, the ARC met with Mr. Grande and Defendants' design/build team to discuss the building envelope violation, concerns that Defendants' contractor was using a job site copy of plans different from that approved by the ARC, and other issues. Resh provided the Association a schematic drawing dated September 29, 2003, documenting the building envelope violation. The drawings included a notation by Resh: "MOVE COL?" referring to the columns constructed within the building envelope. The ARC specifically requested that on the next submission of plans, Defendants make revisions to the original tracings of all drawing sheets affected and "cloud" all changes with revision numbers and dates. The ARC requested this information because the previous submission of plans contained changes that were not identified with revision clouds and numbers. The professional standard is to include such information to document the nature and dates of changes to avoid errors in review. *See* Exhibit "M" and Affidavit of Awa at ¶ 23.

On October 16, 2003, the Property was inspected by a building inspector for the City and County of Honolulu, the Association's Project Manager, Jeff Kloetzel, and Glenn Y. Moribe and his attorney. Defendant Narindar Kaur Grande and Defendants' contractor Jeff Brandt also attended. Actual measurements were taken of the Dwelling, including height and front setback dimensions. The inspection confirmed that portions of the second floor balcony and garage roof encroached beyond the building envelope, and the front facade of the Dwelling (at the garage) breached the 20 foot front yard setback restriction of the Design Guidelines. At this time, the roof framing of the Dwelling had been constructed, but neither the roof nor the plywood sheathing had

been installed. *See* Affidavit of Kloetzel at ¶ 18. As Defendant Narindar Kaur Grande was present at the October 16, 2003, inspection, she knew or should have known of the violation of the Design Guidelines, and, based upon information from Resh, Defendants knew how to fix the problem.

On or about October 19, 2003, Resh submitted to the ARC revised plans for the Dwelling and a letter requesting a building envelope and front setback variance for the Dwelling. Defendants failed to revise the original tracings or cloud all revisions with numbers and dates as requested by the ARC although the ARC specifically requested this information at the October 7, 2003, meeting. *See* Exhibit "N" and Affidavit of Awa at ¶ 24.

By letter dated October 29, 2003, the ARC asked that Defendants re-submit the plans "with all revisions made to each sheet clearly highlighted." This letter also stated: "The ARC further notes that until all these issues are resolved it would be in your best interest to ***cease all further construction*** at 1251 Kamehame Drive." Defendants were also advised that the ARC did not have authority to grant a height setback[2] variance. *See* Exhibit "O" and Affidavit of Kloetzel at ¶ 20.

On November 6, 2003, Defendants were again informed that the ARC was not empowered to grant a height setback variance and Defendants were informed that their garage storage area deviated from plans approved by the ARC and the Design

---

[2] The building envelope is comprised of the height setback, the yard setbacks and the maximum height restriction.

8

Guidelines. Defendants were asked to submit revised plans. *See* Exhibit "P" and Affidavit of Awa at ¶ 25.

On or about November 13, 2003, Resh submitted revised plans to the ARC showing removal of two (2) concrete masonry unit (CMU) columns. By letter dated November 26, 2003, the ARC ***approved*** the removal and reconstruction of the CMU columns but noted portions of the Dwelling (the beam, columns and part of the roof structure) would also have to be moved to conform with the building envelope:

> Your proposal to remove and reconstruct the two (2) cmu columns to be in compliance with the height setback requirements was approved. The only work that shall project beyond the building envelop[e] shall be roof overhangs as may be allowed by both the Design Guidelines and LUO.

*See* Exhibit "Q"and Affidavit of Awa at ¶ 26.

In January, Resh submitted plans with a revision date of January 9, 2004, proposing the cutting off of a portion of the eaves above the garage; the plans did not specify movement of columns or the beam to conform with the building envelope. By letter dated January 28, 2004, the ARC rejected the proposal to correct the violation of the building envelope restriction, commenting that the "roof cut-off is an obvious afterthought and is unacceptable as it is out of character with the overall roof design." Defendants were informed through their architect that they must relocate the beam, together with support columns, so as not to encroach beyond the building envelope. This letter also addressed the lack of adequate storage in the garage and noted a decision had not been made concerning the request for variance from the front setback restriction. *See* Exhibit "R" and Affidavit of Awa at ¶ 27.

9

Construction on non-compliant portions of the Dwelling ceased in approximately late October 2003. The dwelling remained in a substantially incomplete state until January 2004, at which time work resumed. By letter dated January 28, 2004, the Association demanded that Defendants cease all construction on non-compliant portions of the Dwelling immediately. *See* Exhibit "S" and Affidavit of Kloetzel at ¶¶ 21, 22.

On March 4, 2004, the Association's attorneys, Neeley and Anderson LLP A Limited Liability Law Partnership ("Neeley and Anderson"), wrote to Defendants and their architect demanding that all non-compliant construction on the Dwelling cease and that revised plans be submitted to the ARC by March 16, 2004. *See* Exhibit "U" and Affidavit of Kloetzel at ¶ 28.

