IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| NA PALI HAWEO COMMUNITY ASSOCIATION, a Hawaii non-profit corporation,<br><br>    Plaintiff,<br><br>    v.<br><br>ANTHONY CHARLES GRANDE; NARINDAR KAUR GRANDE, and DOES,<br>    Defendants.<br><br><br>ANTHONY CHARLES GRANDE and NARINDAR KAUR GRANDE,<br><br>    Counterclaim Plaintiffs,<br><br>    v.<br><br>NA PALI HAWAO COMMUNITY ASSOCIATION; RONALD K. AWA; and DOES 1-25,<br><br>    Counterclaim Defendants | CIVIL NO. CV04-00413-DAE LEK<br><br>MEMORANDUM IN SUPPORT OF MOTION and IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |

<u>MEMORANDUM IN SUPPORT OF MOTION and IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

## INTRODUCTORY SUMMARY

This case is a classic example of a bureaucracy running amok.

As shown below, after Grandes bought a lot in the Na Pali Haweo Subdivision above Hawaii Kai, the Subdivision's Architectural Review Committee (ARC) approved their plans for a home on that lot.

Two years later, when they were able to build their home, minor changes were made from the originally approved plans.

During the construction, the uphill next-door neighbor, one Glen Moribe, complained about their home, pointing out that it might be too high or to close to the front property line.

It turned out that Moribe was wrong. Grandes' home was well within the "building envelope" approved for it by the ARC – which begins *ten* feet from their front property line, *not* twenty feet.

However, Moribe still continued to put up a stink, threatening to sue the Association, which had approved a "building envelope" for Grandes which differed from the "typical" building envelopes described in the Subdivision's Design Guidelines.

Ironically, Grandes' home, as built, is not significantly outside a "typical" building envelope either. Grandes' home is set back 19'8 ½" from their front property line, a "typical" building envelope is 20' from a lot's front property line.

2

The front height of Grandes' home is within a "typical" building envelope if measured from existing grade – the property's elevation before it was graded for construction.

An ARC member first asked Grandes' to cooperate with the Association by applying for a variance for their house as built, assuring them that it would be granted. So they did.

But then the Association turned on Grandes, with its Board passing a resolution purporting to determine that the ARC lacks the authority to grant variances from building envelope height requirements – the implication being that the ARC's original approval of the 10' "building envelope" setback was void.

After some thrashing about over the "building envelope" question, and over a "garage storage" question which the Association's own purported expert, Mr. Nishimoto, disagrees with the Association on, the Association made demands on those questions. Then, when its demands were not met, the Association filed this suit – without complying with prelitigation procedural requirements in the Association's CC&Rs.

The Association gussied up its Complaint with several new allegations it had not made demands upon – in violation of another requirement of the CC&Rs. Then, during the course of this lawsuit, it added still more allegations, again without complying with the CC&Rs.

3

This cross-motion for summary judgment is made because the Association cannot possibly recover on any of its allegations – old or new – as a matter of law. There is no merit to any of the Association's claims.

Moreover, the Association cannot possibly be entitled to injunctive relief. Even if it were correct on any of its legal points, no more than a declaratory judgment would be appropriate on this record.

### I. THE ASSOCIATION CANNOT POSSIBLY PREVAIL ON ITS ALLEGATIONS WHICH WERE THE SUBJECT OF ITS ORIGINAL DEMANDS.

Building Envelope. It is uncontestable that the Association's ARC approved a 10' building envelope for their home, and that Grandes' home is within that envelope – its setback and its height. (Grande Concise Statement [GCS], para. 13-17)

In that regard, the Association's principal contention appears to be that it's not bound by the ARC's approval of that envelope. (GCS, para. 18)

However, the Association's CC&Rs state that the ARC may . . . authorize variances from compliance with any of the Design Guidelines." (GCS, para. 21; see also para. 22) See Hiner v. Hoffman, 90 Haw. 188, 190 (1999).

