STEVEN B. JACOBSON,
Attorney at Law
A Limited Liability Law Company

ORIGINAL

STEVEN B. JACOBSON    4117-0
 (sjacobson.law@hawaiiantel.net)
Post Office Box 240761
Honolulu, HI  96824-0761
Telephone:  (808) 377-1814

Attorneys for Defendants Anthony
Grande and Narindar Kaur Grande

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

JUN 0 8 2006

at ___11___ o'clock and __49__ min __P__ M
SUE BEITIA, CLERK

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| NA PALI HAWEO COMMUNITY ASSOCIATION, a Hawaii non-profit corporation,<br><br>          Plaintiff,<br><br>     v.<br><br>ANTHONY CHARLES GRANDE; NARINDAR KAUR GRANDE, and DOES,<br>          Defendants.<br><br><br>ANTHONY CHARLES GRANDE and NARINDAR KAUR GRANDE,<br><br>          Counterclaim Plaintiffs,<br><br>     v.<br><br>NA PALI HAWAO COMMUNITY ASSOCIATION; RONALD K. AWA; and DOES 1-25,<br><br>          Counterclaim Defendants | CIVIL NO. CV04-00413-DAE LEK<br><br>DEFENDANTS' CONCISE STATEMENT OF FACTS AS TO WHICH THERE IS NO GENUINE ISSUE IN SUPPORT OF COUNTER-MOTION; REQUEST FOR MANDATORY JUDICIAL NOTICE; DECLARATION OF OWEN CHOCK; DECLARATION OF EDWARD RESH; DECLARATION OF ANTHONY GRANDE; DECLARATION OF NARINDAR GRANDE; DECLARATION OF STEVEN JACOBSON; EXHIBITS A, B, D, O, Q, R and 1-18; CERTIFICATE OF SERVICE<br><br>Date:  June 26, 2006<br>Time:  9:00 a.m.<br>Judge:  Hon. David Alan Ezra |

DEFENDANTS' CONCISE STATEMENT OF FACTS AS TO WHICH THERE
IS NO GENUINE ISSUE IN SUPPORT OF COUNTER-MOTION

ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| NA PALI HAWEO COMMUNITY ASSOCIATION, a Hawaii non-profit corporation,<br><br>                Plaintiff,<br><br>        v.<br><br>ANTHONY CHARLES GRANDE; NARINDAR KAUR GRANDE, and DOES,<br>                Defendants.<br><br><br>ANTHONY CHARLES GRANDE and NARINDAR KAUR GRANDE,<br><br>                Counterclaim Plaintiffs,<br><br>        v.<br><br>NA PALI HAWAO COMMUNITY ASSOCIATION; RONALD K. AWA; and DOES 1-25,<br><br>                Counterclaim Defendants | CIVIL NO. CV04-00413-DAE LEK<br><br>DEFENDANTS' CONCISE STATEMENT OF FACTS AS TO WHICH THERE IS NO GENUINE ISSUE IN SUPPORT OF COUNTER-MOTION; REQUEST FOR MANDATORY JUDICIAL NOTICE; DECLARATION OF OWEN CHOCK; DECLARATION OF EDWARD RESH; DECLARATION OF ANTHONY GRANDE; DECLARATION OF NARINDAR GRANDE; DECLARATION OF STEVEN JACOBSON; EXHIBITS A, B, D, O, Q, R and 1-18; CERTIFICATE OF SERVICE<br><br>Date:  June 26, 2006<br>Time:  9:00 a.m.<br>Judge:  Hon. David Alan Ezra |

<u>DEFENDANTS' CONCISE STATEMENT OF FACTS AS TO WHICH THERE IS NO GENUINE ISSUE IN SUPPORT OF COUNTER-MOTION</u>

**Required Prelitigation Procedures:**

1) Na Pali Haweo's CC&Rs say "no
. . action to enforce *any* . . limitation,
restriction, covenant, condition, [or]
obligation . . may be made or taken
without first giving not less than thirty
(30) days' written notice and demand
to the Owner concerned to cure or
rectify the default or breach
involved."

Request for Mandatory Judicial
Notice [RFJN], para. 1-2; Ex. A, at
55-56.

2) For "correction of defects" in
"work," the CC&Rs first say that
owners are to "give written notice" to
the ARC "[u]pon the completion of
all framing for Improvements to be
constructed on any Lot and upon
completion of any construction . ."
whereupon the ARC "may inspect
such improvement to determine
whether it was constructed,
reconstructed, altered or refinished to
*substantial* compliance with final
plans."

RFJN, para. 1-2; Ex. A, at 46-47.

3) The CC&Rs then say that "If the
Owner shall have failed to remedy .
[any alleged *substantial*]
noncompliance upon the expiration of
thirty (30) days from the date of . .
notification [by the ARC], . . the
[ARC] shall notify the Board [of
Directors which] shall then set a date
on which a hearing before the Board
shall be held regarding the alleged
noncompliance."

