## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| NA PALI HAWEO COMMUNITY ASSOCIATION, a Hawaii non-profit corporation, | CIVIL NO. CV04-00413-DAE LEK |
| Plaintiff, | DECLARATION OF ANTHONY GRANDE |
| v. | |
| ANTHONY CHARLES GRANDE; NARINDAR KAUR GRANDE, and DOES, | |
| Defendants. | |
| | |
| ANTHONY CHARLES GRANDE and NARINDAR KAUR GRANDE, | |
| Counterclaim Plaintiffs, | |
| v. | |
| NA PALI HAWAO COMMUNITY ASSOCIATION; RONALD K. AWA; and DOES 1-25, | |
| Counterclaim Defendants | |

## DECLARATION OF ANTHONY GRANDE

Anthony Grande declares as follows:

1.      I am one of the Defendants in this action.  Defendant Narindar

Grande is my wife.  Our uphill next-door neighbors on Kamehame Drive were Mr.

and Mrs. Moribe. Our downhill next-door neighbors were Ron Yee and his wife. We understood that Mr. Yee was and is a member of Na Pali Haweo's ARC. We are currently Florida residents, because of a job transfer. I have personal knowledge of the facts in this Declaration.

2. I am an airline pilot. My background is in aviation. I did not have any experience in homebuilding or dealing with homeowners associations before we purchased our lot in Na Pali Haweo.

3. Exhibit A hereto is a true and correct copy of excerpts from the Na Pali Haweo CC&Rs, as provided to us when we purchased our lot.

4. Exhibit B hereto is a true and correct copy of excerpts from Na Pali Haweo's Design Guidelines, as provided to us when we purchased our lot.

5. Exhibit 9 hereto is a true and correct copy of excerpts from our purachase contract for our lot.

6. I did not receive a notice of "substantial" noncompliance from the ARC before being sued by the Association, or before its presentation of Exhibits T and 5.

7. I have never received notice of a hearing on alleged noncompliance before the Association's Board of Directors, or of any opportunity to present information to the Board at such a hearing. Nor have I ever received notice of any determination of noncompliance by the Board following a hearing at which I had

an opportunity to present information, of any determination by the Board of the steps necessary to achieve compliance following such a hearing, or of any determination by the Board of the costs of any proposed steps.

8.    To the best of my knowledge, the Board has never given notice of such a hearing, never conducted such a hearing, never made any determinations of desired remedial steps at such a hearing, and never made any determinations of the costs of such steps following such a hearing.

9.    The only demands I received from the Association before being sued were Association Exhibits S and U.

10.    Exhibit 10 consists of true and accurate photographs of our home as of the dates indicated thereon (where dates are indicated), or as of now (if no date is indicated).

11.    Exhibit 13 is a true and correct copy of an interim agreement signed in Magistrate Judge Kobayashi's chambers on September 30, 2005, indicating what the Association wanted us to do at that time.

12.    While meeting on that date, we asked what kind of screening the Association wanted around the air conditioner.  Mr. Kloetzel advised that a simple lattice screen would be sufficient.

13.    Although settlement negotiations were breaking down by early December 2005, and although they broke down later in December 2005, I asked

our architect, on December 6, 2005, to prepare as-built plans as the Association wanted, with the exceptions explained in our later cover letter to the ARC of April 14, 2006 (Ex. 4).  Because of reported health-related issues, I did not receive a draft of the requested plans until late March 2006.  After reviewing them, I asked that certain corrections be made.  I received corrected plans soon after April 8, 2006 (the date on them), reviewed and approved them, and directed my attorney to have them delivered to the ARC with our letter of April 14, 2006 (Ex. 4).

14.    Although most skylights within Na Pali Haweo are bubble, I went ahead in January 2006 and arranged to have ours replaced with flat ones.  I also arranged to have the frames around them painted red like our roof, to have our exhaust vents moved and be the roof color, to have a lattice work screen placed around the backyard air conditioner, and to have the front light fixtures replaced.  Although there were delays because of the heavy winter rains in Hawaii, and reported difficulties in scheduling workers and obtaining flat skylights, all such work was completed by late March 2006.

15.    After receiving the Association's response of May 31, 2006, I arranged to have the skylight frames painted a different shade of red, and to have any flashing the painter missed before covered.  I am currently trying to obtain information on the sound suppressing features of our air conditioner.

16.    We have not yet finished the construction of our home because of the Association's demand that we cease all construction in the front setback area.

17.    The concrete floor of the trash area was poured and has been there since around October 2003.

18.    It was and is my understanding that minor changes from original plans can be made while a home is being built, without stopping construction to obtain permission.  My understanding was and is that minor changes can be reported when the home is finished.

19.    The concerns motivating the modifications included privacy (the original location of the master suite windows gave Moribes a view into our bed and bathroom, the other bedroom window gave a view of my wife's child-nursing room), preservation of the view (the original location of the openable living room windows put window frames across our ocean view), and child safety (reducing the open railings on the second-story).

