IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| NA PALI HAWEO COMMUNITY ASSOCIATION, a Hawaii non-profit corporation,<br><br>    Plaintiff,<br><br>    vs.<br><br>ANTHONY CHARLES GRANDE; NARINDAR KAUR GRANDE; JOHN DOES 1-10; JANE DOES 1-10; DOE PARTNERSHIPS 1-10; DOE CORPORATIONS 1-10; DOE ENTITIES 1-10; AND DOE GOVERNMENTAL UNITS 1-10,<br><br>    Defendants.<br><br>ANTHONY CHARLES GRANDE and NARINDAR KAUR GRANDE,<br><br>    Counterclaim Plaintiffs,<br><br>    vs.<br><br>NA PALI HAWEO COMMUNITY ASSOCIATION; RONALD K. AWA and DOES 1-25,<br><br>    Counterclaim Defendants. | CIVIL NO. CV04-00413 DAE/LEK<br>(Injunctive Relief)<br><br>DECLARATION OF JAMES I. NISHIMOTO |

## DECLARATION OF JAMES I. NISHIMOTO

1.  I am a licensed architect in the State of Hawaii and have been retained by the NA PALI HAWEO COMMUNITY ASSOCIATION ("Association") as an expert witness in this matter. I make this Affidavit based on my own personal knowledge and information.

2.  I am the President and Chief Operating Officer of the architectural firm Group 70 International and I have been a licensed architect in the State of Hawaii since 1980.

3.  I have inspected the property owned by Defendants ANTHONY CHARLES GRANDE and NARINDAR KAUR GRANDE ("Grandes") situate at 1251 Kamehame Drive, Maunalua, Honolulu, Hawaii 96825, including the dwelling thereon ("Dwelling").

4.  I understand that the Grandes contend that the interior of their garage satisfies the requirements of Article III, Section 3.2.4(b) of the Design Guidelines set forth below:

    > Every garage, whether attached or detached, which has a vehicular entrance facing a street shall contain not less than an additional one hundred (100) square feet of enclosed and covered area for service and storage facilities.

5.  Article IV, § 4.3.7 of the Association's Declaration provides, in part: "Garages shall be used only for the parking or repair of personally owned motor

vehicles, storage and workshop purposes." As the Declaration does not contemplate that garages will be used for restroom purposes, the term "service" as used in Article III, § 3.2.4(b) of the Design Guidelines does not include restrooms.

6. In my opinion, the Association's Architectural Review Committee ("ARC") has correctly applied Article III, § 3.2.4(b) and concluded the restroom in the Grandes' garage does not count towards the required 100 square feet of enclosed and covered area for service and storage facilities, contrary to Mr. Resh's area calculations.

7. Section 3.2.1(d) of the Design Guidelines requires that the front yard setback envelope be twenty (20) feet from the property line. The front yard setback envelope for flag lots must be ten (10) feet from the property line. The Grandes' Dwelling is not situated on a flag lot.

8. Section 3.2.1(d) of the Declaration authorizes the ARC to consider variances of the front set back restriction in cases involving unusually shallow or odd shape lots or in which extensive excavation, fill or embankment will be required. In these cases, the only variance permitted by the Design Guidelines is to allow a single level turn-in garage to encroach a maximum of ten (10) feet into the 20-foot setback area. These conditions do not exist on the Grandes' property.

9. Article VI, § 6.3.1(f)(iii) of the Design Guidelines requires that, "The maximum permitted Building Envelope must be shown in relation to the

proposed structure for all elevations." The plans submitted by the Grandes in October 2000 contained erroneous information and violated the Design Guidelines in that the plans did not correctly show the building envelope setback 20 feet from the front property line in accordance with Article III, § 3.2.1(d) of the Design Guidelines.

