



STEVEN B. JACOBSON
Attorney at Law
A Limited Liability Law Company

STEVEN B. JACOBSON        4117-0
 (sjacobson.law@hawaiiantel.net)
Post Office Box 240761
Honolulu, HI 96824-0761
Telephone: (808) 377-1814

Attorneys for Defendants Anthony
and Narindar Kaur Grande

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

JUN 2 1 2006

at ___ o'clock and ___ min. ___ M
SUE BEITIA, CLERK

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| NA PALI HAWEO COMMUNITY ASSOCIATION, a Hawaii non-profit corporation,<br><br>       Plaintiff,<br><br>    v.<br><br>ANTHONY CHARLES GRANDE; NARINDAR KAUR GRANDE, and DOES,<br>       Defendants.<br><br><br>ANTHONY CHARLES GRANDE and NARINDAR KAUR GRANDE,<br><br>       Counterclaim Plaintiffs,<br><br>    v. | CIVIL NO. CV04-00413-DAE LEK<br><br>DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF COUNTER-MOTION FOR SUMMARY JUDGMENT; CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.5(c); REQUEST FOR MANDATORY JUDICIAL NOTICE; DECLARATION OF STEVEN B. JACOBSON; EXHIBITS B, D, 10, 19-20; CERTIFICATE OF SERVICE<br><br>DATE: June 26, 2006<br><br>TIME: 10:30 a.m.<br><br>JUDGE: Hon. David Alan Ezra |

TABLE OF CONTENTS

I.      THE ASSOCIATION CANNOT POSSIBLY PREVAIL ON THE
ALLEGATIONS WHICH WERE THE SUBJECT OF ITS ORIGINAL
DEMANDS.                                                                         3

A.  The Association Cannot Possibly Prevail On Its Original Allegations Given the
Language of the CC&Rs and the Design Guidelines, So Those Allegations Should
Be Dismissed With Prejudice.                                          3

Building Envelope.                                                       3

Garage Service and Storage Space.                               6

B.      The Association Cannot Possibly Prevail On Its Original Allegations Given
Its Failure To Comply With Its Own Pre-Litigation Requirements, So Those
Allegations Must Be Dismissed.                                     8

C.      The Association's Arguments As To Bars and Admissions Are Frivolous.
                                                                                10


II.     THE ASSOCIATION CANNOT POSSIBLY PREVAIL ON ITS
ALLEGATIONS WHICH WERE NEVER THE SUBJECTS OF
PRE-LITIGATION DEMANDS.                                     12

A.      The Association Cannot Possibly Prevail On Such Allegations Given
Its Failure To Comply With Its Own Pre-Litigation Requirements, So Those
Allegations Must At Minimum Be Dismissed Without Prejudice.      12

B.      The Association Cannot Possibly Prevail On Such Allegations On The
Merits, So Those Allegations Must Be Dismissed With Prejudice.      14

1.      The Allegations The Association Didn't Make Until It Filed Its Complaint.
                                                                                14

Bubble Skylights.                                                       14

Roof Exhaust Vents.                                                    15

One Section of the Front Garden Wall (*Not* the Whole Wall).                16


2.    The Allegations The Association Didn't Make Until It Came Up With
Exhibit T While The Parties Were In Settlement Negotiations.                19

Air Conditioner Screening.                                                 19

Concrete Trash Pad.                                                        20

Separate and Distinct Front Roof Elements.                                 21

Eyebrow Roof.                                                             22

Front Garage Gate.                                                         23

Other Items.                                                              23

III.    GRANDES DID NOT REPUDIATE OR BREACH SETTLEMENT
AGREEMENTS OR "TAKE A CHANCE"                                             24

