IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| NA PALI HAWEO COMMUNITY ASSOCIATION, a Hawaii nonprofit corporation,<br><br>    Plaintiff,<br><br>    vs.<br><br>ANTHONY CHARLES GRANDE; NARINDAR KAUR GRANDE; JOHN DOES 1-10; JANE DOES 1-10; DOE PARTNERSHIPS 1-10; DOE ENTITIES 1-10; AND DOE GOVERNMENTAL UNITS 1-10,<br><br>    Defendants.<br><br>ANTHONY CHARLES GRANDE and NARINDAR KAUR GRANDE,<br><br>    Counterclaim Plaintiffs,<br><br>    vs.<br><br>NA PALI HAWEO COMMUNITY ASSOCIATION; RONALD K. AWA and DOES 1-25,<br><br>    Counterclaim Defendants. | CV NO 04-00413 DAE/LEK<br>(Injunctive Relief) |



EXHIBIT B

<u>ORDER GRANTING IN PART AND DENYING IN PART</u>
<u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING IN</u>
<u>PART DEFENDANTS' COUNTER-MOTION FOR SUMMARY JUDGMENT</u>

The court heard Plaintiff's Motion and Defendants' Counter-Motion

on June 26, 2006. Lance Fujisaki, Esq., and John Zalewski, Esq., appeared at the

hearing on behalf of Plaintiff Na Pali Haweo Community Association; Steven B.

Jacobson, Esq., appeared at the hearing on behalf of Defendants Anthony Charles

Grande and Narindar Kaur Grande. After exhaustively reviewing the motion and

the supporting and opposing memoranda, the court GRANTS IN PART AND

DENIES IN PART Plaintiff's Motion for Summary Judgment, and DENIES IN

PART Defendants' Counter-Motion for Summary Judgment.

BACKGROUND

<u>A.</u>    <u>Procedural Background</u>

This case arises from a dispute between Na Pali Haweo Community

Association (the "Association"), and two of its members, Defendants Anthony

Charles Grande and Narindar Kaur Grande (collectively, the "Grandes")

concerning construction on the Grandes' property which allegedly violated the

Association's Design Guidelines. The Association originally filed its Complaint

on June 1, 2004, in the Circuit Court of the First Circuit of the State of Hawaii,

seeking, *inter alia*, an injunction compelling compliance with the Design

2

Guidelines.  The Grandes removed the case to Federal Court on July 2, 2004,

pursuant to diversity jurisdiction, as the Association is a citizen of the State of

Hawaii, and Grandes assert they are both citizens of the State of Florida.

On April 12, 2006, the Association filed its Motion for Summary

Judgment ("Motion for Summary Judgment").   A Notice of Joinder was filed by

Counterclaim Defendants Na Pali Haweo Community Association and Ronald K.

Awa ("Joinder") on April 18, 2006.  The Association filed an Errata

Supplementing its Motion for Summary Judgment on April 20, 2006.  The Grandes

filed their Memorandum in Opposition to Plaintiff's Motion for Summary

Judgment and Counter-Motion for Summary Judgment on June 8, 2006

(respectively, "Grandes' Opposition" and "Grandes' Counter Motion for Summary

Judgment").  Grandes also filed Evidentiary Objections to Declarations of James I.

Nishimoto, Jeff Kloetzel, and Ronald K. Awa on June 8, 2006.  On June 15, 2006,

the Association filed its Reply in Support of its Motion for Summary Judgment and

Memorandum in Opposition to Counter-Motion for Summary Judgment

(respectively, "Association's Reply" and "Association's Opposition").  On June

21, 2006, Grandes filed its Reply Memorandum in Support of Counter-Motion for

Summary Judgment ("Defendant's Reply").  Finally, Grandes filed Evidentiary

Objections to Declarations of James I. Nishimoto (Second), Jeff Kloetzel (Second),

Ronald K. Awa (Second), Ronald Yee, Lane K. Uchimura, and Scott Grigsby and

Exhibits T-U, W-Z, CC-MM, PP-SS, and UU on June 21, 2006.

