FIRST CIRCUIT COURT
STATE OF HAWAII
FILED
_10:20_ O'CLOCK _A_ M.
SEP 1 4 2007, 20____
I. RICHARDSON
Clerk, 4th Division

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

| | | |
|---|---|---|
| BRANDT HOMES INCORPORATED, a Hawaii corporation, and JEFFREY BRANDT, | ) ) ) | Civil. No. 05-1-2061-11 (GJK) |
| Plaintiffs, | ) ) | |
| vs. | ) ) | FINDINGS OF FACT AND CONCLUSIONS OF LAW; ORDER |
| ANTHONY CHARLES GRANDE and NARINDAR KAUR GRANDE; et al., | ) ) ) ) | |
| Defendants. | ) ) | Jury Waived Trial: June 18, 20, 21, 22, 2007 |
| | ) ) | July 11, 12, 13, 2007 |
| ANTHONY CHARLES GRANDE and NARINDAR KAUR GRANDE, | ) ) ) | |
| Counterclaimants, | ) ) | |
| vs. | ) ) | |
| BRANDT HOMES INCORPORATED; JEFFREY BRANDT; and NA PALI HAWEO COMMUNITY ASSOCIATION, | ) ) ) ) | |
| Counterclaim Defendants | ) ) | |

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

This case having come on for jury-waived trial before the Honorable Glenn J. Kim, Judge

of the above-entitled court, on June 18, 20, 21, 22, and July 11, 12, and 13, 2007, Plaintiffs and

Counterclaim Defendants Jeffrey Brandt and Brandt Homes Incorporated being represented by


EXHIBIT _C_

I do hereby certify that this is a full, true, and
correct copy of the original on file in this office.

_____
Clerk Circuit Court, First Circuit

Cid H. Inouye, Esq., and Defendants and Counterclaimants Anthony Charles Grande and

Narindar Kaur Grande being represented by Steven B. Jacobson, Esq., and the Court having

taken witness testimony, received various other documentary and photographic evidence, heard

argument of counsel, and being otherwise fully advised in the premises, hereby makes the

following findings of fact and conclusions of law:

Findings of Fact

1.      On December 3, 2002, licensed contractor Jeffrey Brandt ("Brandt") contracted

with Anthony Grande and his wife, Narindar Kaur Grande ("the Grandes"), to build a house for

the Grandes on their lot located at 1251 Kamehame Drive in Honolulu, Hawaii ("the house").

2.      The parties – Brandt and the Grandes – all signed a written contract dated

December 3, 2002 ("the contract"), memorializing their agreement regarding the building of the

house.

3.      By its specific terms, the contract included architectural plans "identified by the

signatures of the parties" to the contract.

4.      The plans so included in the contract were prepared by the Grandes' architect Ed

Resh ("Resh") and provided to Brandt for his construction of the house.

5.      The house is located in an up-scale subdivision in Hawaii Kai in east Honolulu,

and the subdivision itself is governed by a community association called the Na Pali Haweo

Community Association ("the Association").

6.      The Association is charged with the responsibility of enforcing the Declaration of

Covenants, Conditions, and Restrictions of Na Pali Haweo ("the CCRs"), and the CCRs in turn

provide for a set of specific Design Guidelines ("the Guidelines") which are applicable to and

2

govern any and all construction activities within the subdivision, including new home construction such as the house.

7.      The CCRs also provide for an Architectural Design Committee ("the ARC") which is charged with reviewing and approving architectural plans for proposed new home building in light of the Guidelines.

8.      In addition to the plans he provided to Brandt for the construction of the house – plans which had been signed by Brandt and the Grandes and were thus a part of the contract – Resh also prepared a different set of plans which were submitted for approval to the ARC; these plans were never provided to Brandt, nor was he aware of them for most of the time he was constructing the house.

9.      Still another set of plans was also prepared by Resh and submitted for approval to the City and County of Honolulu Department of Planning and Permitting.

10.     Pursuant to the Guidelines, the "building envelope" of a house in the subdivision as set forth in architectural plans "sets the maximum height, setback, and bulk of each house," although "[i]t does not represent the ultimate shape or architectural appearance of the building"; in other words, a house in the subdivision must conform to, by completely fitting within, the dimensions of the applicable building envelope.

11.     The Guidelines further and relevantly provide that the front of a house must be set back at least twenty feet from the front property line and that "any portion of a structure exceeding twenty feet" in height, including the front of the house, must also be "set back from the front yard buildable area boundary line one foot for every two feet of additional height over twenty feet"; accordingly, if the front of a house is built with a twenty foot setback from the front property line, then the height of the front of the house cannot exceed twenty feet.

3

12.    The building envelope which Resh drew on all three different sets of plans which he prepared – one given to Brandt, one to the city, and one to the ARC – provides for only a ten foot front setback; in other words, the building envelope drawn by Resh on all three sets of plans does not conform to the building envelope mandated by the Guidelines and is accordingly in violation of those Guidelines.