By letter dated March 10, 2004, Resh informed the Association that he has "not been asked by my client, Mr. Grande, to submit the requested drawings by March 16, 2004." *See* Exhibit "V".

On May 25, 2004, Neeley and Anderson wrote to counsel for Defendants, Steven B. Jacobson, Esq., again demanding that all non-complaint construction on the Dwelling cease and that revised plans be submitted to the ARC. *See* Exhibit "W" and Affidavit of Affidavit of Kloetzel at ¶ 29.

By letter dated June 7, 2004, the Association offered to mediate this matter with Defendants before the Mediation Center of the Pacific, provided Defendants agreed to cease all unauthorized construction. *See* Exhibit "X" and Affidavit of Kloetzel at ¶ 30. On June 10, 2004, Defendants' counsel advised that his clients were willing to

mediate but Defendants did not agree to cease unauthorized construction. Defendants continued the unauthorized work. *See* Exhibit "Y" and Affidavit of Kloetzel at ¶ 31.

On June 23, 2004, the Association repeated its offer to mediate if Defendants would simply give their assurances that they would cease any unauthorized construction. No response was received. *See* Exhibit "Z" and Affidavit of Kloetzel at ¶ 32.

On June 1, 2004, the Association filed its Complaint in the Circuit Court of the First Circuit, State of Hawaii which included a demand for injunctive relief against Defendants. Defendants subsequently removed this case to federal court on grounds of diversity.[3]

On November 16, 2004, the Moribes filed a state court action against the Association, its managing agent, Defendants and Defendants' architect and contractor alleging damages relating to violations of the Governing Documents, including decrease in the value of their home. *See* Glen Y. Moribe, et al. v. Anthony Charles Grande, et al., Circuit Court of the First Circuit, State of Hawaii, Civil No. 04-1-2132-11 GWBC. The action was dismissed without prejudice on February 21, 2006.

---

[3]This action was removed from the trial calendar for approximately one year as the parties engaged in settlement negotiations with Magistrate Judge Leslie E. Kobayashi.

## III. <u>ARGUMENT</u>

### A.    SUMMARY JUDGMENT IS REQUIRED IN THIS CASE.

A court sitting in diversity applies state substantive law, including state choice of law rules. *See* <u>Gee v. Tenneco, Inc.</u>, 615 F.2d 857, 861 (9th Cir.1980);    <u>Field v. Liberty Mut. Ins. Co.</u>, 769 F. Supp. 1135, 1138 (D. Haw. 1991).  As a general rule, matters relating to interests in land are governed by the local law of the *situs* of the land. <u>In re Grayco Land Escrow, Ltd.</u>, 57 Haw. 436, 559 P.2d 264, *cert. denied*, 433 U.S. 910, 97 S.Ct. 2976, 53 L.Ed.2d 1094 (1977); <u>California Federal Sav. and Loan Ass'n v. Bell</u>, 6 Haw. App. 597, 604, 735 P.2d 499, 504 (Haw. App. 1987).

A grant of summary judgment is appropriate in actions where, as here, the interpretation of a document is at issue:

> As a general rule, the construction and legal effect to be given a contract is a question of law to be decided by the court.

<u>Bishop Trust Co., Ltd. v. Central Union Church</u>, 3 Haw. App. 624, 628, 656 P.2d 1353, 1356 (1983). *Accord*, <u>Reed & Martin, Inc. v. City and County of Honolulu</u>, 50 Haw. 347, 440 P.2d 526 (1968); <u>Clarkin v. Reimann, Jr.</u>, 2 Haw. App. 618, 638 P.2d 857 (1981).  Hawai`i courts have recognized that in construing restrictive covenants governing the use of land, they are guided by the same rules that are applicable to the construction of contracts.  <u>Pelosi v. Wailea Ranch Estates</u>, 10 Haw. App. 424, 876 P. 2d 1320 (1994),   *reconsideration denied*, 10 Haw. App. 631, 879 P.2d 591, *cert. denied*, 77 Haw. 373, 884 P.2d 1149 (1994).

In <u>Pelosi</u>, the ICA held that "[a]s long as the terms of a covenant are not

ambiguous, *i.e.,* not 'capable of being reasonably understood in more ways than one,' we are required to interpret the terms 'according to their plain, ordinary, and accepted sense in common speech." Id. at 435, 876 P.2d at 1327, citing Cho Mark Oriental Food, Ltd. v. K & K Int'l, 73 Haw. 509, 520, 836 P2d 1057, 1064 (1992).  In ruling that summary judgment should have been granted, the court stated that "if the language of the covenant is clear and unambiguous, and the meaning of the covenant can be readily discerned from the instrument itself, the legal effect and construction of the covenant is a question of law, appropriate for summary judgment disposition," Id. citing 10A C. Wright, A. Miller, and M. Kane, Federal Practice and Procedure, Civil 2d § 2730.1, at 279-81 (1983); Fassler v. Okemo Mountain, Inc., 148 Vt. 538, 540-541, 536 A.2d 930, 931 (1987) (emphasis added).  See also DeMund v. Lum, 5 Haw. App. 336, 690 P.2d 1316 (1984).  The appellate courts in Hawai`i have fully reviewed, as questions of law, the meaning of restrictive covenants, *see, e.g.,* Chang v. Magbee, 45 Haw. 454, 370 P.2d 479 (1962), Clark v. Wodehouse, 4 Haw. App. 507, 669 P.2d 170 (1983), and acknowledged that the interpretation of restrictive covenants presents, in the first instance, a question of law for the courts.  St. Clair v. Krueger, 579 Idaho 702, 769 P.2d 579 (1989).