The Association's Board's attempt to withdraw that authority after the fact, for height variances, is of no effect because the Board lacks the power to amend the CC&Rs. (GCS, para. 20, 23)

Moreover, the Association has not contested the ARC's power to grant front setback variances. (GCS, para. 19)

The Association's Design Guidelines are not rigid anyway. They "express intentions rather than absolutes," and the building envelope guidelines are merely "typical." (GCS, para. 24-25)

Grandes' home is within "typical" height requirements anyway, if measured from existing grade, as it must as a matter of law because the Guidelines do not specify whether existing or finished grades are to be used in measuring compliance with them. GCS, para. 26-28; Hiner v. Hoffman, 90 Haw. 188, 190 (1999).

The 3 ½" setback difference from a "typical" envelope is not material, and there are other homes in the Subdivision within 20' of their front property lines and/or appearing to possibly be within 20'. (GCS, para. 29-30) HRS § 669-11(2); White Egret Condominium Inc. v. Franklin, 379 So.2d 346, 352 (Fla. 1979) (homeowners' associations cannot enforce restrictions upon property use selectively and arbitrarily).

Although the Association has made much ado over the alleged inadequacy of Grandes' compromise proposals to deal with the building height, the

Association has just agreed, on May 31, 2006, that a proposal virtually the same as the one it rejected in January 2004 is now acceptable – although it rejected other aspects of the current compromise proposal. (GCS, para. 31-32)  See Rhue v. Cheyenne Homes, 449 P.2d 361,363 (Colo. 1969) (a homeowners' association's refusal "to approve plans must be reasonable and made in good faith and must not be arbitrary and capricious.") .

Furthermore, the CC&Rs required the Association to give Grandes a noticed hearing before its Board, and to observe other procedural safeguards before suing them, but it failed to provide them. (GCS, para. 2-11)  See Rhue v. Cheyenne Homes, 449 P.2d 361,363 (Colo. 1969).

Garage Storage.  With irrelevant exceptions, the CC&Rs expressly deny the ARC the authority to limit Owners' rights to remodel the interiors of their structures, so the ARC acted outside of its authority in attempting to tell Grandes what to do inside their garage. (GCS, para. 33-35, see also 36)  See Hiner v. Hoffman, 90 Haw. 188, 190 (1999).

Grandes have always been fully compliant with the Design Guideline on garage storage anyway – which calls for 100 square feet of "service and storage" area, not merely "storage" – as both Mr. Nishimoto and Grandes' expert, former Na Pali Haweo ARC Chair Owen Chock – agree. (GCS, para. 37, 39-43; Chock Dec., para. 2, 8)  See Hiner v. Hoffman, 90 Haw. 188, 190 (1999).

The Association has taken the position, in dealing with Grandes, that the Guideline calls for a separate storage room or storage cabinets. But it doesn't, merely requiring that the service and storage facilities be indoors rather than outdoors. (GCS, para. 37-43) See Hiner v. Hoffman, 90 Haw. 188, 190 (1999); White Egret Condominium Inc. v. Franklin, 379 So.2d 346, 352 (Fla. 1979); Rhue v. Cheyenne Homes, 449 P.2d 361,363 (Colo. 1969).

The Association long ago abandoned any right to even attempt such a position, since it did not seek or require separate storage rooms or cabinets from Na Pali Haweo's opening in 1993 until at least 2000. (GCS, para. 41.)

## II. THE ASSOCIATION CANNOT POSSIBLY PREVAIL ON THE MATTERS RAISED IN ITS COMPLAINT, OR HAS RAISED AFTERWARDS, WHICH WERE NOT COVERED BY ITS PRELITIGATION DEMANDS.

None of the Association's other contentions are properly before the Court either, not having been the subjects of prelitigation hearings or prelitigation demands. (GCS, para. 1-12, 47, 54) See Rhue v. Cheyenne Homes, 449 P.2d 361,363 (Colo. 1969).