RFJN, para. 1-2; Ex. A, at 47.

4) "Notice of the hearing date shall
be given . . to the Owner . ." "At the

RFJN, para. 1-2; Ex. A, at 47.

hearing, the Owner, the [ARC] and, in the Board's discretion, any other interested person may present information relevant to question of the alleged noncompliance."

5) "After considering all such information, the Board shall determine whether there is noncompliance and, if so, the nature thereof and the estimated cost of correcting or removing the same. If a noncompliance exists, the Board shall require the Owner to remedy or remove the same within a period of not more than forty-five (45) days from the date of the Board ruling."

RFJN, para. 1-2; Ex. A, at 47.

6) Only after the expiration of compliance period is the Association allowed to take further action.

RFJN, para. 1-2; Ex. A, at 47.

7) Grandes never received a prelitigation notice of "substantial" noncompliance from the ARC. At most, the ARC sent Mr. Grande a notice of noncompliance only covering an alleged inadequacy in storage space, without a finding on substantiality. Otherwise the ARC only sent them responses to proposed compromises and a variance request.

Anthony Grande Declaration [AGD], para. 6; Narindar Grande Declaration [NGD], para. 6; see Association [A] Exs. I, K, L, O-R, *passim*; see also A Exs. S, U, W, X and Z [Association communications], *passim*.

8) Grandes never received notice of a hearing on alleged noncompliance before the Association's Board of Directors, or of an opportunity to present information to the Board at such a hearing.

AGD, para. 7; NGD, para. 7.

2

9)    Grandes never received notice of any determination of noncompliance by the Board following such a hearing, any determination by the Board of the steps necessary to achieve compliance following such a hearing, or any determination by the Board of the costs of any proposed steps.

AGD, para. 7; NGD, para. 7.

10)  To Grandes' knowledge, the Board never gave notice of such a hearing, never conducted such a hearing, and never made any determinations of desired remedial steps or their estimated costs following such a hearing.

AGD, para. 8; NGD, para. 8.

11)  When Mrs. Grande sought to attend an ARC meeting in November 2003, at which their home would be discussed, she was told that ARC Chair Awa did not like owners attending, and would not allow "wives" to attend "because they are too emotional."

NGD, para. 24.

12)  The only written demands Grandes received thirty days or more before the Association filed this action, which concerned the purportedly "non-compliant" items alleged herein, involved the "front set back," "second floor balcony columns," "front roof section above the garage," and "interior garage storage." They received no written demand with respect to any of the other items raised in this action.

AGD, para. 9; NGD, para. 9; Jacobson Declaration, [JD], para. 7; A Exs. R and U, *passim*; see also A Exs. W, X and Z, *passim*.

3

**The Three Building Envelope Allegations (setback, balcony columns and front roof):**

13) Grandes' purchase contract says that certain of the lots in the development have height limitations, but not theirs.

AGD, para. 5; NGD, para. 5; Ex. 9.

14) The CC&Rs say "[A]pprovals . . by the [ARC] . . are . . as to style, design, appearance, location and/or compliance with this Declaration."

RFJN, para. 1-2; Ex. A, at 49, para. 9.14.

15) On October 17-24, 2000, the ARC approved a "building envelope" set back *10'* from Grandes' front property line and rising above their proposed home.

Ex. D, at A-1, D-3; A Ex. F.

16) Grandes' home as constructed is set back more than 10' from the front property line, and thus is within the "building envelope" approved by the ARC.

Ex. D, at D-3; A Ex. F; A Ex. T, para. 1 and Att. 1-2 (clouded areas); Resh Declaration [RD], para. 2.

17) As constructed, the heights of the second floor balcony columns and the front roof section above the Grandes' garage are within the "building envelope" approved by the ARC too.

Ex. D, at D-3; A Ex. F; A Ex. T, Att. 2.

18) The Association contends it's not bound by the ARC's October 2000 approval of the building envelope starting 10' from Grandes' front property line because it differs from a "typical" building envelope as described in the Design Guidelines for Na Pali Haweo.

JD, para. 5; Ex. 5, at A-1 & 2.

4

19)  The Association does not dispute that the ARC has the power to grant variances from "typical" front setbacks.

A Ex. N, O (at 1, last para.), P (para. 1), Q (para. 1), R (para. 1), S (next to last para.), and W (at 2, last para.).

20)  The Association disputes whether the ARC has the power to grant variances from "typical" height setbacks.  By letter dated October 29, 2003, when the front of Grandes' home and the roof over it were already in place, the ARC said: "Please note that the Na Pali Haweo *Board of Directors* just ruled at their October 27, 2003 Board meeting that *the ARC does not have the power* to grant height setback variances at Na Pali Haweo."