20.    Shortly after August 29, 2003, after we learned that Mr. and Mrs. Moribe had complained about the front setback and front height of our house, I received Mr. Klotzel's letter of that date.  (Association Exhibit K)  Mr. Kloetzel's letter advised me that "The ARC Chairman made a site inspection on 8/15/03 to check on the construction in question, and notes that construction appears to be in conformance with approved plans and building setbacks and height envelopes."

21.    After the meeting at our lot on October 16, 2003, our downhill neighbor at 1243 Kamehame Drive, Ron Yee, asked us to cooperate with the Association by seeking a variance from Na Pali Haweo's ARC – of which he was and is a member – for our house as built. He assured us that a variance would be granted. We did not believe that we needed a variance, but asked our architect to apply for one anyway, because we wanted to cooperate. Our architect also submitted compromise proposals, in an attempt to make everyone happy. We did not want to have hostile neighbors.

22.    Despite Mr. Yee's assurance, our variance request was partially denied and partially deferred, as reflected in Association Exhibit O dated October 29, 2003, which took the position that height setback variances could not be granted. Mr. Yee later told me that he was not aware of any ARC meeting having taken place before the letter of October 29, 2003, was sent to us, and was not aware of any ARC decision before it.

23.    Association Exhibit O suggested, but did not demand, that "all further construction" "cease" – on all parts of our home. At that point, construction near the front setback area was essentially completed, and no construction was done in that area for several months.

25.    After receiving a copy of Association Exhibit Q, dated November 26, 2003, in which the ARC indicated that a compromise had been reached and said

nothing about stopping construction, I believed we had resolved the building envelope questions.

26.    I was therefore surprised, and dismayed, two months later when I received a Notice To Cease Construction from the Association's Board of Directors dated January 28, 2004, along with a copy of the ARC's letter of January 28, 2004, withdrawing its approvals of two months earlier.  (Compare Association Exhibits Q and R)

27.    The Board's notice of January 28, 2004, stated:  "The ARC requires that all construction on non-compliant portions of the home cease immediately." (Association Exhibit S)  However, as the photographs and the invoices I received from our contractor show, no construction was going on in the front setback area, so I did not know what the ARC was talking about.  Exhibit 15 consists of true and correct copies of our invoices from our contractor.

28.    The ARC's letter of January 28, 2004, asked us to submit "revised plans," but also indicated that the Association had not yet decided whether the alleged 3-1 ½" front setback "discrepancy" was of significance to it.  Thus, we did not know what the "revised plans" the ARC was asking for should show – should the location of any proposed changes in the front roof be based upon a 19'-8 ½" front setback, or a 20' front setback?  Mr. Resh, our architect, had other questions

about what the ARC now wanted too. When I called to ask ARC Chair Awa to ask him, he refused to talk to me.

29.    The Association's attorneys' demand letter of March 4, 2004, was similarly confusing, in that it demanded that work stop in "noncompliant areas" without specifying what work it was referring to, and the front setback area had been constructed by October 30, 2003. That letter demanded revised plans "which address each of the issues and/or deficiencies discussed in the January 28, 2004 letter . . . excluding the front setback issue which is under consideration by the Board."

30.    It was pointless for us to prepare the plans the Association demanded on March 4, 2004, if the Association was later going to deny our compromise variance request relating to the front setback, because the building envelope question included both the front setback and the front height.

31.    Our contractor stopped any work and refused to complete construction at this point, telling us he would not do anything more because of threats of lawsuits by Moribes and the Association. We have paid him $539,202.58 for the work he performed and the materials he provided.

32.    At this point we decided to hire an attorney. Exhibit 16 is a copy of one of our attorneys' responses to the Association's attorneys' March 4, 2004 letter.

33.    By mid-May 2004, we were faced with multiple dilemmas.  The CC&Rs provided that we were to keep our garage door closed, as did security and aesthetic concerns, but our garage doors had not been installed.  Also, the roof over the front of our house had been ProtectoWrapped and exposed to sunlight and weather since October 2003, the front concrete blocks remained unfinished and exposed to the weather, and the specifications for ProtectWrap said "Rainproof TM roofing underlayment must be covered with finished roofing materials within 30 days," and "This membrane is not intended for permanent exposure to sunlight."  Exhibit 17 is a true and correct copy of those specifications, which I reviewed at that time and later downloaded.

34.    I therefore had the roof tiles and shingles installed, for which I paid $1,250 on May 20, 2004, and the front stuccoed over, for which I paid $5,000.00 on May 24, 2004.  To have the garage doors installed, I paid a $1,366.66 on June 1, 2004, and $1,366.66 on August 30, 2004.  A spreadsheet I prepared showing all of our construction-related costs after the contractor quit is attached as Exhibit 18.

35.    We could not promise to provide revised plans within 24 hours as demanded in the Association's attorneys' letter of May 25, 2004, because our architect reported that he was having severe health problems.

I declare under penalty of perjury that the foregoing facts are true and correct.

Executed this 8th day of June, 2006, at Melbourne Beach, Florida.


ANTHONY GRANDE