10. The approved plans showed the building envelope in relation to the proposed structures, however, the Grandes' architect, Edward Resh, drew the building envelope setback 10 feet from the property line rather than 20 feet from the property line. Hence, the drawing indicated that the Dwelling was within the building envelope. Had Mr. Resh drawn the building envelope in its correct location, as required by the Design Guidelines, this would have revealed that the proposed Dwelling encroached beyond the building envelope.

11. The building envelope is established by the Design Guidelines at Article III, § 3.2.1(d), and this restriction applies to all lots in Na Pali Haweo.

12. The pre-fabricated lattice work screening installed around the Grandes' air-conditioning equipment is not permitted by the Design Guidelines. Section 3.2.7 of the Design Guidelines prohibits the use of prefabricated lattice work. Section 3.2.14 of the Design Guidelines requires that air-conditioning equipment be screened from view.

13. Section 3.2.14(a) of the Design Guidelines requires that prior to the installation of an air-conditioning system, an owner must secure the written

concurrence of the ARC as to the location and type of system. The Grandes' air-conditioning system was not shown on the approved plans.

14. The Declaration of Edward Resh states that the Grandes' home is "within the 'typical' building envelope described in the Na Pali Haweo Design Guidelines if measured from existing lot elevations, *i.e.*, lot elevations before grading and construction."

15. The foregoing statement is not correct. Based upon plans submitted by the Grandes on October 5, 2000, and approved by the ARC, the existing grade as shown on Building Section 1/A-5 of the plans (reflecting the grade at the center of the garage) is lower than the finished grade. *See* Exhibit "BB." In this instance, the height of the front roof plate and eave exceed the height setback restriction regardless of whether the height is measured from the existing or finished grade. (As used in the design and construction profession, the term "existing grade" in this instance refers to the original grade of the Property as constructed per the subdivision grading plan.)

16. The Declaration of Edward Resh provides at ¶ 4 that "[e]ven if the columns or roof at the front of the house were too high, in terms of the approved building envelope or a 'typical' envelope, they could be brought into conformity by the use of ground level soil or planters (raising the as-built ground level), as the City and County of Honolulu allows where a building is otherwise too high."

17. Mr. Resh is apparently referring to the building height envelope under the Land Use Ordinance of the City and County of Honolulu ("LUO"). This building height envelope is similar to the building height envelope in the Design Guidelines, except that the LUO measures this envelope 10 feet from the front property line, whereas the Design Guidelines measure this envelope 20 feet from the front property line. Section 21-4.60 of the LUO provides:

> The building height envelope shall run parallel to existing or finish grade, ***whichever is lower*** (see Figure 21-4.3), except where finish grade is higher than existing grade in order to meet city construction standards for driveways, roadways, drainage, sewerage and other infrastructure requirements, or to meet conditions of permits approved under the provisions of this chapter. In these cases, height shall be measured from finish grade.

18. Based upon the foregoing provision, the LUO would not permit the Grandes to contravene the building height envelope by artificially raising the finish grade to thereby raise the building height envelope. The LUO specifically provides that the building height envelope is measured from the lower of existing or finish grade. Thus, Mr. Resh's statement that the City would permit the Grandes to correct a building height envelope encroachment by "use of ground level soil or planters" is not correct; such changes would be irrelevant because the benchmark for measuring the building height envelope is the lower of the existing grade or finish grade.

19. The principle under the LUO that the building height envelope is measured from the lower of existing or finish grade applies to all residential zoned districts throughout the City and County of Honolulu and should apply as well to the calculation of the building height envelope under the Design Guidelines. However, as noted above, even if the Grandes' building height envelope were measured from existing grade, the height of the dwelling exceeds the height setback restriction because the existing grade along the front edge of the garage is lower than finish grade as shown on Exhibits "D-3" and "BB".

20. Contrary to Mr. Resh's statement, the Grandes cannot circumvent the building height envelope by artificially raising the as-built ground level by the use of ground level soil or planters. In calculating the front building envelope for the Property, the finish grade is fixed by the elevation of the driveway and garage floor. The finish grade cannot be increased using soil or planters as this will not change the elevation of the driveway and garage floor.