TABLE OF AUTHORITIES

Cases

*Fong v. Hashimoto*, 92 Haw. 568, 994 P.2d 500 (2000)     5

*Hiner v. Hoffman*, 90 Haw. 188, 977 P.2d 879 (1999)     5, 8, 20

*SCI Management Corp. v. Sims*, 101 Haw. 438, 71 P.3d 389 (2003)    18, 19

Statutes

HRS § 421J-10(a)     9

Rules

Federal Rule of Civil Procedure 56(e)     15, 19

Federal Rule of Civil Procedure 56(f)     15, 19

Federal Rule of Evidence 408     11, 12, 19, 22

Local Rule 7.4     2, 11

Miscellaneous

Kipfer (ed.), *Roget's 21st Century Thesaurus* (2d ed. 1999)     5

NA PALI HAWAO COMMUNITY
ASSOCIATION; RONALD K.
AWA; and DOES 1-25,

                Counterclaim Defendants

## DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF COUNTER-MOTION FOR SUMMARY JUDGMENT

Nothing in the Association's opposition/reply filed June 15, 2006, is sufficient to defeat any part of Mr. and Mrs. Grandes' summary judgment motion – let alone to entitle it to summary judgment in its favor.

In fact, many of the Association's arguments cannot even be considered in resolving its summary judgment motion, because the Association did not make them in its moving papers. LR 7.4 ("Any arguments made for the first time in the reply shall be disregarded").

Most notably, the Association's moving papers objected to a number of minor items solely upon the *procedural* basis that they allegedly differ from those items as shown on the original plans approved by its ARC. (Moving Memo, at 22-23). Now, however, the Association is belatedly attempting to characterize those items as *substantively* major. (Reply Memo [hereinafter Memo], 11-12, and the Declarations cited therein)

Moreover, most of the Association's new "evidence" is inadmissible, *e.g.*,

facts alleged without personal knowledge, foundationless opinions by persons not

shown to be experts, proffered conclusions about the contents of documents

contradicted by the documents themselves, etc.

In reality, the Association's effective admissions in its opposition/reply

further demonstrate why Grandes are entitled to summary judgment.

I.    THE ASSOCIATION CANNOT POSSIBLY PREVAIL ON THE
ALLEGATIONS WHICH WERE THE SUBJECT OF ITS ORIGINAL
DEMANDS.

A.  The Association Cannot Possibly Prevail On Its Original Allegations
Given the Language of the CC&Rs and the Design Guidelines, So
Those Allegations Should Be Dismissed With Prejudice.

Building Envelope.  The Association does not contest that its Architectural

Review Committee (ARC) approved plans submitted by Grandes' architect

showing a building envelope beginning 10' from Grandes' front property line. (A

Ex. F; Memo, esp. at 6-8; Ass'n Reply to Grandes' Concise Statement [ARGCS],

para. 15; new Awa, para. 7-12)

Nor does the Association contest that Grandes' home is within the so

approved envelope – both its front setback and its height. (Memo and Declarations,

*passim*; ARGCS, para. 16)

Instead, the Association contends that it's not bound by the ARC's approval of the plans.

The Association's essential arguments are that (1) the term "typical" as used in its Guidelines to describe building envelopes necessarily means "mandatory"; (2) alternatively, the term "typical" refers only to front setbacks and not building heights; (3) the ARC lacks the power to grant variances from supposedly-"mandatory" Guideline provisions; (4) the ARC therefore lacks the power to approve plans with elements varying from supposedly-"mandatory" Guideline provisions; (5) the ARC therefore lacked the power to approve the atypical building envelope shown in Grandes' plans; and (6) Grandes' architect therefore should be faulted for submitting plans showing an atypical building envelope. (Memo, at 6-8)

There is a flag lot behind Grandes' lot, as various exhibits show, so Grandes' home needs to be on the front part of their lot, if their rear neighbors are to have any privacy. (A Ex. T, Att. 1 [driveway on right], Atts. 5, 9 & 10 [bottom photos], Att. 14; G Ex. 10, first page)

All of the Association's arguments are wrong, because the Association's underlying premises are wrong.

*First*, the word "typical" is reasonably susceptible of meaning something less than "mandatory," because "typical" more often means "usual," "average,"

4

"general" or "suggestive," and "mandatory" is not even listed as a form of "typical" in the current version of Roget's Thesaurus. Kipfer (ed.), *Roget's 21st Century Thesaurus*, at 829 (2d ed. 1999). The Guidelines here even say that they "express intentions rather than absolutes." (Grande CS [GCS] and ARGCS, para. 24) If the Association had meant "mandatory," it could easily have said "mandatory."