B.     Factual Background

The instant lawsuit revolves around a single-family home

("Dwelling") constructed at 1251 Kamehame Drive, also known as Lot 49 (the

"Property").   Defendants Anthony Charles Grande and Narindar Kaur Grande,

(collectively, the "Grandes") are the owners of the Property.  Plaintiff Na Pali

Haweo Community Association (the "Association"), is the community association

for the subdivision and is charged with the responsibility of enforcing the

Declaration of Covenants, Conditions, and Restrictions of Na Pali Haweo (the

"CCRs").  Counterclaim Defendant Ronald K. Awa (" Mr. Awa") is a licensed

architect in the State of Hawaii and is the Chairman of the Association's

Architectural Review Committee ("ARC").

Na Pali Haweo is an luxury subdivision located on the east end of

Oahu on the summit of a ridge line of Hawaii Kai in Maunalua, Honolulu, Hawaii.

The neighborhood is upscale , with homes typically exceeding 3,000 square feet.

Na Pali Haweo was developed with the goal of allowing access to views of the

surrounding landscape, tradewinds, sunshine, and open space.  To further these

goals, a Declaration of Covenants, Conditions, and Restrictions (the "CCRs") are binding upon all owners of property within the Na Pali Haweo subdivision.

In addition to the CCRs, all of the lots within Na Pali Haweo are covered by the Design Guidelines (the "Design Guidelines"), a series of design and development guidelines which are applicable to all construction activities within Na Pali Haweo. The CCRs provide for an Architectural Design Committee (the "ARC") to review plans for all proposed homes at the Na Pali Haweo, including the Grande residence which lies at the heart of this lawsuit. The ARC, pursuant to the CCRs, adopted the Design Guidelines. See Ex. B to Plaintiff's Motion for Summary Judgment.

The Grandes purchased their lot and the deed was recorded at the Bureau of Conveyances in the State of Hawaii on March 23, 2000. In October 2000, the Grandes submitted construction plans for a house to the ARC for approval. Included with the proposed plans was a letter from the Grandes' architect, Edward A. Resh ("Mr. Resh") who acknowledged his use of the Design Guidelines in designing the Dwelling. On October 24, 2000, this set of plans was approved by the ARC, subject to a modification of the trash enclosure and clarification of the design for skylights ("approved plans"). The Grandes submitted a different set of plans to the City and County of Honolulu Department

of Planning and Permitting, without the prior knowledge and approval of the ARC and in violation of the CCRs and Design Guidelines.

Approximately three years later, in 2003, the Grandes began construction on the Dwelling. During the initial stages of construction, Glen Moribe ("Mr. Moribe"), the Grandes' uphill next door neighbor, complained to the Association when the Dwelling appeared to exceed the height limit imposed by the Design Guidelines. In response to growing and repeated complaints, on July 30, 2003, the Association contacted Mr. Resh and requested that he verify that construction of the Dwelling was in accordance with the approved plans. On August 8, 2003, Mr. Resh confirmed via letter that all items were "the same as approved plans previously submitted to the Kamehame Architectural Committee." See Ex. J to Plaintiff's Motion for Summary Judgment.   A week later, Mr. Awa visually inspected the Dwelling and concluded that construction appeared to conform with the approved plans. At that time, the roof framing above the master bedroom/garage had not been completed. However, during that same visit, Mr. Awa noted a set of plans indicating plumbing fixtures within the room intended for storage and plumbing rough-ins in the garage.

On September 22, 2003, the Association informed the Grandes of the continued complaints by the Moribes about the Dwelling's height setback and

frontyard setback.  Mr. Moribe hired an attorney and demanded actual "as-built" measurements of the Dwelling.  Mr. Moribe was still convinced that the Dwelling was not in conformance with the Design Guidelines.  On October 7, 2003, the ARC met with Mr. Grande and his design/build team.  At that meeting, Mr. Resh produced a drawing dated September 29, 2003, which included a notation of "MOVE COL?" referring to the columns constructed within the building envelope.