13.    Likewise, all three sets of plans provide that the house itself is built set back twenty feet from the front property line, with a front height (it being a two-story house) of several feet more than the maximum of twenty called for by the Guidelines.

14.    Accordingly, the front height of the house as drawn by Resh on his various sets of plans is also in violation of the Guidelines, though not of the building envelope on the plans themselves, since the front setback of the building envelope drawn on the plans is only ten feet.

15.    Brandt followed the plans provided to him by Resh in building the house; accordingly, unbeknownst to Brandt while he was building it, a portion of the front of the house was built in non-compliance with the height limitations of the Guidelines' building envelope.

16.    Brandt worked on constructing the house throughout the year 2003 and into the early months of 2004.

17.    During the construction of the house in 2003, one of the Grandes' neighbors named Moribe began to complain both to the Grandes and to the Association that the house was not being built in conformance with the Guidelines; Moribe's complaints were numerous and insistent, and he finally ended up bringing a lawsuit against the Grandes because of the house.

18.    Alerted by Moribe, the Association notified the Grandes of the potential problem with the house and began a series of communications – many by letter – with the Grandes regarding the construction of the house.

4

19.    It was around this time, during the fall of 2003, that Brandt first learned of a potential problem with the house, and it was at this same time, around September of 2003, that Brandt first learned about the existence of the Guidelines and the twenty foot front setback building envelope.

20.    However, by this time the essential structure of the house was complete, with all the outside walls constructed and the roof truss in place.

21.    Because he had now been made aware of the potential problem with the height of the front of the house, Brandt did make some alterations, such as filling in part of the front lanai area so that a supporting column could be moved further back if necessary in order to move the roof line back and bring the front roof back into compliance with the Guidelines' building envelope.

22.    Brandt also provided an estimate to the Grandes of how much it would cost at this point to bring the front roof area of the house into compliance with the Guidelines – $8450.00 – but the Grandes never responded to him on this point.

23.    It was Brandt's understanding at this time that the Association was allowing the Grandes to complete the house construction with the exception of the non-compliant area in front, and since the Grandes had requested that he continue working on the house, Brandt did so, except for the non-compliant portion of the house.

24.    Accordingly, Brandt did not complete construction of the non-compliant front part of the house, including the front of the garage and that part of the roof and ceiling; he also did not install a garage door.

25.     Brandt did not complete construction of the non-compliant front part of the house because the Association had ordered the Grandes to cease construction of this non-compliant part of the house in January of 2004.

26.     However, despite the continuing controversy with the Association and Moribe about the house's non-compliance and the Association's order to them to cease construction of the non-compliant portion of the house, the Grandes insisted that Brandt complete construction of the house, including the non-compliant portion.

27.     Through his attorney, Brandt then requested that the Grandes indemnify him before he acceded to their request that he finish the house; the Grandes refused to do so, and Brandt then refused to complete the non-compliant portion of the house.

28.     The Grandes left Hawaii and relocated back to the mainland in January of 2004, although the controversy about the house with both the Association and Moribe continued.

29.     On March 24, 2004, Brandt completed construction of the house except for the non-compliant portion and certain other areas of the house – for example, some of the tiling of the roof – which could not be completed due to work on the non-compliant portion not being finished.

30.     At that time, Resh, accompanied by Brandt, inspected the house at Brandt's request and certified Brandt's completion of the house except for the non-compliant portion by signing a letter to that effect: "all [w]ork has been completed . . . as indicated except for the areas that are in dispute with [the] Guidelines and beyond the control of the Contractor, the quality of the work is in accordance with the Contract Documents."

6

31.    Besides the fact that Brandt did not complete the non-compliant portion of the house, there is one significant respect, and another minor one, in which he did not follow the plans provided to him by Resh.

32.    First, instead of building a portion of the front roof in two separate sections which do not intersect as set forth in the plans, Brandt joined together the sections to form one continuous roofline in that part of the front of the house above the front doorway in order, Brandt claims, to alleviate a problem with rain gutter installation.  However, Resh approved of this change in the plans, as is evidenced by his signing of the certification letter of March 24, 2004.

33.    Second, when specific measurements were taken of the subject areas of the house in October of 2003, it was discovered that a part of the front of the house in the area of the garage was approximately three inches short of the mandated twenty foot front setback. However, it is clear to the court from the various correspondence exchanged by the Association and the Grandes/Resh that this very minor discrepancy alone would have caused no significant difficulty for the Grandes and that it was only in combination with the other, material breaches of the Guidelines, together with the Grandes' stubborn refusal to wholeheartedly attempt to reach some sort of accommodation with the Association that compelled the latter to refuse what would otherwise have been an easily-granted variance.

34.    Except for the foregoing items, and the non-completion of the portion of the front of the house not compliant with the Guidelines on which the Association demanded that work be stopped, Brandt constructed the house in conformance with the contract and the signed plans contained therein.

35.     As already noted, Moribe eventually sued the Grandes because of the non-compliance of the house with the Guidelines, and the Association ultimately also did so in the summer of 2004, a lawsuit that remains pending in federal court.