### B.  DEFENDANTS ARE REQUIRED TO COMPLY WITH THE DESIGN GUIDELINES

At the outset, it should be noted that the Declaration provides that all owners, including Defendants, must strictly comply with the Design Guidelines. Article IV, § 4.1 of the Declaration provides:

13

4.1 <u>Design Guidelines</u> . . . ***All Owners, builders, and developers shall conduct their activities strictly in accordance with the Design Guidelines.***

Any construction or reconstruction of, or the refinishing or alteration of any part of the exterior of, any Improvement upon any Lot is absolutely prohibited until and unless the Owner of such Lot ***first obtains the approval therefor from the Architectural Committee and otherwise complies with all of the provisions of the Design Guidelines and/or this Declaration***. The Association may remove any Improvement constructed, reconstructed, refinished, altered or maintained in violation of this Section and the Owner thereof shall reimburse the Association for all expenses incurred in connection therewith. Any Owner proposing to construct or reconstruct, or to refinish or alter the Lot, or any part of the exterior of, any Improvement on or within his Lot, or to perform any work which under this Section requires the prior approval of the Architectural Committee, shall apply to the Architectural Committee for approval . . . .

*See* Exhibit "A" (emphasis added).

Article IV, Sections 4.3 and 4.3.4 of the Declaration likewise provide, in part, that construction of improvements shall be undertaken pursuant to the Design Guidelines and Declaration:

4.3    <u>Residential Area: Permitted Uses and Limitations; Construction and Alteration of Improvements</u>: Absolutely ***no construction or alteration*** of Improvements may be undertaken on a Lot without prior approval of the Architectural Committee ***pursuant to the Design Guidelines and this Declaration* . . . .**

4.3.4  <u>Improvements, Alterations and Repairs</u>: No Improvement, repair, Excavation, Fill or other work which in any way alters the exterior appearance of any Lot or the Improvements located thereon from its natural or improved state existing on the date such Lot was first conveyed or demised by the Trustees to Owner shall be made or done ***without the prior written approval of the Architectural Committee given pursuant to the provisions of the Design Guidelines and this Declaration***, except as specifically authorized herein.  All repairs, maintenance and care of the exterior surfaces of Residences and Lots shall be undertaken by Owner in accordance with this Article IV and the

14

standards established in the Design Guidelines and/or Architectural Committee Rules.

*See* Exhibit "A" (emphasis added).

The Hawai`i Intermediate Court of Appeals has emphasized that courts have *no power* to amend explicit and unambiguous provisions of declarations, regardless of whether those provisions are fair.    D'Elia v. Association of Apartment Owners of Fairway Manor, 2 Haw. App. 347, 632 P.2d 296, 297 (1981). Although these comments were made regarding a condominium declaration, they apply equally to this case. This Court has no authority to amend or reform the clear and unambiguous provisions of the Association's Governing Documents.

## C.    DEFENDANTS HAVE VIOLATED UNAMBIGUOUS PROVISIONS OF THE DECLARATION AND DESIGN GUIDELINES

### 1.    The Dwelling Exceeds the "Building Envelope"

Article III, Section 3.2.1(d) of the Design Guidelines defines the "building envelope" as follows:

> (d)    *Building Envelope*.  *All improvements shall be constructed in accordance with applicable building line, setback and height provisions set forth on the subdivision map and/or local ordinance.  No structure of any nature shall be constructed or permitted on a Lot which violates any provisions of the requirements of the Land Use Ordinance of the City and County of Honolulu, as amended, or any other declaration of building restrictions recorded against the Lot, whichever is more restrictive.*
>
> **The Building Envelope sets the maximum height, setback, and bulk of each house.  It does not represent the ultimate shape or architectural appearance of the building.**

15

> ***No part of any structure or auxiliary structure may protrude
> outside the building envelope*** *except roof overhangs, eaves, sunshades,
> sills, beam ends, awnings, planters, and other architectural
> embellishments or appendages with less than a 30 inch vertical
> thickness. Roof overhangs may protrude* ***not more than 2-1/2 feet
> outside the envelope****. Chimneys may protrude outside the envelope only
> to meet code requirements of the City/County, but should not encroach
> within 5' of the property line.*

*See* Exhibit "B" (emphasis added). Portions of the Dwelling (including two columns

supporting the roof above the master bedroom, the roof beam at the front edge of the

roof, and more than 2 ½ feet of the roof eaves) protrude beyond the building envelope

in violation of Article III, Section 3.2.1(d) of the Design Guidelines. *See* Exhibit "T"

at ¶ 2 and Attachment 2, and Affidavits of James I. Nishimoto, AIA ("Nishimoto") at

¶ 7, Kloetzel at ¶ 24 and Awa at ¶ 31.