Upon learning of the new allegations in the Complaint, Grandes agreed that they would remedy any such violations, other than one that was so vague as to be incomprehensible. (GCS, para. 45)

7

After learning of the items not raised until March 2005 – which included the minor changes from the approved plans – Grandes obtained clarifications of what the Association supposedly wanted in September 2005. (GCS, para. 46, 48)

Grandes changed some items to meet the Association's modifications, as they had said they would, before the Association's present motion was filed – and the Association knew it. (GCS, para. 49-52)

Since its motion was filed, the Association has taken new positions and alleged different "violations," in materials provided on May 31, 2006. (GCS, para. 53) See Rhue v. Cheyenne Homes, 449 P.2d 361,363 (Colo. 1969).

Bubble Skylights. This item would be comical but for the Association's vituperative tone. There are bubble skylights all over Na Paleo Haweo, including on the Association's secretary-treasurer's house, many more than flat skylights. (GCS, para. 55, 60) The Guideline has obviously been abandoned. See also White Egret Condominium Inc. v. Franklin, 379 So.2d 346, 352 (Fla. 1979)

Grandes have nonetheless removed theirs because they said they would, have painted their frames, and are otherwise in full compliance with the letter of the Guideline. (GCS, para. 45, 49, 56-61) The Association's own Exhibit AA shows that the new flat skylights were there before the Association moved for summary judgment (top photo),

<u>Air Conditioner Screening</u>.  Although Grandes' next-door neighbor – an ARC member – has two unscreened air conditioners visible from Grandes' property, Grandes screened theirs – before the Association moved for summary judgment.  (GCS, para. 49, 62)  See <u>White Egret Condominium Inc. v. Franklin</u>, 379 So.2d 346, 352 (Fla. 1979)

The Association now wants to argue about the form of the screen, although Grandes installed what the Association's representative suggested, and although it meets the requirements of the Guidelines.  (GCS, para. 62-69)  See <u>Hiner v. Hoffman</u>, 90 Haw. 188, 190 (1999); <u>Rhue v. Cheyenne Homes</u>, 449 P.2d 361,363 (Colo. 1969).

<u>Roof Exhaust Vents.</u>  As promised, Grandes moved and replaced them to meet the Association's desires, before the Association moved for summary judgment.  (GCS, para. 45, 49, 70-74)  The Association's May 31 response complains that they're not shown on as-built plans delivered to the Association on April 19, 2006.  (GCS, para. 72)  But they are, as Mr. Chock points out, if the Association looks at the right page.  (GCS, para. 73)  See also <u>Rhue v. Cheyenne Homes</u>, 449 P.2d 361,363 (Colo. 1969)

<u>Front Garage Gate:</u>  The Association demanded that Grandes cease construction in the area of the front setback in January, March and May, 2004, and

9

Grandes have complied. (GCS, para. 76, 78) The Association has thereby waived and is estopped from complaining that they didn't install it.

Moreover, the last word Grandes heard on the front gate came on September 30, 2005, when the Association agreed that Grandes would "omit the front gate from the plans." (GCS, para. 77) See Rhue v. Cheyenne Homes, 449 P.2d 361,363 (Colo. 1969).

Front Entry Light Fixture. This is another item Grandes fixed after learning about it, before the association moved for summary judgment. (GCS, para. 49, 84)

Front Garden Wall. This is another item Grandes agreed to fix after learning about it. (GCS, para. 45) They are merely awaiting Association approval, which is being withheld on the specious ground that their April 2006 plans don't describe their proposal. (GCS, para. 81-82) They do, as Mr. Chock points out, and fully comply with the Guidelines. (GCS, para. 83-85) See also Rhue v. Cheyenne Homes, 449 P.2d 361,363 (Colo. 1969)