Ex. O, at 2; TGD, para. 10; NGD, para. 10; Ex. 10 (10-30-03 photograph).

21)  The CC&Rs say "*The Architectural Committee* may . . . authorize variances from compliance with *any* of the Design Guidelines . ." The only substantive restriction on variances in the CC&Rs is that "no variance shall . . . (b) be contrary to the restrictions set forth in the body of this Declaration . ."

RFJN, para. 1-2; Ex. A, at 17.

22)  There are no restrictions on building setbacks or heights in the body of the CC&Rs, which say as to view channels, "*Except for residential construction variances granted by the Architectural Committee*, the area above the view plane shall constitute a view easement . . neither the Declarant nor the Association guarantees any obstructed view."

RFJN, para. 1-2; Ex. A, at 15.

23) The CC&Rs say that only the Developer or 75% of the Association's members can amend the CC&Rs, and that the Developer cannot enact amendments with "material adverse effect upon any right of any Owner."

RFJN, para. 1-2; Ex. A, at 54.

24) The Design Guidelines say "The guidelines express 'intentions' rather than 'absolutes' . ." "These Design Guidelines establish . . concept and general guidelines . . The sketches and graphic representations contained herein are to be used as general visual aids in understanding the basic intent of the guidelines and are not meant to depict any actual lot or building design."

AGD, para. 4; NGD, para. 4; Ex. B, at 1.

25) The Guidelines on building envelopes describe those pictured and described therein as merely "typical".

AGD, para. 4; NGD, para. 4; Ex. B, at 12.

26) The Guidelines do not say whether the "typical" building heights pictured therein are measured from "existing grade" (lot elevation prior to grading) or "finish grade".

AGD, para. 4; NGD, para. 4; Ex. B, at 11-13, see also at 3 (defining existing grade).

27) If measured from "existing grade," the front height of Grandes' home as constructed is within the "typical" building envelopes pictured in the Guidelines, as well as the building envelope approved by the ARC.

RD, para. 3.

28) If measured from "finished grade," as viewed from Moribes'

RD, para. 4.

adjacent house (uphill neighbor), the front height of Grandes' home as constructed would be within the "typical" building envelopes described in the Guidelines if soil were built up along that side to restore the "existing grade".

29) The 3½" "discrepancy" from a "typical" setback is not material to the appearance of Grandes' home, or to Moribes' view, and it would be expensive to move Grandes' home back 3 ½". Grandes' exterior is cement block rather than merely wood.

Chock Declaration [CD], para. 4-5; TGD, para. 10; NGD, para. 10; Ex. 10 (10-30-03 photograph).

30) There are other homes in Na Pali Haweo within 20' of their owners' front property lines, or appearing to possibly be within 20'.

CD, para. 6-7; Ex. 1.

31) On May 31, 2006, the Association "accepted" a compromise proposal by Grandes insofar as it dealt with the front height, although rejecting the proposal as a whole.

JD, para. 5; Ex. 5, at B-1, Item 2.

32) That part of the proposal did not differ materially from the compromise front height proposal the ARC rejected on January 28, 2004.

RD, para. 12; compare Ex. 5, at B-1, Item 2, with Ex. Q, at 2, and Ex. R, at 2.

**The Garage Storage Allegation:**
33) The CC&Rs say "*Nothing contained herein shall be construed to limit the right of an Owner to remodel or redecorate the interior of structures comprising a lot in any manner desired.*" The only limitation

RFJN, para. 1-2; Ex. A, at 10.

is that "modifications or alterations to
. . portions of the lot visible from
outside the Lot shall be subject to
approval."

| | |
|---|---|
| 34)    The Design Guidelines say "in the event of any conflict . . the CC&Rs shall control." | AGD, para. 4; NGD, para. 4; Ex. B, at 1. |
| 35) The interiors of garages are not "visible from outside the lot" for purposes of the CC&Rs, which say "Garage doors visible from any street within the Project shall remain closed except during ingress and egress or when the garage is being actively used . ." The Design Guidelines add "All garages must be fully enclosed and have automatic roll-up doors." | RFJN, para. 1-2; Ex. A, at 13; AGD, para. 4; NGD, para. 4; Ex. B, at 16. |
| 36) The CC&Rs also say "Garages shall be used only for the parking or repair of personally owned motor vehicles, storage and workshop purposes. ." | RFJN, para. 1-2; Ex. A, at 13. |
| 37) The Design Guidelines say that "Every garage . . . shall contain not less than an additional one hundred (100) square feet of enclosed and covered area for *service and* storage facilities. ." They do not specify how high or how many cubic feet of "service and storage" space there "shall" be. | AGD, para. 4; NGD, para. 4; Ex. B, at 16. |
| 38)  In its dealings with Grandes, the ARC has applied the Guideline as if it called for 100 square feet of only | A Exs. K, L, P (at 2), Q (at 2), R (para. 2a&b), T (para. 10). |

storage area. The ARC has also
applied the Guideline as if it called for
entirely separate storage rooms or
separate storage cabinets in their
garage.