21. Various changes made by the Grandes were not "minor changes" including but not limited to, the increased building footprint and resulting roof line redesign, failure to construct the roof eyebrow, failure to install the clerestory window above the front entry, failure to install front planters, failure to construct separate and distinct roof elements over the master bedroom and main entry, failure to construct the garage door opening with arched corners and failure to construct the Dwelling

within the required front setback and height setback, all of which substantially deviated from the approved plans. Attached as Exhibit "CC" is a comparison of the plans approved by the ARC on October 17, 2000 versus plans submitted on April 19, 2006.

22. The aggregate effect of all the changes and/or deviations made by the Grandes is that the Dwelling constructed by the Grandes is different from the dwelling depicted in the approved plans.

23. I disagree with statements in Mr. Resh and Mr. Chock's declarations that "[i]t is common in homebuilding, including homebuilding within planned communities, to make minor revisions from approved plans during construction, and to then seek approval for the revisions once the home is completed, by showing them in the final as-built plans submitted along with notices of completion."

24. The Grandes did not "make minor revisions from approved plans." Rather, after obtaining approval from the ARC in October 2000, they submitted a different set of plans to the City and County of Honolulu and obtained a building permit based upon the different set of plans, which were substantially different from the plans approved by the ARC. During construction, the Grandes made further substantial changes from the plans approved by the ARC.

25. The Grandes argue that "the Design Guidelines are not rigid anyway. They 'express intentions rather than absolutes,' and the building envelope guidelines are merely 'typical.'"

26. The Design Guidelines (1) provide owners with general concepts for the design and construction of homes, and (2) provide specific requirements and restrictions for the design and construction of homes. The ARC has interpreted that certain requirements and restrictions in the Design Guidelines are mandatory requirements for all owners. The mandatory requirements include, but are not limited to, the building height envelope, the 20 foot front setback, the requirements and restrictions concerning vents and skylights, air conditioning screening, and garage storage, all of which are at issue in this case.

27. Plans received from the Grandes on April 19, 2006 do not indicate the color of the roof, or otherwise indicate that the roof will match the existing roof of the Dwelling.

28. Portions of the garden wall at the front property line exceed the height indicated on the approved drawings and as permitted by Article III, Section 3.2.7 of the Design Guidelines. I have reviewed plans submitted by the Grandes on April 19, 2006, and with regard to the proposed remedy for the garden wall violation, it is my opinion that the plans are ambiguous as to what the Grandes will do to remedy the violation. The plans do not indicate adequately where the walls will be cut

or otherwise modified to meet the height restrictions of the Design Guidelines. For example, top of wall elevations are not provided for each step of the walls. Also, Sheet A-1 of the plans show a dotted line drawn above the wall; however, there is no notation as to what this line means and dotted lines have multiple meanings in the architectural profession.

    29. I have reviewed various plans submitted by the Grandes with regard to the proposed remedy of the Dwelling's encroachment into the front setback building envelope. It is my opinion that the plans submitted by the Grandes on April 19, 2006, are substantially different from those submitted on November 3, 2003, and January 9, 2004. For example, the plans submitted on November 3, 2003, indicate a new column but do not show any reduction in the roof above the master bedroom balcony. The plans submitted on January 9, 2004, for example, reflect the new columns but do not reflect the elimination or relocation of the roof beam at the balcony edge. In addition, the reduction in the roof eaves occurs only at the front edge, and not the left corner and right side. The plans received on April 19, 2006, indicate relocation of columns and the roof beam, and removal of roof eaves on the front, left corner and right side. See Exhibit "DD".

I, JAMES I. NISHIMOTO, do declare under penalty of law that the foregoing is true and correct.

DATED: Honolulu, Hawaii, ___15 June 2006___.

_____
JAMES I. NISHIMOTO