Consequently, the word "typical" must be construed in Grandes' favor as *not* meaning "mandatory." In both *Fong v. Hashimoto*, 92 Haw. 568, 573, 994 P.2d 500, 505 (2000), and *Hiner v. Hoffman*, 90 Haw. 188, 189, 192-193, 977 P.2d 878, 879, 882-883 (1999), the Hawaii Supreme Court held that restrictive covenants are to be "strictly" construed "in favor of the grantee," in holding that the terms "one story in height" and "two stories in height" are ambiguous because they are "reasonably susceptible to more than one meaning." Notably, *Hiner* rejected the idea of using typical story heights to measure the allowed height of a building.

Contrary to the Association's implications (at 3-5), neither *Hiner* nor *Fong* was brought by a developer. *Hiner* was brought by a community association and other owners, and *Fong* was brought by another owner.

This is Hawaii. Hawaii precedents apply.

*Second*, the Guidelines clearly use the undefined term "typical" to describe all aspects of building envelopes, including building heights: "The following first

and *second story envelopes* define the *typical* limits of the building envelope."
"Inclusive of the first story envelope, *the second story envelope sets the maximum
height allowed.*"  (G Ex. B, at 3-4 [undefined], 12)[1]

   *Third*, the CC&Rs *do* give the ARC full authority to grant variances from
typical building envelopes, and therefore to also approve plans varying from them.
(GCS, para. 19-23)  Variances merely need to be in writing, which the ARC's
approval was, and cannot be contrary to restrictions in the CC&Rs themselves –
and there are no applicable restrictions on building envelopes in the CC&Rs.  (A
Ex. F; G Ex. A, at 17; GCS, para. 22)

   *Fourth*, the Association's own declarations confirm that its ARC has
regularly approved plans with elements differing from those described in the
Guidelines – including those Guidelines using words like "must" – as obviously
contemplated by the statement in the Guidelines that they do not constitute
"absolutes."  (Awa, para. 6; Kloetzel, para. 9-10; Uchimura, para. 8-13; GCS, para.
24)

   The Guidelines do not freeze the styles of 1993 at Na Pali Haweo.

   Garage Service and Storage Space.  The Association does not effectively
contest that, with irrelevant exceptions, the CC&Rs expressly deny the ARC

--------

[1] The attached exhibits only include the pages thereof which weren't previously
filed with the Court.

authority to limit Owners' rights to remodel the interiors of their homes, including their garages. (Memo and Declarations, *passim*; GCS and ARGCS, para. 33-35)

The Association's lame assertion that the interiors of garages "are visible when garage doors are open" is irrelevant, ignoring *inter alia* the CC&Rs' requirement that garage doors "shall remain closed except during ingress and egress or when the garage is being actively used." (GCS and ARGCS, para. 33-35) The interiors of entry areas are "visible" during moments when a home's front doors are open too.

That ends the garage service and storage space question. The Guidelines themselves say that "in the event of any conflict . . . the CC&Rs shall control." (GCS and ARGCS, para. 34)

Even if the CC&Rs were ambiguous in that regard, the ARC would be exceeding its authority in telling Grandes what they can do inside their garage, because the CC&Rs are most easily read – and therefore susceptible of meaning – that the ARC is prohibited from doing so. *Hiner*, *supra*.

It is nonetheless notable that the Association does not dispute that "The common meaning in the homebuilding industry of 'enclosed and covered area' is only that such an area is indoors rather than outdoors." (Memo and Declarations, *passim*; ARGCS, para. 40; Chock Declaration, para. 9)

In addition, it is notable that declarant Nishimoto has done an about face on the garage interior question.

Nishimoto originally agreed that "the toilet and heater space" within Grandes' garage, which includes the water heater, "may be counted as service space" for purposes of the unenforcably ambiguous[2] Guideline suggesting "(100) square feet of enclosed and covered area for service and storage facilities." (A Ex. T, item 10 and Att. 12 [top])

Now Nishimoto (para. 6) is calling the same space a "restroom" – ignoring the water heater – and saying that none of it would count toward the 100 square feet.

B.  The Association Cannot Possibly Prevail On Its Original Allegations Given Its Failure To Comply With Its Own Pre-Litigation Requirements, So Those Allegations Must Be Dismissed.