On October 16, 2003, the Property was inspected by a county building inspector, Na Pali Haweo project manager Jeff Kloetzel ("Mr. Kloetzel), Mr. Moribe, and Mr. Moribe's attorney.  Also present at the inspection were Mrs. Grande and the Defendants' contractor, Jeff Brandt.  Measurements of the property, including the front setback, second floor balcony, and garage roof were taken during the inspection.  According to the Association, the roof framing of the Dwelling had been constructed, but neither the roof nor the plywood sheathing had yet been installed.  The Association asserts that, consistent with Mr. Moribe's suspicions, the measurements taken confirmed that portions of the Dwelling's second floor balcony and garage roof protruded beyond the building envelope, and the front facade of the Dwelling (at the garage) breached the 20-foot front setback restriction of the Design Guidelines.

On or about October 19, 2003, Mr. Resh submitted revised plans to the ARC and a letter requesting a building envelope and a front yard setback variance for the Dwelling.  This request was denied by the ARC.  On October 29, 2003, the Grandes were advised that the ARC did not have authority to grant a height setback variance and that it would be in the Grandes' best interest to cease all further construction on non-compliant areas.  Mr. Awa sent another letter on November 6, 2003, informing the Grandes once more that the ARC could not grant a height setback variance.  The letter also informed the Grandes that their garage storage area deviated from the approved plans and was in violation of the Design Guidelines.

On November 13, 2003, Mr. Resh submitted another set of revised plans to the ARC showing removal of two columns.  The removal and reconstruction of the columns was approved by the ARC, but it was noted that there were other portions of the Dwelling that would still have to be moved in order to conform with the building envelope restriction of the CCRs and Design Guidelines.  In late October 2003, construction of the Dwelling ceased and did not resume until sometime in January 2004.

Mr. Resh submitted yet another set of plans dated January 9, 2004, in an attempt to address the concerns expressed in the ARC's November 26, 2003

letter. However, those plans were rejected because, according to the Association, the proposal to cut off a portion of the eaves above the garage appeared to be more of a design "afterthought" and was so out of character with the rest of the roof design. See Ex. R to Plaintiff's Motion for Summary Judgment. According to the Association, on January 28, 2004, it demanded that the Grandes cease construction on non-compliant portions of the Dwelling. When construction presumably did not cease, the Associations' attorneys wrote to the Grandes on March 4, 2004 demanding that all non-compliant construction immediately cease and that revised plans be submitted to the ARC.

Despite the Association's repeated demands and letters, construction on the Dwelling still appeared to continue. By May 2004, the Grandes had hired their own attorney, Steven B. Jacobson ("Mr. Jacobson"). On May 25, 2004, the Association's attorneys wrote to Mr. Jacobson and demanded, once again, that all non-compliant construction on the Dwelling cease and that revised plans be submitted to the ARC, consistent with the Design Guidelines. On June 7, 2004, the Association offered to mediate with the Grandes, provided that the Grandes cease all unauthorized construction. In response, Mr. Jacobson advised the Association that his clients were willing to mediate, but they did not agree to cease construction because, in the Grandes' opinion, there was still ambiguity and dispute over which

areas of the Dwelling were truly "non-compliant." <u>See</u> Ex. Y to Plaintiff's Motion for Summary Judgment. On June 23, 2004, the Association repeated their offer to mediate if the Grandes would cease unauthorized construction. According to the Association, a response was never received from the Grandes and construction continued on the Dwelling.

On June 1, 2004, the Association filed a lawsuit against the Grandes in the Circuit Court of the First Circuit of the State of Hawaii, seeking, *inter alia,* an injunction compelling compliance with the Design Guidelines. The Grandes removed the case to Federal Court on July 2, 2004. This motion and counter-motion timely followed.