36.     In view of the Grandes' refusal to indemnify him, it was reasonable for Brandt to comply with the Association's order to the Grandes to cease work on the non-compliant portions of the house despite the Grandes' insistence that he continue, especially given the fact that his own attorneys were telling him that the Association might well bring suit against the Grandes, which in fact, as noted, the Association ultimately did.

37.     The contract specifies that although the Grandes could order changes in the work while the house was under construction, such work order changes had to be in writing and "no claim by the Contractor for extra cost shall be make [sic.] unless the work performed, which is the basis for the extra cost, is ordered by the Owner in writing prior to the performance of the work."

38.     The contract further states that "[i]n case suit is instituted on this Contract, the prevailing party shall receive from the adverse party reasonable attorneys' fees[.]"

39.     At the Grandes' request, the contract also includes a liquidated damages provision under which the contractor is excused from paying such liquidated damages otherwise assessable due to "conditions beyond the control of Contractor," and Brandt correctly contends that he owes the Grandes no such liquidated damages because of delays occasioned by problems with the roof truss design, inclement weather, and several days when a neighbor, presumably Moribe, caused problems with subcontractors for the project.

40.     According to the expert testimony of two experienced architects, one for the plaintiff and the other the defendants' own expert, it is clearly the responsibility and the

obligation of the project architect, and not the contractor, to make sure that the project plans adhere to any applicable building guidelines, such as the Guidelines at issue in the instant case.

41.    Brandt is claiming a total of $42,023.60 in addition to reasonable attorneys' fees - - $31,875.74 as what the Grandes have still not paid him for work done under the contract, and 10% interest from April 12, 2004 to June 19, 2007. Of the $31,875.74, $7233.90 is for purported change orders from the Grandes, while to arrive at the $31,875.74 figure, Brandt has also discounted some $23,545.73 in allowances to the Grandes, some of which are due to his excusable failure to complete the non-compliant portion of the house.

42.    None of the purported change orders by the Grandes were ever reduced to writing and Anthony Grande also contests some of them on other grounds.

43.    The Grandes are counterclaiming for their expenses in having the house finished by other builders after Brandt left the job in March of 2004, for any future expenses incurred by them if they are forced to bring the house into compliance with the Guidelines, and for reasonable attorneys' fees and costs associated with their defending the lawsuits brought against them by the Moribes and the Association.

## CONCLUSIONS OF LAW

1.    In his construction of the house, which he completed except for the area in front not in compliance with the Guidelines, Brandt substantially performed under and did not materially breach the contract with the Grandes. Accordingly, in Count I of the Complaint, Brandt is entitled to recover the unpaid balance for his work with allowable interest, especially given the discounts he has allowed the Grandes for portions of the work he did not complete due to the Association's stop-work order, and insofar as the Grandes have refused to pay him such unpaid balance for his work, they have breached the contract; in addition, Brandt is entitled to

reasonable attorneys' fees pursuant to the contract. (Given the court's decision in Count I, Counts II, III, and IV of the Complaint are dismissed.)

    2.      However, because none of the purported change orders were in writing, also pursuant to the specific terms of the contract, Brandt cannot recover any amounts for these purported change orders.

    3.      Because Brandt substantially performed under and did not materially breach the contract with the Grandes, the Grandes are not entitled to recover anything from Brandt regarding any alleged costs associated with completing the non-compliant portion of the house or any future costs which may be necessary to bring the house into compliance with the Guidelines, and the Grandes are likewise not entitled to recover anything from Brandt regarding any fees and costs associated with their defense of lawsuits brought against them by Moribe and the Association.

    4.      As a breach of contract claim, Count I of the Complaint is an action "in the nature of assumpsit," as well as involving a "contract in writing that provides for an attorney's fee" pursuant to Hawaii Revised Statutes ("HRS") Section 607-14.

    5.      HRS Section 607-14 further relevantly states that where such contract in writing "provides for a reasonable attorney's fee, not more than twenty-five per cent [of the judgment] shall be allowed."

    6.      Accordingly, in the instant case, the reasonable attorney's fee to be allowed to Brandt is a maximum of twenty-five per cent of the total of the judgment.

ORDER

Accordingly, based on the foregoing findings of fact and conclusions of law, it is hereby ORDERED, ADJUDGED, AND DECREED that judgment shall enter in favor of the plaintiffs

10

Jeffrey Brandt and Brandt Homes Incorporated and against the defendant-counterclaimants Anthony and Narindar Kaur Grande in the amount of $32,493.38, in addition to reasonable attorney's fees in an amount to be determined, but not to exceed $8123.35. It is further ORDERED that judgment shall enter in favor of Brandt and against the Grandes on the Grandes' counterclaim. Following determination of the amount of attorney's fees to be awarded, counsel for Brandt is requested to prepare an appropriate judgment in accordance with the foregoing order.

DATED:  Honolulu, Hawaii, _OCT 1 4 2007_____.

_____
JUDGE OF THE ABOVE-ENTITLED COURT

SEAL
FIRST CIRCUIT COURT
STATE OF HAWAII

11