The building envelope violation could and should have been cured by

Defendants. As discussed above, by no later than October 7, 2003, Defendants were

aware that the Dwelling was encroaching beyond the building envelope as Resh

provided the Association a schematic drawing dated September 29, 2003, confirming

that the Dwelling had violated the building envelope. The drawing included a notation

by Resh: "MOVE COL?" indicating that Resh was aware that the columns needed to

be moved to correct the building envelope encroachment. *See* Exhibit "M".

At the time Defendants discovered the building envelope encroachment, the

roof of the Dwelling had not been constructed and the Dwelling was in a substantially

incomplete state. Roof framing had been constructed but roof tiles and sheathing had

not been installed. The Dwelling remained in this condition through January 2004,

16

when construction restarted. During that period, the building envelope violation could have been remedied at relatively minor expense. Indeed, on November 13, 2003, Defendants submitted plans calling for the relocation of the front columns, which were approved in part. However, although Defendants initially appeared to stop construction, they ultimately continued construction without curing the building envelope violation and without revised plans being submitted to, or approved by, the ARC. *See* Affidavit of Awa at ¶ 28.

## 2.    Front Yard Setback Encroachment

Article III, Section 3.2.1 (d) of the Design Guidelines sets forth property setback requirements:

> *Typical First Story Envelope*
>
> *The first story portion of the envelope is the area in which only ground level construction is allowed.*
>
> **Front: 20' setback from the Property line.**
> *Side: 5' setback from the Property line.*
> *Rear: 5' set back from the Property line.*

*See* Exhibit "B" (emphasis added). The Dwelling is in violation of Article III, Section 3.2.1 of the Design Guidelines in that the front section of the Dwelling, including the front section of the garage, is set back 19 feet 9 1/2 inches, rather than the required 20 feet, from the front property line. *See* Exhibit "T" at ¶ 1 and Affidavits of Nishimoto at ¶ 7, Kloetzel at ¶ 24 and Awa at ¶ 31. Defendants were notified of this violation by letters dated September 22, 2003, October 29, 2003, November 6, 2003, November 26, 2003, January 28, 2004, March 4, 2004 and May 25, 2004. *See* Exhibits "L", "O"-

17

"R","U", "W".  The front yard setback violation is of concern because when combined with the building envelope encroachment and other deviations from the approved plans, they all contribute to the imposing mass and scale of the Dwelling. *See* Exhibit "AA", and Affidavit of Awa at ¶ 29.

### 3.    Front Wall Violates Height Restrictions of Design Guidelines

Article III, Section 3.2.7 of the Design Guidelines sets forth restrictions on walls and fences.

> 3.2.7 <u>*Fences.*</u>
>
> (a)    <u>*Height of Fences.*</u>  *No garden wall or fence being along property lines or within the setback areas, whether or not used as a retaining wall, shall have an **exposed face higher than six feet (6') from existing grade** and the area between such walls or fences and the property line at street frontage shall be adequately landscaped.*
>
> The front streetscape forms the visual experience of the community. Front setback areas and front facades are an important part of this visual experience.  These areas should be designed to create a cohesive neighborhood environment that complements the hillside character yet allows for individual expression within each Lot.
>
> *Walls or fences constructed within the front twenty foot (20') setback shall comply with the following:*
>
> (a)    *Be no higher than five feet (5') above the finished grade on the side of the wall facing adjacent property;*
>
> . . .
>
> *No fences, hedges or walls shall be erected or maintained on any Lot other than as are initially installed by Declarant unless first approved by the Architectural Review Committee.*

*See* Exhibit "B" (emphasis added).  Defendants constructed a wall on the Property which deviates from plans previously approved by the ARC and which violates Article

III, Section 3.2.7 of the Design Guidelines in that it exceeds six feet in height and violates Article IV, Sections 4.1, 4.3 and 4.3.4 of the Declaration. *See* Exhibit "T" at ¶ 8, Affidavits of Nishimoto at ¶ 7, Kloetzel at ¶ 24 and Awa at ¶ 31.

### 4.     Roof Vents Violate Design Guidelines

Article III, Section 3.2.3(f) of the Design Guidelines sets forth restrictions on installation of vents.