"Separate and Distinct Roof Elements" and Concrete Trash Pad. These are more silly items. The Association is looking at the roof from the wrong angle, and is looking in the wrong place for the concrete trash pad. They are both there and have been there for years, exactly as called for in Grandes' approved plans. (GCS, para. 86-89, 98-100) See also Rhue v. Cheyenne Homes, 449 P.2d 361,363 (Colo. 1969)

Front Roof Eyebrow. Once again: The Association demanded that Grandes cease construction in the area of the front setback in January, March and May, 2004, and Grandes have complied. (GCS, para. 76, 78, 92) The Association has thereby waived and is estopped from complaining that they didn't install the front eyebrow roof, which would have jutted out into it. (GCS, para. 91) Grandes have repeatedly said that they will install the eyebrow roof once the Association allows work in that area. (GCS, para. 93)

In its response of May 31, 2006, the Association quibbles that Grandes April 2006 plans don't show the roof angle or the type of tile. (GCS, para. 94) But they do, as Mr. Chock points out, and otherwise comply with the letter of the Guidelines. (GCS, para. 95-97) See also Rhue v. Cheyenne Homes, 449 P.2d 361,363 (Colo. 1969)

Miscellaneous Minor Matters. The Association's other assertions are of matters so minor and unnoticeable that the Association made no demands relating to them, and said nothing about them in its Complaint. (See also GCS, para. 101, 103-104)

The standard in the CC&Rs is whether construction is in "*substantial compliance with final plans,*" and Grandes' construction is. (GCS, para. 2, 103, 107-108)

When the Association "disapproved" the miscellaneous minor matters, as shown in Grandes' April 2006 as-built plans, in its response of May 31, 2006, it was unable to give any explanation or reasons. (GCS, para. 106)  See Rhue v. Cheyenne Homes, 449 P.2d 361,363 (Colo. 1969)

The last previous word Grandes had heard on the miscellaneous minor matters had come on September 30, 2005, when the Association had only asked for plans showing them in their current condition – as distinguished from proposed revisions. (GCS, para. 105)  See Rhue v. Cheyenne Homes, 449 P.2d 361,363 (Colo. 1969).

As Mr. Chock, the ARC's previous Chair, explains:  It is common practice in homebuilding, including homebuilding within planned communities, to make minor revisions from approved plans during construction, and to then seek approval for the revisions once the home is completed, by showing them in the final as-built plans submitted along with notices of completion. (GCS, para. 103)

### III.  THE ASSOCIATION HAS GROSSLY MISSTATED THE BACKGROUND OF THIS ACTION.

The Association's moving papers are larded with wild accusations that Grandes disregarded demands, etc.  Aside from the fact that the Association's demands were illegitimate (there being no building envelope or storage space violations), its accusations are simply false.

The Association's allegations are not supported with admissible evidence, and are a study in vagueness and ambiguity. What, precisely, is the Association accusing the Grandes of constructing in disputed areas?

The actual facts, including the fact that the front setback area of Grandes' house was largely finished by October 30, 2003, are set forth in Grandes' concise statement supporting their counter-motion at paras. 109-123, and in the evidentiary materials cited therein.

## IV. THE ASSOCIATION'S EVIDENCE IS LARGELY INADMISSIBLE.

Another reason the Association cannot prevail on its present motions is that it has failed to present admissible evidence to support its allegations. See Grandes' Evidentiary Objections filed concurrently herewith.

Messrs. Awa and Kloetzel, at the end of their Declarations, indicate that much of what they are saying is based upon purported information and belief.

## V. CONCLUSION.

Summary judgment should be granted for Grandes, and the Association's summary judgment motion denied, for each and all of the foregoing reasons.

13

DATED: Honolulu, Hawai'i, June 8, 2006.

                                                  STEVEN B. JACOBSON
                                                  Attorney at Law
                                                  A Limited Liability Law Company

                                                  STEVEN B. JACOBSON
                                                  Attorneys for Defendants