39) The Association's proposed
expert says that under that Guideline,
the toilet and heater room within
Grandes' garage count toward the 100
square feet as service area.

A Ex. T, para. 10.

40) The Guideline provision for an
"enclosed and covered area for
service and storage facilities" means
only that such facilities, like garages
themselves ("fully enclosed"), must
be indoors rather than outdoors.

CD, para. 9.

41) The ARC did not require separate
rooms or storage cabinets between
1993 and at least 2000.

CD, para. 8.

42) The toilet and heater room is 7'4
by 6', or 44 square feet. The washer-
dryer-sink area within the garage,
with a shelf over it, is an additional 19
½ square feet (6'6" by at least 3').
There is far more than an additional
36 ½ square feet of area in the garage
for storage.

RD, para. 11, 13; Ex. 4, at A-2 (left
side).

43) The Association has rejected
compromise offers by Grandes, most
recently on May 31, 2006, to build a
minimum of 44 square feet of storage
cabinets, and utilize additional square
footage within the garage for storage,
to meet the Guideline (if enforceable).

JD, para. 4-5; RD, para. 11, 13; Ex. 4,
at 1 and A-2 (left side); Ex. 5, at B-3,
Item 10.

.

**Allegations Which Were Not Made in the Association's Prelitigation Demands:**

44) The Association's Complaint included allegations of purported "violations" which had not been the subject of its previous demands, concerning roof vents, skylights, the wall at the very front of the lot, and "roof ridges, hips and/or valleys."

Complaint, para. 15-25; compare A Exs. R and U (at 1); see also A Exs. W, X and Z.

45) Grandes' response to the Association and this Court, filed September 27, 2004, said, "Grandes are not sure whether the vents on the house differ from those depicted on page A.6. of their approved plans, and are willing to have them painted whatever other color (if any) is necessary for compliance." "If the contractor in fact installed skylights of an unapproved and improper color or an unapproved and improper design, Grandes will have them replaced." "Grandes are willing to remedy any actual fence-wall violations at the front of the lot." "As to unspecified 'roof ridges, hips and/or valleys' which allegedly "deviate from plans approved by the ARC and/or which violate the Governing Documents,' Grandes don't know what the Association is referring to."

Grande Memorandum filed 9-27-04, at 11-12 (attached as Ex. 11); Anthony Grande Declaration filed 9-27-04, para. 31-35 (attached as Ex. 12).

46) On or shortly after March 22, 2005, after this action had been stayed for settlement discussions, the Association presented Grandes with Association Exhibit T, alleging even more purported "violations."

A Ex. T.

47)  With respect to the additional allegations in the Complaint and in Exhibit T, Grandes never received notice of a hearing on alleged noncompliance before the Association's Board of Directors, or of an opportunity to present information to the Board at such a hearing.  Grandes never received notice of any determination of noncompliance by the Board following such a hearing, any determination by the Board of the steps necessary to achieve compliance following such a hearing, or any determination by the Board of the costs of any proposed steps. To Grandes' knowledge, the Board never gave notice of such a hearing, never conducted such a hearing, and never made any determinations of desired remedial steps or their estimated costs following such a hearing.

AGD, para. 6-8; NGD, para. 6-8.

48)    On September 30, 2005, the Association and Grandes reached an interim agreement indicating what the Association then wanted Grandes to do.  It wanted (1) some items changed, (2) some items merely to be shown on as-built plans ("The Grandes shall submit plans that show the subject item in its current condition"), and (3) nothing whatsoever done with respect to two items ("The Grandes will not be required to show on the revised plans movement of the front wall of the garage to address the front setback . . however, . . the Association reserves

AGD, para. 11; NGD, para. 11; Ex. 13.

. rights . ."  "The Grandes will omit the front gate from the plans").

49)  Although settlement negotiations broke down later in December 2005, Grandes nonetheless went ahead and replaced their bubble skylights with flat ones, painted their frames red like their roof, moved and painted the roof exhaust vents, put a lattice work screen around their conditioner, and replaced their front light fixtures with ones covering the bulbs.  All such work was completed prior to April 12, 2006, when the Association filed its summary judgment motion.

AGD, para. 10, 14; CD, para. 14; Ex. 3, 7.

50)  The Association was aware of that work.  Mr. Yee of the ARC is Grandes' next-door neighbor.

A Ex. AA (top photo showing flat skylights); AGD, para. 1; NGD, para. 1; JD, para. 6; Ex. 14.