The Association does not dispute that it failed to follow its own internal procedures providing for notices, a hearing, preparation of cost analyses, and opportunities for compliance, before charging into Court on its original allegations

_____

[2] The Guideline is unenforcably ambiguous because it does not define "service" or, as in *Hiner*, the *height* of the 100 square foot area(s). (G Ex. B, at 3-4, 16-17)

and allowing its attorneys to run up tens of thousands of dollars in fees.[3] (Memo, *passim*, esp. at 13; GCS and ARGCS, para. 1-10)

Instead, the Association argues that (1) those procedures don't apply because Grandes haven't completed construction yet, (2) "Defendants never requested a hearing," and (3) Grandes have "suffered no prejudice" because there were settlement negotiations after litigation began. *Id.*

The Association is wrong because (1) those procedures are also triggered by "the completion of all framing for Improvements"; (2) the Association also failed to follow other procedural requirements; (3) it was the Board's obligation to set a hearing (the *Board's* obligation re a hearing was to set one *after* receipt of a notice the ARC apparently never gave); and (4) Grandes have obviously been prejudiced by the Board's and Association's failure to follow its own procedures. (See GCS, para. 2-10)

The facts of this case – the ARC's original approval of a later-challenged building envelope, the dubiousness under the CC&Rs of the ARC's attempt to regulate interior garage space, etc. – cried out for the very kind of reasoned,

---

[3] The Association has recorded a $59,114.50 lien against Grandes' home, for its alleged fees and costs only through August 25, 2005, although there is no judgment and it has not been adjudged the prevailing party. (Request for Mandatory Judicial Notice [RFJN], *infra*, para. 1; Ex. 19) See HRS § 421J-10(a), showing that the Association would only become entitled to its fees, costs and expenses *if* it prevailed here and *if* this Court awarded them.

balanced, thoughtful, informed, participatory, *pre*-litigation deliberation and cost-benefit analysis called for in the Association's CC&Rs.

The Board, to fulfill its duties to all Association members (including Grandes), was supposed to evaluate the situation with reasoned *input* from *all* concerned, and in light of *all* of the applicable facts and law, *before* reaching any conclusions. That's the obvious reason for the CC&Rs' procedures.

The proposition that the Board could conduct a neutral and unbiased evaluation during settlement negotiations, still without input from Grandes, and without being influenced by the $50,000+ of fees its attorneys had already run up (see G Ex. 19), is preposterous.

### C. The Association's Arguments As To Bars and Admissions Are Frivolous.

The Association cannot escape summary judgment on the building envelope questions with its last-gasp "admission" and "bar" arguments (at 1-3, 8).[4]

The cover letter accompanying Grandes' compromise proposal of April 2006 repeated Grandes' continuing position that "the front setback and the house as constructed are within the Building Envelope as approved by the Committee on October 17, 2000." (G Ex. 4, p. 1)  The Association disputed that very point in its

response. (G Ex. 5, at p. A-1)  Thus, by its express terms, Grandes' proposal cannot possibly be construed as "an admission against interest which confirms their violation of the governing documents."  See also FRE 408.

As for a "bar," the Association admits (at 1) that it *rejected* most of Grandes' April 2006 compromise proposal, as G Exhibit 5 amply shows.  Therefore, there was no agreement.  One cannot form a contract by agreeing to some aspects of an offer but rejecting others.

Notably also, Grandes had no prior notice that the Association had any *substantive* objection to most items it "disapproved" on May 31 in rejecting Grandes' proposed compromise – the Association's only previous objection having been procedural, *i.e.*, that those items allegedly differed from those shown on the originally approved plans.[5]  (See GCS, para. 44-48)

As for a purported April 2004 "admission" that the front setback violates the CC&Rs, after Grandes' attorney alleged such a conclusion in compromise negotiations between Grandes and their contractor (see A Exs. RR and SS) – to

---

[4] Because these new arguments were not made in the Association's moving papers, they cannot be considered in resolving the Association's summary judgment motion.  LR 7.4.