STANDARD OF REVIEW

As set forth in Federal Rule of Civil Procedure 56(c), summary judgment shall be entered when:

> . . . the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c) (2003).

In its motion for summary judgment, the moving party has the initial burden of demonstrating for the court that there is no genuine issue of material fact

10

and that the court may rule on the issues as a matter of law.  See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970)).  Despite this burden, the moving party need not produce evidence negating the existence of an element for which the opposing party will bear the ultimate burden of proof at trial.  See id. at 323.

Once the movant has met its initial burden, the opposing party has the affirmative burden of coming forward with specific facts evidencing a need for trial.  See Fed. R. Civ. P. 56(e).  The opposing party cannot stand on its pleadings, nor simply assert that it will be able to discredit the movant's evidence at trial.  See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987); Fed. R. Civ. P. 56(e).  Moreover, there is no genuine issue of fact "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citation omitted).

A material fact is one that may affect the decision, so that the finding of that fact is relevant and necessary to the proceedings.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine issue is shown to exist if sufficient evidence is presented such that a reasonable fact finder could decide the question in favor of the nonmoving party.  See id.  The evidence submitted by the

11

Case 1:04-cv-00413-⊑ ⊑-LEK    Document 150    Filed 07/ꞁ ⋃/2006    Page 12 of 28

nonmovant in opposition to a motion for summary judgment "is to be believed, and all justifiable inferences are to be drawn in [its] favor." Id. at 255.

In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law. See id. at 254. The court must assess the adequacy of the non-movant's response and must determine whether the showing the nonmovant asserts it will make at trial would be sufficient to carry its burden of proof. See Celotex, 477 U.S. at 322.

Although highly fact-based cases are not generally suitable for summary judgment, the nonmoving party must demonstrate that sufficient evidence of a factual dispute exists to require a jury or judge to resolve the parties' differing versions of the truth at trial. In ruling on such a motion, this court may not make credibility determinations or weigh conflicting evidence. See Musick v. Burke, 913 F.2d 1390, 1394 (9th Cir. 1990).

## DISCUSSION

The CCRs and Design Guidelines are the governing documents of the dispute between the parties. Thus, as restrictive covenants, the law is clear as to their interpretation and application:

12

> In construing restrictive covenants, a court must interpret the covenant or restriction based upon the entire context of the provision, with words interpreted in accordance with the intention of the parties, and in their ordinary and popular sense.

DeMund v. Lum, 5 Haw. App. 336,690 P.2d 1316 (1984), *cert. denied* 67 Haw. 685, 744 P.2d 781 (citing 20 Am. Jur. 2d Covenants, Sec. 186 (1965)); Pelosi v. Wailea Ranch Estates, 10 Haw. App. 424, 435-36, 876 O.2d 1320, 1326-27 (1994).

The Association alleges that the Grandes violated numerous provisions of the Design Guidelines. In turn, the Grandes assert that there was no violation, and even if there were, they are *de minimis*, or in some other manner excused. The Court addresses each of the alleged violations and makes it ruling as to summary judgment as follows:

A.    Building Envelope

Article III, Section 3.2.1(d) defines the "building envelope" as follows:

> (d) Building envelope.  All improvements shall be construed in accordance with the applicable building line, setback and height provisions set forth on the subdivision map and/or local ordinance.  No structure of any nature shall be constructed on a Lot which violates any provisions of the requirements of the City and County of Honolulu, as amended, or any other declaration of building restrictions recorded against the Lot, whichever is more restrictive.

The Building Envelope sets the maximum height, setback, and bulk of each house. It does not represent the ultimate shape or architectural appearance of the building.

No part of any structure or auxiliary structure may protrude outside the building envelope except roof overhangs, eaves, sunshades, sills, beam ends, awnings, planters, and other architectural embellishments or appendages with less than a 30 inch vertical thickness. Roof overhangs may protrude not more than 2-1/2 feet outside the envelope. Chimneys may protrude outside the envelope only to meet code requirements of the City/County , but should not encroach within 5' of the property line.