> *Vents.  All vents, stacks and pipes must be colored to match the roof or wall material from which they project, must not be visible from the street, and are to be grouped so as to minimize roof penetrations.*

*See* Exhibit "B" (emphasis added).  Defendants installed commercial aluminum turbine-style roof vents which not only differ from those depicted on the ARC approved plans, and thus were not approved by the ARC, but the roof vents are not colored to match the roof and are visible from the street. *See* Exhibit "T" at ¶ 5 and Affidavits of Nishimoto at ¶ 7, Kloetzel at ¶ 24 and Awa at ¶ 31.  This is in violation of Article III, Section 3.2.3(f) and Article VI, Section 6.3.4 of the Design Guidelines and Article IV, Sections 4.1, 4.3 and 4.3.4 of the Declaration. The approved plans show that roof vents were to be flush mounted to the surface of the roof. *See* Exhibit "D" at Sheet A-5.

### 5.     Skylights Violate Design Guidelines

Article III, Section 3.2.3(i) of the Design Guidelines sets forth restrictions on installation of skylights.

> (i)     *Skylights.  Skylights are to be designed as an integral part of the roof.*  **Skylight glazing must be clear, solar bronze or gray**; *white or reflective glazing is prohibited.  Skylight framing material  must be*

*bronze anodized or colored to match adjacent roof. Natural aluminum is prohibited. No bubble or plastic skylights will be allowed and skylights facing the street shall be non-operable and subject to the approval of the Architectural Review Committee.*

*See* Exhibit "B" (emphasis added). Defendants installed "bubble" skylights, which are prohibited by Article III, Section 3.2.3(i) of the Design Guidelines. Further, the skylights installed by Defendants have white glazing, are not designed as an integral part of the roof, and the skylight framing is galvanized steel or natural aluminum rather than bronze anodized or colored to match the roof, all in violation of Article III, Section 3.2.3 (i) and Article IV, Sections 4.1, 4.3 and 4.3.4 of the Declaration. *See* Exhibit "T" at ¶ 3 and Affidavits of Nishimoto at ¶ 7, Kloetzel at ¶ 24 and Awa at ¶ 31. The ARC informed Defendants of the skylight requirements by letter dated October 24, 2000, as well as in subsequent communications. *See* Exhibit "F."

### 6.    Failure to Construct Storage Facilities in Garage

Defendants have failed to construct within the garage an enclosed storage area of at least 100 square feet as required by the Design Guidelines. Article III, Section 3.2.4(b) of the Design Guidelines provides, in part:

*(b)    Garages. A double-car garage containing not less than four hundred (400) square feet of parking area and a clear width of not less than eighteen (18') feet between outside support shall be attached to the residence; provided, however, that a detached double-car garage may be substituted in cases where an attached garage is not feasible. **Every garage, whether attached or detached, which has a vehicular entrance facing a street shall contain not less than an additional one hundred (100) square feet of enclosed and covered area for service and storage facilities.** Carports and single-car garages will not be permitted. The purpose of this requirement is to ensure that garages have*

20

> *adequate storage and thereby improve the aesthetic appearance of garages which face the street.*

*See* Exhibit "B" (emphasis added). Plans submitted by Defendants and approved by the ARC reflected a storage area meeting the requirements of Article III, § 3.2.4(b). However, during inspections of the property, the ARC discovered that the storage area had not been constructed according to plan. Thus, the garage deviates from plans previously approved by the ARC and violates Article III, Section 3.2.4(b) of the Design Guidelines in that it has less than 100 square feet of storage space. *See* Exhibit "T" at ¶ 10 and Affidavits of Nishimoto at ¶ 7, Kloetzel at ¶ 24 and Awa at ¶ 31. Section 3.2.4(b) provides that the purpose of the storage requirement is to ensure that garages have adequate storage and thereby improve the aesthetic appearance of garages which face the street. Defendants were notified of this violation by letters dated August 29, 2003, November 6, 2003, November 26, 2003, January 28, 2004 and March 4, 2004. *See* Exhibits "K", "P", "Q", "R" and "U".

Further, when Defendants were informed that the storage area did not meet the Design Guidelines' requirements, they were directed to submit revised plans to the ARC for approval. Defendants did submit revised plans, however, those plans were not approved by the ARC. *See* Exhibits "P", "Q" and "R" and Affidavit of Awa at ¶ 30. Defendants have, therefore, constructed these portions of the Dwelling in violation of Article IV, Sections 4.1, 4.3 and 4.3.4 of the Declaration.

**7.    Exposed Air Conditioning Equipment Violates Design Guidelines**

21

Article III, Section 3.2.14 of the Design Guidelines provides:

> **Mechanical Equipment.** *All air conditioning, heating equipment and soft water tanks must be screened from view and be insulated for sound attenuation. Air conditioning units are not permitted on roofs.*

*See* Exhibit "B". The Dwelling is in violation of Article III, Section 3.2.14 of the Design Guidelines in that air conditioning equipment that was not a part of the approved plans is exposed at the rear yard, with no fence or screening. The air conditioning equipment was not shown on the approved plans. *See* Exhibit "T" at ¶ 4 and Affidavits of Nishimoto at ¶ 7, Kloetzel at ¶ 24 and Awa at ¶ 31.