51)  Grandes also went ahead and had their architect prepare plans showing the as-built items the Association wanted as-built plans for, and proposed revisions of other items including their front wall.  Mr. Grande had asked their architect to prepare the plans in December 2005, and the final version of the plans was in the process of being approved by Grandes in Florida (where Grandes now live after a job transfer), having been completed on April 8, 2006, when the Association filed its surprise motion for summary judgment on April 12, 2006.

RD, para. 10-11; AGD, para. 1, 13; NGD, para. 1; Ex. 4.

52)  The Association had served a document request and sets of interrogatories on March 30, 2006, but then filed its motion for summary judgment before receiving any responses.

Certificates of Service filed March 30 and May 1, 2006.

53)  On May 31, 2006, the Association responded to Grandes' as-built and proposed plans of April 2006.  The Association's new responses differ from its previously-expressed desires in that, *inter alia*, (1) the Association raised new and different objections to the skylights, roof exhaust vents and air conditioner screening; (2) the Association "disapproved" many minor items it had merely wanted shown on as-built plans before; and (3) the Association "disapproved" both the alleged 3 ½" front setback discrepancy and the absence of the front gate.

JD, para. 5; Ex. 5; compare Ex. 13.

54)  Grandes did not receive notice of a hearing before the Association's Board of Directors on the new allegations of noncompliance, or of an opportunity to present information to the Board at such a hearing.  Grandes never received notice of any determination of noncompliance by the Board following such a hearing, any determination by the Board of the steps necessary to achieve compliance following such a hearing, or any determination by the Board of the costs of any proposed steps. To Grandes' knowledge, the Board never

AGD, para. 7-8; NGD, para. 7-8.

gave notice of such a hearing, never
conducted such a hearing, and never
made any determinations of desired
remedial steps or their estimated costs
following such a hearing.

**Skylight Allegations:**

55) Most skylights within Na Pali
Haweo are of the bubble type,
including those of the Association's
secretary-treasurer, Everett McDaniel.

CD, para. 21-22; Ex. 6-7; JD, para. 6;
Ex. 14; RFJN, para. 4.

56) The Association agrees that
Grandes' skylights are flat.

JD, para. 5; Ex. 5, at B-1, item 3.

57) Grandes' roof is multiple shades
of red. The frames around their
skylights are red.

CD, para. 14, 22; AGD, para. 10; Ex.
3, 7, 10.

58) The Association's response of
May 31, 2006, says that it "may"
"approv[e]" Grandes' skylights if
their frames are painted "to match
color of roof tile," if "exposed lead
flashing" is "paint[ed] to match roof
tile," and if it approves the
"manufacturer's brochure or similar
product information for skylights."

JD, para. 5; Ex. 5, at B-1, item 3.

59) Grandes' painter repainted their
skylight frames a different shade of
red, including any lead flashing
missed before, after Grandes received
the response of May 31, 2006.

AGD, para. 10, 15; CD, para 14, 22;
Ex. 3, 7, 10.

60) There are two other homes in Na
Pali Haweo with flat skylights. There
is less contrast in shades of red
between Grandes' multi-red-shade
roof and their skylight frames, than

CD, para. 22; Ex. 7.

there is the other homes' shades of grey/black and green.

61) Grandes' skylights are on one of their side facing-roofs. They are not "facing the street" for purposes of Design Guideline 3.2.3(i), which says that "skylights facing the street shall be . . subject to the approval of the Architectural Review Committee."

CD, para. 20; A Ex. T, Att. 3; A Ex. AA, top picture; AGD, para. 4; NGD, para. 4; Ex. B, at 16.

**Air Conditioner Screening Allegation:**

62) The much larger backyard air conditioner of Grandes' downhill next-door neighbor, Ron Yee, a member of the ARC, is completely unscreened, as is the side air conditioner at 1309 Kamehame.

CD, para. 25; AGD, para. 1; RFJN, para. 3, 6; Ex. 8.

63) The Association's allegation of March 22, 2005, was that "Air conditioning equipment is exposed at the rear yard, with no fence or earth embankment screening."

A Ex. T, item 4.

64) On September 30, 2005, Mr. Klotzel, the project manager for Na Pali Haweo's managing agent, orally advised Grandes that a lattice work screen around their air conditioner would meet the Association's desire.

AGD, para. 12; NGD, para. 12.

65) The Association agrees that Grandes' air conditioner has a lattice screen around it.

JD, para. 5; Ex. 5, at B-1, item 4.

66) The Association's response of May 31, 2006, says that "Lattice work

JD, para. 5; Ex. 5, at B-1, item 4.

*fencing* is prohibited . . [under]
Design Guideline . . § 3.2.7."  It also
says that Grandes air conditioner
"must be . . insulated for sound
attenuation."