[5] FRE 408 does not prevent Grandes from pointing out the Association's prior positions, not to prove "liability" or "invalidity," but only for "another purpose" – to show that the Association did not take its current *substantive* positions on the minor matters until it filed its opposition/reply on June 15 (last Thursday), so Grandes had no notice of any need to deal with them until then.
Trying to pin down the Association's positions is like trying to capture an eel.

which the Association was *not* a party – the contractor's attorney responded by

pointing out that the Association had approved a 10' front setback. (Jacobson,

*infra*, para. 2)

Consequently that allegation was withdrawn, as shown by Grandes' counter-

claim in the related state court action between their contractor and Grandes.

(RFJN, para. 2; Ex. 20, para. 6) Even if not withdrawn, FRE 408 would bar its

consideration here.

II.    THE ASSOCIATION CANNOT POSSIBLY PREVAIL ON ITS
       ALLEGATIONS WHICH WERE NEVER THE SUBJECTS OF
       PRE-LITIGATION DEMANDS.

A. The Association Cannot Possibly Prevail On Such Allegations Given
   Its Failure To Comply With Its Own Pre-Litigation Requirements, So
   Those Allegations Must At Minimum Be Dismissed Without
   Prejudice.

The Association does not dispute (1) the requirement of its CC&Rs that "no

. . . action to enforce *any* . . . limitation, restriction, covenant, condition, [or]

obligation . . . may be made or taken without giving not less than thirty (30) days'

written notice and demand to the Owner concerned to cure or rectify the default or

breach involved," or (2) its failure to give the Grandes such notice before making

the other allegations in its Complaint, its Exhibit T, and G Exhibit 5. (Memo,

*passim,*esp. at 13; GCS and ARCGS, para. 1, 12, 44, 53-54)

Consequently, those matters are not properly before this Court, and the Association's allegations with respect to them should be dismissed forthwith.

The facts of this case amply illustrate the wisdom of such pre-litigation requirements in preventing needless litigation.

It is undisputed that once Grandes learned of the Association's purported concerns, they indicated their willingness to address and correct any actual violations, and then followed through by actually addressing all of the belatedly-raised matters – by complying with the Association's desires or submitting plans addressing them – once settlement negotiations failed.  (Memo, *passim*; GCS and ARGCS, para. 44-51)

Because of Grandes' willingness to comply once notified, without legal compulsion, the Association is left – in an attempt to justify its needlessly incurred attorneys' fees – to arguing over such *manini* matters as the placement of an admittedly-existing concrete trash pad (see Exhibit TT), and to reversing its previous position that most of the purported "deviations" found mid-litigation by Nishimoto's fine-tooth-combing could be cured by merely submitting plans which showed them (see GCS, para. 48, 51).[6]

---

[6] The Association cites no evidence whatsoever to support its false allegations that "Grandes did not notify the Association that such plans were being prepared" and

B. The Association Cannot Possibly Prevail On Such Allegations On The Merits, So Those Allegations Must Be Dismissed With Prejudice.

1. The Allegations The Association Didn't Make Until It Filed Its Complaint.

Bubble Skylights.  The Association's reply/opposition fails to effectively dispute that Grandes' skylights are now in full compliance with its Guidelines. (Memo, *passim*, esp. at 9, 11; Declarations, *passim*; GCS and ARCGS, para. 56-61; see G Ex. 7)

It does not dispute that (1) Grandes' skylights are flat rather than bubbles, (2) they are on a side-facing roof, and (3) the Guidelines say only that "skylights facing the street shall . . . be subject to approval of the [ARC]."  (Memo and Declarations, *passim*; see GCS and ARCGS, para. 56-61)

It merely argues that (1) it "does not have sufficient information to accept or dispute" whether Grandes' painter repainted their skylight frames a different shade of red after the Association objected to the first shade, or whether the painter covered any parts of the lead flashing he might have missed before; (2) that it "cannot reasonably frame a response" dealing with the revised shade of red; and (3) two paragraphs of Mr. Nishimoto's declaration establish that its "position" on

---

that "Grandes were aware that the Association intended to file a Motion for Summary Judgment."  (ARGCS, para. 51)

skylights is "reasonable." (GCS and ARCGS, para. 59-60; Memo, at 11; see also G Ex. 7)

The first two arguments are plainly insufficient under FRCP Rules 56(e-f), being mere denials advanced without any evidentiary support, and without a "showing that the [Association] cannot for reasons stated present by affidavit facts essential to justify its opposition." The Association can't go look at Grandes' skylight frames?