The Association states that portions of the Dwelling (including two columns supporting the roof above the master bedroom, the roof beam at the front edge of the roof, and more than 2½ feet of the roof eaves) protrude beyond the building envelope. The Association argues that by October 7, 2003, the Grandes had already been on notice that the Dwelling was encroaching beyond the building envelope and that a schematic drawing dated September 29, 2003 by Mr. Resh included a notation of "MOVE COL?" indicated that Mr. Resh was aware that the columns need to be moved in order to correct the building envelope encroachment.

The Association also asserts that when the Grandes became aware of the building envelope encroachment, the roof of the Dwelling had not yet been constructed and that the Dwelling was still in a substantially incomplete state.

Thus, the Association contends, the building envelope violation could have been remedied at relatively minor expense. On November 13, 2003, the Grandes apparently submitted plans that detailed relocation of the front columns. Although these plans were approved in part, the Association states that the Grandes continued construction in contravention of the approved plans and proceeded without curing the building envelope violation.

In response, the Grandes state that the Association had initially approved plans for a 10' building envelope for their home (in the first set of approved plans submitted to the ARC in 2000) and are now refusing to be bound by that prior approval. The Grandes argue that the ARC was authorized to grant variances from the Design Guidelines and that was, in effect, what it had done when the Grandes' first set of plans were approved. The Grandes attempt to bolster their argument with the contention that "[t]he Association's Design Guidelines are not rigid anyway," that they "express intentions rather than absolutes," and that the Dwelling is within the "typical" height requirements if measured from existing grade.

The Court finds that the language of Section 3.2.1 of the Design Guidelines is clear and unequivocal. All owners must comply with the specified height setback of 20'. Any variance that may be granted for the building envelope

must be in writing and the Grandes' request for a variance on October 19, 2003, was expressly rejected by the Association and the ARC had no authority to grant a variance to the Grandes. And regardless, even if the authority existed, a variance was not approved.

In any event, the Grandes also cannot rely on the previously approved plans (which provided for a 10' building envelope) because they did not use the first set of plans that were approved by the Association.

There are no genuine issues of material fact as to the building envelope. Accordingly, the Court GRANTS Plaintiff's Motion for Summary Judgment and DENIES Defendants' Counter-Motion for Summary Judgment as to the building envelope.

**B.    Setback**

Article III, Section 3.2.1(d) of the Design Guidelines addresses the property setback requirements:

> Typical First Story Envelope
> The first story portion of the envelope is the area in which only ground level construction is allowed.
>
> Front: 20' setback from the Property line.
> Side: 5' setback frm the Property line.
> Rear: 5' setback from the Property line.

The Association states that the Dwelling is in violation of this section of the Design Guidelines because the front section of the Dwelling, including the front section of the garage, is set back 19' 9½" instead of the required 20', from the front Property line. According to the Association, seven letters were sent during 2003 and 2004 informing the Grandes of this violation. The Association's concern over the setback violation stems from its assertions that, when combined with the building envelope encroachment and other asserted deviations from the approved plans, they all contribute to the imposing amass and scale of the Dwelling. See Plaintiff's Motion for Summary Judgment at p. 18.

The Grandes argue that the 3½" setback difference from a typical envelope is not material because there are other homes in Na Pali Haweo that are within 20' of their front property lines.

As a last-ditch effort to justify their position, the Grandes assert that the CCRs required the Association to give them a noticed hearing before its Board, and to observe other procedural safeguards before suing, but failed to do so.

It is of no consequence that the Grandes assert the 3½" setback difference is not material. The language of the Design Guidelines is clear and unambiguous. They do not dispute the front setback encroachment and thus there are no genuine issues of material fact. Accordingly, the Court GRANTS Plaintiff's

Motion for Summary Judgment and DENIES Defendants' Counter-Motion for

Summary Judgment.