### 8.    Light Fixtures With Exposed Bulbs Violate Design Guidelines

Article III, Section 3.2.6 of the Design Guidelines provides:

> **Exterior Lighting.** *All exterior lighting is to be indirect and shielded to prevent spillover onto adjacent lots and street. Exposed bulbs, spotlights, reflectors and lenses are prohibited.*

*See* Exhibit "B". The Dwelling is in violation of Article III, Section 3.2.6 of the Design Guidelines in that the front entry light fixtures on the entry column bases have exposed bulbs. *See* Exhibit "T" at ¶ 7 and Affidavits of Nishimoto at ¶ 7, Kloetzel at ¶ 24 and Awa at ¶ 31.

### 9.    Failure to Complete the Dwelling in Accordance with Approved Plans Violates Design Guidelines

Article VI, Section 6.3.4 of the Design Guidelines provides in part:

> *Any proposed changes or deviations from the approved plans occurring during construction must be submitted to the Architectural Review Committee for approval, prior to the execution of such changes.*

*See* Exhibit "B". The Dwelling is in violation of Article VI, Section 6.3.4 of the Design Guidelines in that Defendants have failed to complete construction of the Dwelling as per the approved plans and/or have deviated from the approved plans as follows: (a) Defendants failed to install a sliding garage gate in accordance with the approved plans (Exhibit "T" at ¶ 6); (b) Defendants failed to install a concrete pad at the trash area (Exhibit "T" at ¶ 11); and (c) Defendants deviated from the approved plans by modifying numerous exterior fenestrations without approval of the ARC, including without limitation, deleting the roof eyebrow above the garage, changing the upper corners of the garage door opening from an arched to squared-off design, failing to construct the roof over the entry and the roof over the master bedroom as separate and distinct elements, deleting planters at the entry, deleting the metal railing at the balcony corner, deleting windows on the left side of the Dwelling, and deleting the arched clerestory window above the entry door. (Exhibit "T" at ¶ 9 and Attachments 8 -11). *See* Affidavits of Nishimoto at ¶ 7 and Awa at ¶ 31.

### D.   DEFENDANTS HAD ACTUAL AND CONSTRUCTIVE KNOWLEDGE OF THE LAW AND THE GOVERNING DOCUMENTS.

As a matter of law, the recordation of the Declaration at the Bureau of Conveyances places all owners on constructive notice of the provisions of the Declaration. Ass'n of Apartment Owners of Kukui Plaza v. City and County of Honolulu, 7 Haw. App. 60, 742 P.2d 974 (1987). *See also* SGM Partnership v. Nelson, 5 Haw. App. 526, 529 (1985):

23

> Constructive notice arises as a legal inference, . . . where, 'circumstances are such that a reasonably prudent person should make inquiries, [and therefore] the law charges a person with notice of facts which inquiry would have disclosed.'

Everyone is presumed to know the law. Ignorance of the law is not an excuse for any person to breach a duty or to omit to carry out that duty. <u>Application of Suekichi Tsuji</u>, 4 U.S. Dist. Ct. Haw. 52 (1911); <u>Kapena v. Kaleleonalani</u>, 6 Haw. 579 (1885). In addition, Defendants' architect, Edward Resh, acknowledged receipt of the Association's Design Guidelines and use of the same in designing the Dwelling. Exhibit "E". Further, Defendants were given notice of the provisions of the Declaration and Design Guidelines by correspondence from the Association. *See* Exhibits "F","I", "K", "L", "O"-"R", "U", "W", and "Z".

### E.    INJUNCTIVE RELIEF IS APPROPRIATE IN THIS CASE.

#### 1.    The Declaration Authorizes An Award of Injunctive Relief

The Declaration expressly authorizes the Association to bring an action to enjoin violations of the Governing Documents. The Association is specifically authorized and obligated under the Declaration to bring this action. Article XII, Section 12.2.1 of the Declaration provides in relevant part:

> [T]he Association, or any Owner or Owners shall have the right to enforce any and all of the limitations, covenants, conditions, restrictions, obligations liens and charges now or hereafter imposed by this Declaration upon the Owners or upon any lot in the Project.

Article XII, Section 12.2.2 of the Declaration states, in relevant part:

> Every act or omission whereby a covenant, condition or restriction of this Declaration is violated in whole or in part is hereby declared to be a

24

nuisance and may be enjoined or abated, whether or not the relief sought is for negative or affirmative action, by Declarant, the Trustees..., the Association, or an Owner or Owners.

*See* Exhibit "A".