67) Design Guideline 3.2.14 provides
for air conditioning to be "screened"
from view and does not use the word
"fence."

AGD, para. 4; NGD, para. 4; Ex. B, at
18.

68)    The screening Grandes have
installed around their air conditioner
is a "screen" as distinguished from a
fence.

CD, para. 14, 23; Ex. 3.

69)    Mr. Grande is presently
attempting to determine the sound-
suppressing features of their air
conditioner.  The Association did not
raise the question of sound
suppression until May 31, 2006.

AGD, para. 15; see A Ex. T;
Complaint, *passim*.

**Roof Exhaust Vent Allegations:**
70) The Association's allegation of
March 22, 2005, was that "Roof
exhaust vents (two) are natural
aluminum finish instead of a color
matching the roof material and are
visible from the street."

A Ex. T, item 5.

71) The Association's response of
May 31, 2006, agrees that "Grandes
installed two replacement vents," does
not dispute that their color matches
Grandes' roof, and does not dispute
that the new vents do not face the
street.

JD, para. 5; Ex. 5, at B-1, item 5.

72) The Association's response of

JD, para. 5; Ex. 5, at B-1, item 5.

16

May 31, 2006, says that it has
"disapproved" the new vents as not
"reflect[ed]" in the April 2006 as-built
plans, and wants to approve "the
manufacturer's brochure or similar
product information for vents."

| | |
|---|---|
| 73)  The location of the roof exhaust vents is shown on page A-9 of the as-built plans submitted to the ARC in April 2006. | CD, para. 26; JD, para. 4; Ex. 4, at A-9. |
| 74)  The Design Guideline for roof vents does not provide for ARC approval of manufacturer's brochures or product information.  It says "All vents . . must be colored to match the roof . . from which they project, must not be visible from the street, and are to be grouped so as to minimize roof penetrations." | AGD, para. 4; NGD, para. 4; Ex. B, at 15. |

**Front Garage Gate Allegation:**

| | |
|---|---|
| 75)  The Association's allegation of March 22, 2005, is "Sliding garage gate is missing leaving double wall receptor exposed." | A Ex. T, item 6. |
| 76)  The Association demanded that Grandes cease construction in the front setback area on January 28, 2004, March 4, 2004, and May 25, 2004. | A Ex. S, U, W. |
| 77)  The parties interim agreement of September 30, 2005, said "The Grandes will omit the front gate from the plans". | AGD, para. 11; NGD, para. 11; Ex. 13, item 6. |

78) Grandes have not completed the construction of their house because of the Association's demands.

AGD, para. 16

**Front Entry Light Fixture Allegation:**

79) The Association's response of May 31, 2006, says that it has "approved" Grandes' front entry light fixtures.

JD, para. 5; Ex. 5, at B-2, item 7.

**Front Garden Wall Allegations:**

80) The Association's allegation of March 22, 2005, was that "Portions of the garden wall at the front property line exceed the height indicated on approved drawings and as permitted by Design Guidelines."

A Ex. T, item 8.

81) Grandes' plans submitted to the ARC in April 2006 provide for a reduction in the height of the wall.

JD, para. 4; Ex. 4, at A-1, both sides.

82) The Association's response of May 31, 2006, says that it has "disapproved" Grandes' proposal because "Plans do not clearly indicate how Grandes' will modify wall. Sheet A-1 front wall elevation simply shows a dashed line above the garden wall with no other description or notation concerning the alteration."

JD, para. 5; Ex. 5, at B-2, item 8.

83) Sheet A-1 of the April 2006 plans specifies that Grandes' front garden wall will be lowered to an elevation of 583.3 tow (top of wall) on the left side as viewed from the street, and 583.0 to 578.5 tow (top of wall) on the right side.

CD, para. 27; JD, para. 4; Ex. 4, at A-1, right side.

84) As measured by the Association's surveyor, the elevation at the bottom of the front garden wall is between 579.82 and 580.55 on the left side, and between 577.78 and 575.2 on the right side. The lowered front wall, as proposed, thus would be no higher than 5.22 feet.

A Ex. T, Att. 1 (same area).

85) Design Guideline 3.2.7(a) says "No garden wall . . built within the setback areas . . shall have an exposed face higher than six feet (6') from existing grade."

AGD, para. 4; NGD, para. 4; Ex. B, at 17.

**Front Roof Allegations:**

86) The Association's allegation of March 22, 2005, was that "the roof over the entry and the roof over the master bedroom are not separate and distinct elements as shown in the [approved plans]."

Ex. T, item 9.a.6.

87) There is no difference between the front roofs as-built and the front roofs as-drawn-and-approved.

CD, para. 10-12; Ex. 2; A Ex. T, Att. 8 (top drawing) & Att. 11 (compare bottom of both drawings).