As for the third argument, neither the cited paragraphs nor the rest of the Nishimoto Declaration say anything about skylights. (Nishimoto, *passim* esp. para. 12-13)

The Association goes on to insist that it hasn't abandoned its Guideline on bubble skylights, but does not dispute that most skylights in Na Pali Haweo are bubbles, and admits that its ARC regularly allowed the installation of bubble skylights for at least seven years. (Memo, at 9, 15; Kloetzel, para. 9-10; Uchimura, para. 5, 13; see GCS and ARGCS, para. 55, 60)

That's abandonment.

Roof Exhaust Vents. The Association does not dispute that Grandes' roof exhaust vents are a color matching their roof and do not, in fact, face the street. (Memo, *passim* esp. 10-11, and Declarations, *passim*; see GCS and ARGCS, para. 71-72)

It no longer denies that the roof exhaust vents are shown on page A-9 of Grandes' as-built plans, and agrees that the Guideline for roof vents does *not* call for ARC approval of manufacturer's brochures or other product information for vents. (Memo, *passim* esp. 10-11, and Declarations, *passim*; see GCS and ARGCS, para. 72-74)

The Association merely asserts (1) that the ARC nonetheless "has the authority to require owners to submit specifications for building components," and (2) that the same two paragraphs of Mr. Nishimoto's declaration establish that its "position" on roof exhaust vents is "reasonable." (ARGCS, para. 74; Memo, at 11)

However, it cites no evidence to support the first assertion, and neither the cited paragraphs nor the rest of the Nishimoto Declaration say anything about roof exhaust vents either. (ARGCS, para. 74; Nishimoto, *passim* esp. para. 12-13)

One Section of the Front Garden Wall (*Not* the Whole Wall). The Association does not dispute that, upon being advised – by the Association's Complaint – that one section of their front garden wall was higher than provided under the Guidelines, Grandes promised the Association and this Court that they would bring it into compliance. (Memo, *passim*, esp. 8-9; Declarations, *passim*; see GCS and ARGCS, para. 45)

16

Nor does the Association effectively dispute that Grandes provided the ARC with proposed drawings for lowering that one section, after settlement negotiations failed. (Memo, at 9; GCS and ARCGS, para. 51, 81-82)

The one section, exceeding the suggested 6' height limit in the Guidelines, is to the right of Grandes' front steps. (A Ex. T, Att. 1; see GCS and ARCGS, para. 85)

There are points where the elevations at the top of the wall, as shown in the *Association's* exhibits, reach "584.38" and "584.34," while the bottom of the wall is shown at "577.78" and "577.3," before the height of the wall drops down to 3.75' ("581.05" less "577.3"). (A Ex. T, Atts. 1[measurements] and 7[photos]; G Ex. 10 [first photo])

Most of the front wall is lower than 6', as the Association's exhibits also show. *Id.*.

The Association has *already* approved the drawings for the revised wall. To hopefully avoid bickering, Grandes' "new" drawings for the wall are identical to those in their original plans approved by the ARC in October 2000. (Compare G Ex. D, *infra*, at A-1 [both sides]; and G Ex. 4, at A-1 [both sides])

Despite having approved them before, the Association now quibbles that (1) the drawings are "ambiguous" because they supposedly don't show "where the walls will be cut or otherwise modified"; (2) "top of wall elevations are not

provided for each step of the walls"; and (3) it is "without sufficient information to accept or dispute the allegations concerning the surveyor's measurements and the allegations by Grandes' counsel." (Memo, at 9; ARGCS, para. 81-84)

All of that is wrong and/or irrelevant.