C.    Skylights

Article III, Section 3.2.1(i) of the Design Guidelines states:

Skylights are to be designed as an integral part of the roof.
Skylight glazing must be clear, solar bronze or gray; white or
reflective glazing is prohibited.  Skylight framing material must
be bronze anodized or colored to match adjacent roof.  Natural
aluminum is prohibited.  No bubble or plastic skylights will be
allowed and skylights facing the streets shall be non-operable
and subject to the approval of the Architectural Review
Committee.

The Association alleges that the two skylights on the north roof slope

of Dwelling are bubble type with white frost, plastic lens, and natural aluminum

curbs and therefore violate the design guidelines.  According to the Association,

the skylights installed by the Grandes have white glazing, are not designed as an

integral part of the roof, and the skylight framing is galvanized steel or natural

aluminum rather than bronze anodized or colored to match the roof.

The Grandes argue that most skylights within Na Pali Haweo are of

the bubble type and that the Design Guidelines pertaining to this area have been

effectively abandoned.  However, the Grandes also admit that they have removed

the bubble skylights and assert that the skylights are now in compliance with the

Design Guidelines. In response, the Association states that any modifications that may have been made were done without the notification and prior approval of the ARC, as required by the Design Guidelines. Although the Association is silent on the matter of whether the skylights now comply with the Design Guidelines, it maintains that the skylight frames are not painted in a color that matches the Dwelling's roof, which in and of itself is another alleged violation of the Design Guidelines. Plaintiff's Opposition CSOF at ¶49.

Abandonment is a question of fact, and the burden of proof rests on the defendant. Sandstrom v. Larsen, 59 Haw. 491, 496 (1978). Defendants must show that "the lot owners of the subdivision acquiesced in substantial and general violations of the covenant within the restricted area." Id. at 497 (further citations omitted). Failure to enforce covenants against a single property does not result in abandonment. Kalenka v. Taylor, 896 P.2d 222, 226 (Alaska 1995) (further citations omitted). However, because the skylights have been changed, the issue of abandonment is moot in this case.

The question of whether the skylights are presently flat with framing that matches the color of the roof is a question of fact that must be answered by a jury. The Court therefore finds that this matter is not appropriate for summary

judgment and therefore DENIES Plaintiff's Motion for Summary Judgment and

Defendants' Counter-Motion for Summary Judgment.

D.    <u>Air Conditioning</u>

Article III, Section 3.2.14 of the Design Guidelines states:

<u>Mechanical Equipment</u>.  All air conditioning, heating
equipment and soft water tanks must be screened from view and
be insulated for sound attenuation.  Air conditioning units are
not permitted on roofs.

More specifically, Article III, Section 3.2.14(a) of the Design Guidelines
states:

<u>Air Conditioning System</u>.  Prior to the installation of the air
conditioning systems, Owner shall secure the written
concurrence of the [ARC] a to the location and type of system.
Such air conditioning system shall be sound-treated to prevent
noise nuisance.

The Association asserts that the Dwelling is in violation of the above-

quoted provision because the air-conditioning was not a part of the approved plans,

and is exposed at the rear yard with no fence or screening.  In response, the

Grandes point their finger at their next-door neighbor and assert that he has two

unscreened air conditioners of his own.  The Grandes make no mention of whether

they first obtained approval for their air conditioning was prior to installation as

required by the Design Guidelines), but instead shift the focus to the  screening

over the air conditioning.  The Grandes insist that this screening was approved by a

representative of the Association and is in compliance with the restrictive covenants.

The matters of prior approval for installation of the Grandes' air conditioning unit and whether the associated lattice work is compliant with the Design Guidelines is an issue of fact. Thus, this matter is not appropriate for summary disposition by the Court. Accordingly, the Court DENIES Plaintiff's Motion for Summary Judgment and DENIES Defendants' Counter-Motion for Summary Judgment.

E.    Roof Vents

Article III, Section 3.2.3(f) of the Design Guidelines states

All vents, stacks, and pipes must be colored to match the roof or wall material from which they project, must not be visible from the street, and are to be grouped so as to minimize roof penetrations.