### 2.    Authorities Support An Award of Injunctive Relief

Hawai`i courts have made it clear that owners who live in community associations and who violate restrictive covenants are subject to the remedy of injunctive relief. For example, in <u>Sandstrom v. Larsen</u>, 59 Haw. 491, 583 P.2d 971 (1978), the Hawai`i Supreme Court upheld a decision by a trial court issuing a mandatory injunction requiring owners to remove the top story of their residential structure because the structure violated a restrictive height covenant applicable to their property. In so holding, the Hawai`i Supreme Court set forth the following rationale:

> A basic consideration in the enforcement of restrictive covenants "is that they are enforceable through the equitable relief afforded by an injunction." <u>McDonough v. W. W. Snow Construction Co.</u>, <u>supra</u>, 131 Vt. at 441, 306 A.2d at 122. As such, because the court is enforcing an established legal right embodied in the covenants, *"the relative hardships to the parties has no application to the award of final relief to the plaintiff."*
>
> . . .
>
> [A]lthough appellants may have mistakenly relied upon the *incorrect advice of their architect*, such a mistaken assumption that they were acting legally and properly *did not confer immunity upon them* from the right of appellees or any other homeowners in the subdivision to seek, equitable enforcement of the restriction.
>
> . . .
>
> *We are convinced that where a property owner deliberately and intentionally violates a valid express restriction running with the land or intentionally 'takes a chance', the appropriate remedy is a mandatory injunction to eradicate the violation.*

Id. at p. 499-500, 583 P.2d at 978 (quotation marks omitted) (emphasis added). The power to enforce the Governing Documents through injunctive relief proceedings is critical to the Association's ability to operate, manage, and govern the project.

In <u>Chang v. Magbee</u>, 45 Haw. 454, 370 P.2d 479 (1962), the Hawai`i Supreme Court enforced a restrictive covenant prohibiting a parcel from being used as a boarding house, hospital or sanitarium. The court held that the use of the property for a convalescent or nursing home violated the covenant.

In <u>McNamee v. Bishop Trust Co.</u>, 62 Haw. 397, 616 P.2d 205 (1980), the Hawaii Supreme Court reviewed the decision of a trial court affirming the decision of a managing committee of a community association disapproving an alteration. In that case, the plaintiffs sought permission to add a second story to their house, which the association's committee denied. The Supreme Court affirmed the trial court's decision in favor of the association, recognizing that the trial court should not be substituting its judgment for the committee and determining the reasonableness of the decision itself:

> The trial court's focus on the reasonableness of the Committee's actions rather than the reasonableness of plaintiffs' plans was well taken. ***Plaintiffs' presentation of their case was directed towards showing that their plans for construction were reasonable. However, this is not a question for a court either at the trial or appellate level to consider. The body most suited for this determination was the [association's] designated board -- the Managing Committee.*** The trial court's task was to see that the Committee's decision was not arbitrary or made in bad faith.

Id. at 402 at n.10, 616 P.2d at 209 at n. 10 (emphasis added).

26

In <u>DeMund v. Lum</u>, 5 Haw. App. 336, 690 P.2d 1316 (1984), the Hawai`i Intermediate Court of Appeals enforced a restrictive covenant requiring lots to be used "as a single-family residence only." The court held that the trial court did not err in enjoining owners from renting portions of their homes. *See also*, <u>Clark v. Wodehouse</u>, 4 Haw. App. 507, 669 P.2d 170 (1983) (Intermediate Court of Appeals enforced a height limit in a restrictive covenant).

In addition to Hawai`i case law, the Restatement of the Law of Property, Third, Servitudes ("Restatement") recognizes that injunctive relief is normally available to redress violations of restrictive covenants:

> ***Injunctive relief is normally available to redress violations of easements and restrictive covenants without proof of irreparable injury or a showing that a judgment for damages would be inadequate.*** The value of a restrictive covenant or easement is often difficult to quantify and may be impossible to replace. When it is enjoyed as an appurtenance to ownership of land, its value to the land owner may not be adequately reflected by market values. An award of damages instead of injunctive relief that would allow the other party to buy out the servitude obligation would seldom be appropriate so long as the servitude continues to serve the purpose contemplated at its creation. This consideration is even more important for conservation and preservation servitudes than for other types of servitudes.

*Restatement of the Law of Property, Third, Servitudes* (1998) ("*Restatement*"), § 8.3, Comment b (emphasis added). The Hawai`i Supreme Court recently recognized the *Restatement* in an opinion deciding the validity of restrictive covenants applicable to a community association. <u>Lee v. Puamana Community Association</u>, 109 Haw. 561, 128 P.3d 874, 884 (2006). The Hawai`i Supreme Court has also recognized the

27

*Restatement* in a case dealing with easements. *See* <u>Association of Apartment Owners</u> <u>of Wailea Elua v. Wailea Resort Company, Ltd.</u>, 58 P.3d 608 (2002).