88) The photograph the Association has submitted as Attachment No. 8 to Exhibit T is misleading because it is taken from a low angle, from which only the edges of the front roofs as-built can be seen.

CD, para. 11-12; Ex. 2

89) When viewed from the same angle as they were drawn, the front roofs are separate and distinct, and are the same as in the approved drawing.

CD, para. 10-12; Ex. 2; A Ex. T, Att. 8 (top drawing) & Att. 11 (compare bottom of both drawings).

**Front Eyebrow Roof Allegation:**

90)  The Association's allegation of March 22, 2005 is that "Roof eyebrow above the garage is missing."

Ex. T, item 9.a.1.

91)  The eyebrow roof above the garage, as approved by the ARC in October 2000, would jut out within 20' of the front setback area.

Ex. D-3

92)  The Association demanded that Grandes cease construction in that area on January 28, 2004, March 4, 2004, and May 25, 2004.

A Ex. S, U, W.

93)  Grandes have repeatedly said that they will have the front eyebrow roof constructed once the Association agrees that they may do so.

AGD, para. 11; NGD, para. 11; Ex. 13, item 9.a.1.6; JD, para. 4; Ex. 4, at 1.

94)  The Association's response of May 31, 2006, says "plans do not indicate [eyebrow] roof slope or roofing material to be used."

JD, para. 5; Ex. 5, at B-2, item 9.a.1.

95)  The April 2006 plans specify "'Monier' tile roofing for the eyebrow.

CD, para. 28; JD, para. 4; Ex. 4, at A-2, right side.

96)  The April 2006 plans show the slope and angle.  They also show that the front eyebrow roof will jut out 2'2½" from the front of the garage.

JD, para. 4; Ex. 4, at A-2, right side, and A-3, top drawing.

97)  The Design Guideline for "typical" building envelopes says "Roof overhangs may protrude not more than 2 ½ feet outside the envelope . ."

AGD, para. 4; NGD, para. 4; Ex. B, at 11.

**Concrete Trash Pad Allegation:**

98)  The Association's allegation of March 22, 2005, is "The concrete pad in the trash area as noted in the approved submitted drawings is missing . ."

A Ex. T, item 11.

99)  The concrete pad in the trash area was poured and has been in the approved location since approximately October 2003.

AGD, para. 17; Ex. D, at A-1; see CD, para. 15; Ex. 3.

100)  Attachment No. 5 to Association Exhibit T is not a picture of the location specified for the concrete trash pad, which is further to the left and behind the wall in the picture.

CD, para. 16; see Ex. D, at A-1.

**The Other New Allegations of March 22, 2005:**

101)  The Association's other new allegations of March 22, 2005, concern a) the squaring off of the corners of Grandes' garage door opening, b) the substitution of a decorative window for an arched "celestory" window above the front entry door, c) an alleged "lowering" of the front living room windows, d) the deletion of planter boxes from the front porch, e) an alleged and unspecified modification of the location of front stair railings, f) the moving out of the back corner of the house and a resultant slight change to the roofline, g) substituting a regular window for a picture window in the back corner bedroom, h) "lowering" of the side living room windows

A Ex. T incl. Att. 8-11, 13.

(moving the lower of the two openable windows up, so that it is beneath the upper openable window), i) "deletion" of the side decorative panel (moving it to above the front door), j) "revision" of the master suite windows, and k) substituting a solid wall of the same height for a metal railing on the side of the front balcony.

102)  It is common practice in homebuilding, including homebuilding within planned communities, to make minor revisions from approved plans during a home's construction, and to then seek approval for the revisions once the home is completed, by showing them in the final as-built plans submitted along with the notice of the home's completion.

CD, para. 17-18; RD, para. 15; see AGD, para. 18; NGD, para. 18.

103)  All of these modifications are minor, are fully consistent with the design and aesthetics of other homes in Na Pali Haweo, and are not substantial deviations from Grandes' plans as approved by the ARC.

CD, para. 18, 29; RD, para. 16.

104)    The reasons for the modifications included privacy (the original location of the master suite windows gave Moribes a view into Grandes' bed and bathroom, the other windows gave a view of Mrs. Grandes' child-nursing room), preservation of the view (the original location of the openable windows put window frames across Grandes'

AGD, para. 19; NGD, para. 19.

ocean view), and child safety (reducing the open railings on the second-story).

105) As to these items, the interim agreement of September 30, 2005, said "The Grandes shall submit plans that show the subject item[s] in [their] current condition".

AGD, para. 11; NGD, para. 11; Ex. 13.

106) The Association's response of May 31, 2006, now says that they are "disapproved," but does not state any reasons or give any explanations.

JD, para. 5; Ex. 5, at B-1 through B-3.

107) Moving out the back right corner of Grandes' home added 56 square feet of floor space (14' x 4'), and eliminated a kink in their roof.