The drawings show that on the right side of the front steps, the top of the wall will be dropped to a level elevation of "583.0" – as the Association previously approved. (G Ex. 4, at A-1 [right side]; see also G Ex. D, at A-1 [right side]; A Ex. T, Att. 1) On the left side of the front steps, so it won't look oddly higher, the top of the wall will be dropped to a level elevation of "583.3" – as the Association previously approved. *Id.* The rest of the front wall will remain the same – at the elevations the Association previously approved. *Id.*

Elevations *are* shown for the two sections of the wall being lowered, and the already-approved 2000 plans do not show the elevations of "each step" of the wall either. (G Ex. 4, at A-1 [both sides]; G Ex. D, at A-1 [both sides]; A Ex. T, Att. 1)

The ARC is in fact estopped from picking apart any aspect of drawings it approved in October 2000. Under *SCI Management Corp. v. Sims*, 101 Haw. 438, 445, 71 P.3d 389, 396 (2003), "A party is precluded from asserting to another's disadvantage a right inconsistent with a position previously taken by him".

As for the Association's purported inability "to accept or dispute the allegations concerning the surveyor's measurements and the allegations of

Grandes' counsel," FRCP Rules 56(e-f) preclude mere denials advanced without any evidentiary support, unless they are supported by a "showing that the [Association] cannot for reasons stated present by affidavit facts essential to justify its opposition." The Association can't look at the elevation numbers on the exhibits, or perform simple subtractions?

> 2. <u>The Allegations The Association Didn't Make Until It Came Up With Exhibit T While The Parties Were In Settlement Negotiations.</u>

<u>Air Conditioner Screening</u>. The Association does not deny that Grandes have screened their backyard air conditioner, using lattice work screening after the Association's managing agent (Mr. Kloetzel) told Grandes that such a screen would be sufficient to meet the Association's desires. (Memo, *passim*, esp. at 10-11; Declarations, *passim*, esp. Kloetzel, *passim*; see GCS and ARGCS, para. 63-65)

Accordingly, the Association is estopped from asserting that the Grandes need to meet additional requirements concerning their air conditioner. *SCI Management Corp., supra.*

The Association objects to the introduction of Kloetzel's advice on the basis that it was given during a settlement conference, but it was not part of compromise negotiations so FRE Rule 408 does not apply. (ARGCS, para. 64; see Jacobson, para. 4)

The Association admits dispute that Grandes' next-door neighbor, an ARC member, has unscreened air conditioning equipment in his back yard which has been there since at least last year. (ARGCS, para. 62; Memo, *passim*; Declarations, *passim*, esp. Yee, para. 12) Accordingly, the Association is acting arbitrarily in pursuing Grandes for not screening theirs.

The Association asserts that "lattice work is a prohibited *material* under the Design Guidelines," but that is both irrelevant – because of the estoppel and the arbitrarily different treatment of Grandes and Mr. Yee – and wrong. (See Memo, at 11; ARGCS, para. 68; Awa, para. 14)

The Guideline for air conditioners merely provides that they be "screened," *not* "fenced," and Section 3.2.7 of the Guidelines merely prohibits "lattice work fencing," saying nothing about mere lattice work "screens" or "lattice work anything else." (GCS and ARCGS, para. 66-68) Grandes' screen certainly doesn't look like a fence. (G Ex. 3, top photo)

Any ambiguity as to whether Grandes' screen is also a fence must be resolved in Grandes' favor under *Hiner*.

Concrete Trash Pad. The Association's memo (at 8) asserts that the approved plans call for a concrete pad in "the trash area (between the driveway and trash storage area) which has not been constructed." (See also ARCGS, para. 99)

However, the approved plans do not call that area a "trash area." The area on the plans marked "trash" is further to the left – the one the Association is now calling a "trash storage area," and which the Association's own photo shows to be concrete. (A Ex. D, at A-1, lower left corner; A Ex. NN [the area the Association's attorneys have clouded]; A Ex. TT)

As for the area now in question, the ARC approved alternative plans for it – one without a concrete pad, and one with a concrete pad. (A Ex. D, at A-1, lower left corner; A Ex. NN [the area the Association's attorneys have clouded])

Since the Association gave Grandes an option *not* to put a concrete pad in that area, it cannot fault Grandes for not putting one in.

Separate and Distinct Front Roof Elements. Here the Association's allegation is that "the roof over the entry and the roof over the master bedroom are not separate and distinct elements as shown in the [approved plans]." (See GCS and ARGCS, para. 44-45, 86).