The Association asserts that the Grandes installed commercial aluminum turbine style roof vents which not only differed from those depicted on the ARC approved plans, and thus were not approved by the ARC, but the roof vents are not colored to match the roof and are visible from the street. Plaintiff's Motion for Summary Judgment at p.19.

21

The Grandes argue that the roof vents were moved and replaced "to meet the Association's desires" and before the Association moved for summary judgment. See Defendants' Counter-Motion for Summary Judgment at p.4.

Whether the now-replaced roof vents comply with the Design Guidelines is an issue of fact that precludes this Court from determining summary judgment. Therefore, the Court DENIES Plaintiff's Motion for Summary Judgment and DENIES Defendants' Counter-Motion for Summary Judgment.

F.    Front Garden Wall

Article III, Section 3.2.7 of the Design Guidelines states, in relevant part, that:

> (a)    Height of Fences.  No garden wall of fence being along property lines or within the setback areas, whether or not use as a retaining wall, shall have an exposed face higher than six feet (6') from existing grade and the area between such walls or fences and the property line at street frontage shall be adequately landscaped.
>        ...
> Walls or fences constructed within the front twenty foot (20') setback shall comply with the following:
>
> (a)    Be no higher than five feet (5') above the finished grade on the side of the wall facing adjacent property;
>        ...
> No fences, hedges, or walls shall be erected or maintained on any Lot other than as initially installed by Declarant unless first approved by the Architectural Review Committee.

22

The Association argues that the Grandes constructed a wall on the Property which deviates from the previously approved plans by the ARC and that the Design Guidelines have been violated because the garden walls at the front property line exceed 6' in height.

In turn, the Grandes state that they agreed to fix this alleged violation, but are "merely awaiting Association approval, which is being withheld on the specious ground that [Defendants'] April 2006 don't describe [Defendants'] proposal." Defendants' Counter-Motion for Summary Judgment at p.10.

The Grandes do not dispute that the wall is currently in violation of the Design Guidelines. Because there is no genuine issue of material fact, the court GRANTS Plaintiff's Motion for Summary Judgment and DENIES Defendants' Counter-Motion for Summary Judgment.

G.    Garage Storage Space

Section 4.3.7 of the CCRs states, in relevant part, that "Garages shall be used only for the parking or repair of personally owned motor vehicles, storage, and workshop purposes." Additionally, Article III, Section 3.2.4(b) of the Design Guidelines states:

> Every garage, whether attached or detached, which has a
> vehicular entrance facing a street shall contain not less than an
> additional one hundred (100) square feet of enclosed and
> covered area for service and storage facilities.

The Association asserts that the Grandes failed to construct proper

storage facilities in the Dwelling's garage. According to the Association, the

approved plans that were first proffered, and subsequently approved, satisfied the

requirements of this section of the Design Guidelines. However, during

subsequent inspections of the property, the Association discovered that the storage

area had not been constructed according to the approved plans and provided for

less than the required 100 square feet of storage space. The Grandes were sent five

separate letters notifying them of this violation and were directed to submit new

plans for approval. The Grandes submitted new plans, but they were not approved

by the Association.

The Grandes take the position that the Association does not have the

authority to limit their rights to remodel the interior of their garage. They also

argue that they have always remained in compliance with respect to this provision

because the Design Guidelines call for 100 square feet of "service and storage" and

therefore the toilet room as constructed constitutes permissive as "service" use.