Moreover, the Hawai`i Supreme Court's analysis in recent decisions involving enforcement of restrictive covenants has been consistent with the analysis set forth in the *Restatement*:[4]

> "Every covenant has a burden to the covenantor and a benefit to the covenantee." <u>Waikiki Malia Hotel, Inc. v. Kinkai Properties Ltd.</u> <u>Partnership</u>, 75 Haw. 370, 382, 862 P.2d 1048, 1056 (1993). An individual may suffer a violation of his or her rights without suffering actual damages. It follows, therefore, that a breach of a covenant alone may be grounds for injunctive relief, "even absent a showing of the amount of damage which has in fact been caused by that breach." <u>Sandstrom</u>, 59 Haw. at 501, 583 P.2d at 979; *see also Powell, supra*, § 60.07, at 60-120 (injunctive relief may be granted for breach of covenant "*irrespective*" of the amount of actual monetary damage" (emphasis added)); <u>Cordogan v. Union Nat'l Bank of Elgin</u>, 64 Ill.App.3d 248, 21 Ill.Dec. 18, 380 N.E.2d 1194, 1199 (1978) (observing that "'it was well settled that equity would entertain bills for injunctions to prevent their

---

[4] Numerous courts have cited and relied upon various sections of the *Restatement*. *See, e.g.,* <u>Laverty v. Alaska Railroad Corp.</u>, 13 P.3d 725 (Alaska 2000) (Alaska Supreme Court citing *Restatement* at § 1.2); <u>Il Giardino, LLC v. Belle Haven</u> <u>Land Company</u>, 254 Conn. 502, 757 A.2d 1103 (2000) (citing *Restatement* at § 4.11); <u>Skow v. Goforth</u>, 618 N.W.2d 275 (Iowa 2000) (Iowa Supreme Court citing *Restatement* at § 4.9); <u>Plymouth Canton Community Crier, Inc. v. Prose</u>, 619 N.W.2d 725 (Mich. App. 2000) (citing *Restatement* at § 2.16); <u>Anolick v. Holy Trinity</u> <u>Greek Orthodox Church</u>, 2001 WL 85681 (citing *Restatement* at § 2.16); <u>Abington</u> <u>Limited Partnership v. Heublein</u>, 257 Conn. 570, 778 A.2d 885 (Conn. 2001) (citing *Restatement* at § 4.10); <u>Fox v. Kings Grant Maintenance Association</u>, 167 N.J. 208, 770 A.2d 707 (2001) (citing *Restatement* at § 6, et seq.); <u>Beattie v. State ex rel.</u> <u>Grande River Dam Authority</u>, 41 P.3d 377, 2002 OK 3 (Okla. 2002) (citing *Restatement* at §§ 1.2, 1.4); <u>Stillwater Lakes Civic Association, Inc. v. Krawitz</u>, 772 A.2d 118 (2001) (citing *Restatement* at § 1.1); <u>Fahser v. Hilgart</u>, 630 N.W.2d 277 (Wis. App. 2001) (citing *Restatement* at § 2.16).

breach although the breach would cause no substantial injury'" (citation omitted)).

Pelosi v. Wailea Ranch Estates, 985 P.2d 1045, 91 Hawai'i 478, (Hawai'i 1999).

## IV.  CONCLUSION

It cannot be overemphasized that the Association's claims for injunctive relief should be resolved via summary judgment as this motion seeks a ruling on the legal effect and construction of restrictive covenants.  The Supreme Court of California's comments in Nahrstedt v. Lakeside Village Condominium Ass'n, Inc., 8 Cal.4th 361, 33 Cal.Rptr.2d 63, 878 P.2d 1275 (1994) are particularly appropriate in this regard:

> Refusing to enforce the CC & R's contained in a recorded declaration, or enforcing them only after protracted litigation that would require justification of their application on a case-by-case basis, would ***impose great strain on the social fabric of the common interest development.***

*Id*. at 1288 (emphasis added).  If summary judgment is denied, the Association will be required to prepare for and proceed to trial with regard to enforcement of its Governing Documents and consume significant judicial resources and incur significant legal fees and costs to resolve legal points which are completely appropriate for summary disposition.

The Association seeks summary judgment compelling Defendants to do as follows:

1.    Submit a set of plans accurately reflecting the as-built conditions of the Dwelling.

2.    Submit plans consistent with the Governing Documents correcting the building envelope and front yard setback encroachments, and the violations

29

relating to the roof vents, skylights, garage storage area, garden walls, exposed air conditioning equipment and unshielded front entry light fixtures.

3.    Correct the violations set forth above in accordance with the Design Guidelines and the plans approved by the ARC.

4.    In addition, in accordance with the plans that were approved by the ARC, Defendants shall install or construct a sliding garage gate, a concrete pad at the trash area, and exterior fenestrations, including without limitation, a roof eyebrow above the garage, an arched clerestory window above the entry door, arched corners within the garage wall opening, planters at the front entry, a metal railing at the master bedroom balcony corner, windows on the left side of the Dwelling, and separate and distinct roof elements over the entry and the master bedroom as depicted on the approved plans.

The Association reserves its rights with regard to any other violations of the Governing Documents that may be disclosed by the as-built plans referenced above. The Association's claims for attorneys' fees and costs are reserved for subsequent determination by the Court.

DATED:  Honolulu, Hawai`i April 12, 2006.


JOYCE Y. NEELEY
LANCE S. FUJISAKI
SCOTT R. GRIGSBY
Attorneys for Plaintiff
NA PALI HAWEO COMMUNITY
ASSOCIATION

30