RD, para. 17; compare Ex. D, at D-1 and D-7, with A Ex. T, at Att. 1 (back corner of house) and Att. 11.

108) Page 10 of the Design Guidelines for Na Pali Haweo says that "roofs should be simple hip or gable forms with low to medium roof pitches," and is illustrated with straight roofs without kinks as a model designs.

AGD, para. 4; NGD, para. 4; Ex. B, at 10.

**Other Matters:**
109) On August 29, 2003, Grandes were told "The ARC Chairman made a site inspection on 8/15/03 to check on the construction in question, and notes that construction appears to be in conformance with approved plans and building setbacks and height envelopes."

A Ex. K

110)    On or about October 16, 2003, Mr. Yee of the ARC asked us to cooperate with the Association by seeking a variance for their house as built, and assured them that a variance would be granted.

AGD, para. 21; NGD, para. 21

111)    Mr. Yee later told Grandes that he was not aware of any ARC meeting having taken place before the letter of October 29, 2003, was sent to them, and was not aware of any ARC decision upon the matters stated therein.

AGD, para. 22; NGD, para. 22.

112)    By October 30, 2003, construction near Grandes' front setback area was essentially completed, and no construction was done in that area for several months afterwards.

AGD, para. 10, 27, 29, 31, 33-34; NGD, para. 10; Exs. 10, 15, 18.

113)    Although the Board's notice of January 28, 2004, said "The ARC requires that all construction on non-compliant portions of the home cease immediately," Grandes could not tell what the Association was talking about, because there had been no construction in the front setback area since October 30, 2003 or earlier.

AGD para. 10, 27; NGD, para. 10; Exs. 10, 15.

114)    The ARC's letter of January 28, 2004, asked Grandes to submit "revised plans," but did not say whether the "revised plans" should show proposed changes in the front roof based upon a 19'-8 ½" front setback, or a 20' front setback.

A Exs. R & S; see AGD, para. 28.

115)    When Mr. called ARC Chair Awa to ask him, Awa refused to talk to him.

AGD, para. 28.

116)    The Association's attorneys' demand letter of March 4, 2004, demanded that work stop in "noncompliant areas" without specifying what work it was referring to. It demanded revised plans "which address each of the issues and/or deficiencies discussed in the January 28, 2004 letter . . . excluding the front setback issue which is under consideration by the Board."

A Ex. U.

117)    If the Association later decided to deny Grandes' compromise request for a variance relating to the front setback, that would have required another new set of plans, because the building envelope question included both the front setback and the front height.

AGD, para. 30.

118)    Grandes' contractor stopped work and refused to complete any more construction in early March 2003. He had not done any work in the front setback area after October 30, 2003. Grandes have paid him $539,202.58 for the work he performed and the materials he provided.

AGD, para. 27, 31; Exs. 10, 15.

119)    On May 4, 2004, Grandes' recently retained attorney asked that the Association say something on the front setback question as soon as possible, adding "It would be a waste

AGD, para. 32; Ex. 16.

of everyone's time and resources for another set of plans to be submitted to the ARC now, only to find out later that those plans would have to be revised once again in light of the board's decision. The applicable declaration and design guidelines themselves contemplate that plan submissions be as complete as possible, rather than being done piecemeal."

120)    By mid-May 2004, Grandes we were faced with multiple dilemmas.  The CC&Rs provided that they were to keep their garage door closed, as did security and aesthetic concerns, but their garage doors had not been installed.  Also, the roof over the front of their house had been ProtectoWrapped and exposed to sunlight and weather since October 2003, the front concrete blocks remained unfinished and exposed to the weather.  The specifications for the ProtectWrap said "Rainproof TM roofing underlayment must be covered with finished roofing materials within 30 days," and "This membrane is not intended for permanent exposure to sunlight."

RFJN, para. 1-2; AGD, para. 10, 33; Ex. A, at 13; Ex. 10, 17.

121)    Mr. Grande paid $1,250 for having the roof tiles and shingles installed on May 20, 2004, and $5,000 for having the front stuccoed over on May 24, 2004.

AGD, para. 34.

| | |
|---|---|
| 122)  Grandes could not promise to provide revised plans within 24 hours after seeing the Association's attorneys' letter of May 25, 2004, because of their architect's severe health problems. | AGD, para. 35; RD, para. 19 |
| 123)     Mr. Grande paid $1,366.66 on June 1, 2004, and $1,366.66 on August 30, 2004, to have the garage doors installed. | AGD, para. 34; Ex. 18 |

DATED:  Honolulu, Hawai'i, June 8, 2006.

STEVEN B. JACOBSON
Attorney at Law
A Limited Liability Law Company


STEVEN B. JACOBSON
Attorneys for Defendants

28