However, the Association has not created any genuine issues of *fact* as to whether it is wrong on that question, which it is.

The new Awa and Nishimoto Declarations allege, in passing, that there was an alleged "failure to construct separate and distinct roof elements over the master bedroom and main entry," but neither offers any evidence to support that allegation, or any explanation of it – and Nishimoto's own drawings show no

21

difference between the front roofs as-approved and as-built.  (A Ex. T, Att. 8 [top drawing] & Att. 11 [bottom of both drawings]; Awa, para. 29; Nishimoto, para. 21)

Moreover, the photographs show a very definite distinction between the two front roofs.  (G Ex. 2, esp. first page)

The Association offers a muddled double hearsay statement of contractor Brandt, made through his attorney during settlement negotiations, that "the distinct roof" was "combined" to allow the installation of roof gutters.  (ARGCS, para. 87; Ex. EE, esp. at 5; Jacobson, para. 4)  That statement is inadmissible as double hearsay and under FRE 408 – as well as contrary to the evidence before the Court.[7] The roofs are distinct, as the pictures show.

Eyebrow Roof.  The Association's position now (at 11) is that "the ARC has not acted unreasonably in requiring information on the color of the eyebrow roof or the slope of the roof."

However, the Association has not asked about the eyebrow's color (see G Ex. 5, at B-2, 9.a.1), which would of course be the same as Grandes' other roofs.

---

[7] The alleged double hearsay statements of Brandt are clearly unreliable.  For example, Brandt allegedly said – apparently to inflame an Asian judge or jury – that "Mr. Grande deleted [a decorative panel] because he thought it looked Asian and wanted to maintain a Mediterranean look." (Ex. EE)  However, the "Asian-looking" panel was not deleted, but merely moved so that it would be over Grandes' front door.  (Ex. T, Att. 8 [lower photo] and 10 [top photo])

The slope is shown on the plans submitted to the ARC in April.[8] (G Ex. 4, at A-3 [top drawing])

The Association also questions (at 11) Grandes' intent to build the eyebrow, since one set of proposed drawings back in 2003 didn't include it.

However, Association Exhibit EE says that contractor Brandt didn't construct the eyebrow because "The AOAO issued a stop work order before this work was completed." The Association agrees that the eyebrow will jut out to within 20' of the front setback (GCS and ARGCS, para. 91).

<u>Front Garage Gate</u>. The Association does not dispute that last September, it agreed that Grandes could "omit" the front gate from their as-built plans. (GCS and ARGCS, para. 77) Its current complaint that it hasn't been installed is therefore a surprise. The Association does not question that until last September, Grandes intended to install it, once allowed to work in the front setback area. (Memo, at 11)

<u>Other Items</u>. Mr. Nishimoto's allegation of "substantial changes" is inadmissible, not supported by facts, and made without analysis of other homes in Na Pali Haweo. (See Nishimoto, para. 3, 21-24) If one compares Grandes' home

---

[8] The tile for the eyebrow will be the same clay tile as on Grandes' main roofs – not Monier. (G Ex. 4, at A-3, top)

to the one next door, which has only one second story front window, it is more open-looking in the front.  (Ex. 7 & 10, first pages)

III.   GRANDES DID NOT REPUDIATE OR BREACH SETTLEMENT AGREEMENTS OR "TAKE A CHANCE"

Grandes have not repudiated or breached any settlement agreements.  In both instances referenced in its Memo (at 14), the Association purported to reach an agreement by "accepting" its own proposals, rather than Grandes'.  (Jacobson, para. 6-7)

Nor did Grandes "take a chance" and knowingly violate restrictive covenants.  It is undisputed that the ARC's Chair advised them on August 29, 2003, that the construction appeared "to be in conformance with approved plans and building setbacks and height envelopes."  (GCS and ARGCS, para. 109)  By that point the front setback was in place, and most of the roof.  (Ex. 10, *infra*)

DATED:  Honolulu, Hawai'i, June 21, 2006.

STEVEN B. JACOBSON
Attorney at Law
A Limited Liability Law Company


STEVEN B. JACOBSON
Attorneys for Defendants

24