In determining the meaning of the language used in a restrictive covenant, the court "will first look to the plain, ordinary and popular meaning of the words used in the covenant." Clark v. Wodehouse, 4 Haw. App. 507, 669 P.2d 170 (Haw. App. 1983) (citing Collins v. Goetsch, 59 Haw. at 487, n.3, 583 P.2d at 358 (1983)). The term "garage" is ordinarily understood to mean "a building or shed for the storage of a motor vehicle or motor vehicles." The Oxford English Dictionary 579 (1991). The term "service facilities" within the context of these Design Guidelines is not abundantly clear, and whether or not a toilet room lies within the meaning of this term is not a conclusion this Court can reach at this juncture. The meaning of the term "service facilities" within the Design Guidelines is an issue of fact and is precluded from summary judgment. Therefore, the Court DENIES Plaintiff's Motion for Summary Judgment and DENIES Defendants' Counter-Motion for Summary Judgment

**H.**   Sliding Garage Gate

The parties cite to Article VI, Section 6.3.4 of the Design Guidelines as the controlling section of the dispute. However, the Court is not in receipt of this Section in either party's exhibits.

The Grandes argue that because the Association demanded that construction in the front setback area cease in January, March, and May 2004, they

have effectively waived and are estopped from alleging non-compliance by the Grandes for failure to install the gate.

The Grandes do not dispute that there is no sliding garage gate. Its absence is a clear violation of the Design Guidelines. Therefore, because there is no genuine issue of material fact, the court GRANTS Plaintiff's Motion for Summary Judgment and DENIES Defendants' Counter-Motion for Summary Judgment.

I.    Front Entry Light Fixtures

Article III, Section 3.2.6 of the Design Guidelines states that:

Exterior Lighting. All exterior lighting is to be indirect and shielded to prevent spillover onto adjacent lots and street. Exposed bulbs, spotlights, reflectors, and lenses are prohibited.

The Association asserts that the front entry light fixtures on the entry column bases have exposed bulbs. In turn, the Grandes state that this violation was cured prior to the filing of this instant Motion.

Whether the now-installed lights comply with the Design Guidelines is a genuine issue of material fact and is thus precluded from summary judgment. The Court, therefore, DENIES Plaintiff's Motion for Summary Judgment and DENIES Defendants' Counter-Motion for Summary Judgment.

26

J.    Miscellaneous Exterior Fenestrations

As noted above, the Court is not in receipt of Article VI, Section 6.3.4 of the Design Guidelines, which purportedly addresses the alleged violations involving the roof eyebrow, arched clerestory window, arched corners within the garage wall opening, front entry planters, metal balcony railing, left side house windows, and roof elements above the entry and master bedroom.

As there is no controlling document for the Court to interpret as a matter of law and there remain questions as to the existence or non-existence of these fenestrations, summary judgment is DENIED for both Plaintiff's Motion for Summary Judgment and Defendants' Counter-Motion for Summary Judgment.

K.    Trash Area Concrete Pad

Both parties again cite to Article VI, Section 6.3.4 of the Design Guidelines for the requirement of a concrete pad in the trash area. As mentioned above, the Court is not in receipt of the relevant section of the Design Guidelines that address this matter. However, even if the Court were in receipt of the Article VI, Section 6.3.4 of the Design Guidelines, summary judgment would not be appropriate. The Association maintains that no concrete pad has been constructed, and according to the Grandes, this is a "silly item" that they have always complied

with, that it has always existed, and that the Association is simply looking in the wrong area. See Defendants' Counter-Motion for Summary Judgment at p. 10.

The existence, or non-existence, of a concrete pad in the Dwelling's trash area is an issue of fact and is precluded from summary judgment. Therefore, the Court DENIES Plaintiff's Motion for Summary Judgment and DENIES Defendants' Counter-Motion for Summary Judgment.

<u>CONCLUSION</u>

For the reasons stated above, the court GRANTS in part and DENIES in part Plaintiff's Motion for Summary Judgment and GRANTS in PART and DENIES in part Defendants' Counter Motion for Summary Judgment.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, July 14, 2006.



_____
David Alan Ezra
United States District Judge

<u>Na Pali Haweo Community Association. v. Anthony Grande, et al.</u>, CV No. 04-00413 DAE/LEK; ORDER GRANTING AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' COUNTER MOTION FOR SUMMARY JUDGMENT