IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI‛I

| | |
|---|---|
| NA PALI HAWEO COMMUNITY ASSOCIATION, a Hawai`i nonprofit corporation,<br><br>   Plaintiff,<br><br> vs.<br><br>ANTHONY CHARLES GRANDE; NARINDAR KAUR GRANDE; JOHN DOES 1-10; JANE DOES 1-10; DOE PARTNERSHIPS 1-10; DOE ENTITIES 1-10; AND DOE GOVERNMENTAL UNITS 1-10,<br><br>   Defendants.<br><br>ANTHONY CHARLES GRANDE and NARINDAR KAUR GRANDE,<br><br>   Counterclaim Plaintiffs,<br><br> vs.<br><br>NA PALI HAWEO COMMUNITY ASSOCIATION; RONALD K. AWA and DOES 1-25,<br><br>   Counterclaim Defendants.<br>_____ | CV NO 04-00413 DAE/BMK<br>(Injunctive Relief) |

ORDER GRANTING IN PART AND DENYING IN PART AS MOOT
PLAINTIFF NA PALI HAWEO COMMUNITY ASSOCIATION'S MOTION
FOR SUMMARY JUDGMENT AND PERMANENT INJUNCTION; ORDER
GRANTING COUNTERCLAIM DEFENDANTS' MOTION FOR SUMMARY
<u>JUDGMENT; AND ORDER SETTING INJUNCTION</u>

The Court heard Plaintiff Na Pali Haweo Community Association's

Motion for Summary Judgment and Permanent Injunction and Counterclaim

Defendants' Motion for Summary Judgment on March 18, 2008.  Lance Fujisaki,

Esq., and John Zalewski, Esq., appeared at the hearing on behalf of

Plaintiff/Counterclaim Defendant Na Pali Haweo Community Association and

Counterclaim Defendant Mr. Ronald Awa; Defendants/Counterclaim Plaintiffs

Anthony Charles Grande and Narindar Kaur Grande did not appear at the hearing.

After reviewing the motion and the supporting and opposing memoranda, the Court

GRANTS IN PART and DENIES IN PART AS MOOT Plaintiff's Motion for

Summary Judgment and Permanent Injunction, GRANTS Counterclaim

Defendants' Motion for Summary Judgment, and ORDERS the Injunction

described herein to issue effective immediately.

<u>BACKGROUND</u>

This case arises from a dispute between Na Pali Haweo Community

Association (the "Association") and two of its members, Anthony Charles Grande

and Narindar Kaur Grande (collectively, the "Grandes") concerning construction of

2

a single-family home (the "Dwelling") constructed at 1251 Kamehame Drive, also known as Lot 49 (the "Property"). The Grandes are the owners of the Property.

Na Pali Haweo ("NPH" or the "Subdivision") is a luxury subdivision located on the east end of O`ahu on the summit of a ridge line of Hawai`i Kai in Maunalua, Honolulu, Hawai`i. The neighborhood is upscale, with homes typically exceeding 3,000 square feet. NPH was developed with the goal of allowing access to views of the surrounding landscape, tradewinds, sunshine, and open space. To further these goals, a Declaration of Covenants, Conditions, and Restrictions (the "CCRs") are binding upon all owners of property within the Subdivision.

In addition to the CCRs, all of the lots within NPH are covered by the Design Guidelines (the "Guidelines"), a series of design and development guidelines which are applicable to all construction activities within the Subdivision. The CCRs provide for an Architectural Design Committee (the "ARC") to review plans for all proposed homes in NPH. The ARC, pursuant to the CCRs, adopted the Guidelines.[1] The Association is responsible for enforcing the CCRs. Counterclaim Defendant Ronald K. Awa is a licensed architect in the State of Hawai`i and is the Chairman of the ARC.

---

[1] The Court will refer to the CCRs and Guidelines, collectively, as the "Governing Documents."

3

The Grandes purchased their lot and the deed was recorded at the Bureau of Conveyances in the State of Hawai`i on March 23, 2000. In October 2000, the Grandes submitted construction plans for a house to the ARC for approval. Included with the proposed plans was a letter from the Grandes' architect, Edward A. Resh, acknowledging his use of the Guidelines in designing the Dwelling. On October 24, 2000, this set of plans was approved by the ARC, subject to a modification of the trash enclosure and clarification of the design for skylights ("Approved Plans"). The Grandes submitted a different set of plans to the City and County of Honolulu Department of Planning and Permitting, without the prior knowledge and approval of the ARC and in violation of the CCRs and Guidelines.

Approximately three years later, in 2003, the Grandes began construction on the Dwelling. During the initial stages of construction, Glen Moribe, the Grandes' uphill next door neighbor, complained to the Association when the Dwelling appeared to exceed the height limit imposed by the Guidelines. On July 30, 2003, in response to growing and repeated complaints, the Association contacted Mr. Resh and requested that he verify that construction of the Dwelling was in accordance with the Approved Plans. On August 8, 2003, Mr. Resh confirmed via letter that all items were the same as Approved Plans previously

4

submitted to the ARC.  A week later, Mr. Awa visually inspected the Dwelling and concluded that construction appeared to conform with the Approved Plans.  At that time, the roof framing above the master bedroom/garage had not been completed.  During that same visit, however, Mr. Awa noted a set of plans indicating plumbing fixtures within the room intended for storage and plumbing rough-ins in the garage.

On September 22, 2003, the Association informed the Grandes of the continued complaints by the Moribes about the Dwelling's height setback and frontyard setback.  Mr. Moribe hired an attorney and demanded actual "as-built" measurements of the Dwelling.  Mr. Moribe was still convinced that the Dwelling was not in conformance with the Guidelines.  On October 7, 2003, the ARC met with Mr. Grande and his design/build team.  At that meeting, Mr. Resh produced a drawing dated September 29, 2003, which included a notation of "MOVE COL?" referring to the columns constructed within the building envelope.

On October 16, 2003, the Property was inspected by a county building inspector, NPH project manager Jeff Kloetzel, Mr. Moribe, and Mr. Moribe's attorney.  Also present at the inspection were Mrs. Grande and the Grandes' contractor, Jeff Brandt.  Measurements of the property, including the front setback, second floor balcony, and garage roof were taken during the inspection.  According

to the Association, the roof framing of the Dwelling had been constructed, but neither the roof nor the plywood sheathing had yet been installed.  The Association asserts that, consistent with Mr. Moribe's suspicions, the measurements taken confirmed that portions of the Dwelling's second floor balcony and garage roof protruded beyond the building envelope, and the front facade of the Dwelling (at the garage) breached the 20-foot front setback restriction of the Guidelines.

On or about October 19, 2003, Mr. Resh submitted revised plans to the ARC and a letter requesting a building envelope and a frontyard setback variance for the Dwelling.  This request was denied by the ARC.  On October 29, 2003, the Grandes were advised that the ARC did not have authority to grant a height setback variance and that it would be in the Grandes' best interest to cease all further construction on non-compliant areas.  Mr. Awa sent a letter to the Grandes on November 6, 2003, informing them once more that the ARC could not grant a height setback variance.  The letter also informed the Grandes that their garage storage area deviated from the Approved Plans and was in violation of the Guidelines.

On November 13, 2003, Mr. Resh submitted a set of revised plans to the ARC showing removal of two columns.  The removal and reconstruction of the columns was approved by the ARC, but it was noted that there were other portions

of the Dwelling that would still have to be moved in order to conform with the building envelope restriction of the CCRs and Guidelines.  In late October 2003, construction of the Dwelling ceased and did not resume until sometime in January 2004.

Mr. Resh submitted yet another set of plans dated January 9, 2004, in an attempt to address the concerns expressed in the ARC's November 26, 2003 letter.  However, those plans were rejected because, according to the Association, the proposal to cut off a portion of the eaves above the garage appeared to be more of a design "afterthought" and was out of character with the rest of the roof design. According to the Association, on January 28, 2004, it demanded that the Grandes cease construction on non-compliant portions of the Dwelling.  When construction presumably did not cease, the Association's attorneys wrote to the Grandes on March 4, 2004, demanding that all non-compliant construction immediately cease and that revised plans be submitted to the ARC.

Despite the Association's repeated demands and letters, construction on the Dwelling appeared to continue.  By May 2004, the Grandes had hired their own attorney, Steven B. Jacobson.  On May 25, 2004, the Association's attorneys wrote to Mr. Jacobson and again demanded that all non-compliant construction on the Dwelling cease and that revised plans be submitted to the ARC, consistent with

7

the Guidelines.  On June 7, 2004, the Association offered to mediate with the Grandes, provided that the Grandes cease all unauthorized construction.  In response, Mr. Jacobson advised the Association that his clients were willing to mediate, but they did not agree to cease construction because, in the Grandes' opinion, there was still ambiguity and dispute over which areas of the Dwelling were truly "non-compliant."  On June 23, 2004, the Association repeated their offer to mediate if the Grandes would cease unauthorized construction.  According to the Association, the Grandes never responded and construction continued on the Dwelling.

The Association originally filed its Complaint on June 1, 2004, in the Circuit Court of the First Circuit of the State of Hawai`i, seeking, *inter alia*, an injunction compelling compliance with the Guidelines.  The Grandes removed the case to Federal Court on July 2, 2004.  On July 19, 2004, the Grandes filed a Counterclaim against the Association and Mr. Awa (collectively, "Counterclaim Defendants").

On April 12, 2006, the Association filed a motion for summary judgment ("First MSJ") (Doc. # 100) alleging numerous violations of the CCRs and Guidelines.  A Notice of Joinder (Doc. # 102) was filed by Counterclaim Defendants on April 18, 2006.  The Grandes filed their Memorandum in

Opposition to the Association's First MSJ and Counter-Motion for Summary

Judgment (respectively, "Grandes' Opposition" and "Grandes' Counter MSJ")

(Doc. # 119) on June 8, 2006 . On June 15, 2006, the Association filed its Reply in

Support of its Motion for Summary Judgment and Memorandum in Opposition to

Counter-Motion for Summary Judgment (respectively, "Association's Reply" and

"Association's Opposition") (Doc. # 133). On June 21, 2006, Grandes filed its

Reply Memorandum in Support of Counter-Motion for Summary Judgment (Doc.

# 136).

On July 18, 2006, this Court granted in part and denied in part the

Association's First MSJ and denied in part Grandes' Counter MSJ (the "2006

Order") (Doc. # 150) .[2] On August 1, 2006, the Magistrate Judge issued an

Amended Rule 16 Scheduling Order (Doc. # 155) setting a new trial date and

motions deadlines. That same day, the Grandes filed a Motion for Reconsideration

of the 2006 Order (Doc. # 156), which the Association opposed (Doc. # 157) on

August 11, 2006. The Grandes replied on October 18, 2006 (Doc. # 163). On

---

[2] The Court granted summary judgment to the Association on the following issues: (1) the building envelope, (2) the front setback, (3) the front garden wall, and (4) the sliding garage gate. The Court denied summary judgment on: (1) the skylights, (2) the air conditioning equipment, (3) the roof exhaust vents, (4) the garage, (5) the entry light fixtures, and (6) the concrete pad between the trash storage area and the driveway.

October 20, 2006, this Court denied the Grandes' Motion for Reconsideration of the 2006 Order (Doc. # 167).

In late 2006, the parties renewed settlement negotiations before Magistrate Judge Leslie E. Kobayashi and Magistrate Judge Barry M. Kurren, reaching a tentative settlement in December 2006. On March 21, 2007, Magistrate Judge Kurren vacated the trial date due to settlement of the case (Doc. # 189).

On August 15, 2007, this Court granted Mr. Jacobson's motion to withdraw as counsel for the Grandes (Doc. # 196). On November 20, 2007, this Court entered an Amended Rule 16 Scheduling Order (Doc. # 199), which again re-set the trial date and set new deadlines for dispositive motions.

On January 25, 2008, the Counterclaim Defendants filed the instant Motion for Summary Judgment (the "Counterclaim MSJ") (Doc. # 200). That same day, the Association filed the instant Motion for Summary Judgment and Permanent Injunction (respectively, the "Second MSJ" and "Injunction Motion") (Doc. # 202). The Grandes opposed the motions on March 3, 2008 ("Grandes' Second Opposition") (Doc. # 207) and Counterclaim Defendants replied on March 7, 2008 (Doc. # 211). The Association filed a reply on March 10, 2008 (Doc. # 212). On March 14, 2008, the Grandes filed a Declaration/Memorandum in

Response to Reply Memoranda on Motions for Summary Judgment Filed by

Plaintiff and Counterclaim Defendants ("Grandes' Reply") (Doc. # 114).[3]

STANDARDS OF REVIEW

I.  Summary Judgment

          As set forth in Federal Rule of Civil Procedure 56(c), summary

judgment shall be entered when:

> . . . the pleadings, depositions, answers to interrogatories,
> and admissions on file, together with the affidavits, if
> any, show that there is no genuine issue of material fact
> and that the moving party is entitled to judgment as a
> matter of law.

Fed. R. Civ. P. 56(c) (2003).

          In its motion for summary judgment, the moving party has the initial

burden of demonstrating for the court that there is no genuine issue of material fact

and that the court may rule on the issues as a matter of law.  See Celotex Corp. v.

Catrett, 477 U.S. 317, 325 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S.

144 (1970)).  Despite this burden, the moving party need not produce evidence

---

[3] The Grandes' extraneous reply violates Local Rule 7.4, which provides that
no supplemental briefing shall be submitted without leave of the court.
Nonetheless, in consideration of the Grandes' pro se status, the Court recognizes
the Grandes' Reply for purposes of the instant Order.

negating the existence of an element for which the opposing party will bear the ultimate burden of proof at trial.  See id. at 323.

Once the movant has met its initial burden, the opposing party has the affirmative burden of coming forward with specific facts evidencing a need for trial.  See Fed. R. Civ. P. 56(e).  The opposing party cannot stand on its pleadings, nor simply assert that it will be able to discredit the movant's evidence at trial.  See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987); Fed. R. Civ. P. 56(e).  Moreover, there is no genuine issue of fact "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citation omitted).

A material fact is one that may affect the decision, so that the finding of that fact is relevant and necessary to the proceedings.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine issue is shown to exist if sufficient evidence is presented such that a reasonable fact finder could decide the question in favor of the nonmoving party.  See id.  The evidence submitted by the nonmovant in opposition to a motion for summary judgment "is to be believed, and all justifiable inferences are to be drawn in [its] favor."  Id. at 255.

In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law.  See id. at 254.  The court must assess the adequacy of the non-movant's response and must determine whether the showing the nonmovant asserts it will make at trial would be sufficient to carry its burden of proof.  See Celotex, 477 U.S. at 322.

Although highly fact-based cases are not generally suitable for summary judgment, the nonmoving party must demonstrate that sufficient evidence of a factual dispute exists to require a jury or judge to resolve the parties' differing versions of the truth at trial.  In ruling on such a motion, this court may not make credibility determinations or weigh conflicting evidence.  See Musick v. Burke, 913 F.2d 1390, 1394 (9th Cir. 1990).

When a plaintiff appears pro se, the court has an obligation to construe the plaintiff's complaint liberally.  See Bernhardt v. Los Angeles County, 339 F.3d 920, 925 (9th Cir. 2003); Jackson v. Carey, 353 F.3d 750, 757 (9th Cir. 2003).

13

II.  Permanent Injunction

"The requirements for the issuance of a permanent injunction are 'the likelihood of substantial and immediate irreparable injury and the inadequacy of remedies at law.'"  Easyriders Freedom F.I.G.H.T. v. Hannigan, 92 F.3d 1486, 1495 (9th Cir. 1996) (quoting American-Arab Anti-Discrimination Comm. v. Reno, 70 F.3d 1045, 1066-67 (9th Cir. 1995)).  Where a party seeks more than maintaining the status quo, and seeks mandatory injunctive relief, the moving party must show that the law and facts clearly favor granting such relief.  Stanley v. Univ. of S. Cal., 13 F.3d 1313, 1320 (9th Cir. 1994); D.D. ex rel. V.D. v. New York City Bd. of Educ., 465 F.3d 503, 510 (2nd Cir. 2006) ("party moving for a mandatory injunction that alters the status quo by commanding a positive act must meet a higher standard").  This is because a "prohibitory injunction preserves the status quo [whereas] [a] mandatory injunction goes well beyond simply maintaining the status quo pendente lite and is particularly disfavored."  Stanley, 13 F.3d at 1320 (citation and internal quotations omitted).

Injunctive relief is appropriate when restrictive covenants are violated. Sandstrom v. Larsen, 583 P.2d 971, 978 (Haw. 1978).  When the enforcement of an established legal right, embodied in the covenant, is involved, the relative hardships between the parties is irrelevant to the granting of injunctive relief.  Id.

14

Furthermore, a breach of a covenant may be grounds for injunctive relief even absent a showing of the amount of damage which has in fact been caused by that breach. <u>Pelosi</u>, 985 P.2d at 1061 (Haw. 1999) (internal quotation and citation omitted).

<u>DISCUSSION</u>

I.  <u>Second MSJ</u>

The Association seeks summary judgment on the remaining issues upon which summary judgment was not entered by the Court's 2006 Order.  Each of these alleged violations will be addressed in turn.  The Court first discusses arguments raised by the Grandes in opposition to the Second MSJ.

A.  <u>The Grandes' Arguments</u>

The Grandes first contend that the Second MSJ should be denied because this new motion essentially represents an untimely motion for reconsideration under Local Rule ("LR") 60.1.  As the Court already ruled on the issues upon which the Association seeks summary judgment here, the argument goes, the instant motion is inappropriately brought.  The Grandes are mistaken.  LR 60.1 does not preclude the Association from bringing a subsequent motion for summary judgment to resolve remaining claims.  The November 20, 2007 Amended Rule 16 Scheduling Order established a new dispositive motions

deadline of February 13, 2008.  The Association and Mr. Awa timely filed the

instant motions on January 25, 2008.  The Association's Second MSJ is therefore

properly before this Court.

The Grandes next argue that the Association failed to comply with the

mandatory prerequisites to filing suit as set forth in the Association's CCRs and,

therefore, the instant motion is not properly before this Court.  The Grandes raised

a similar argument in their 2006 briefs supporting their Counter MSJ.  The

argument remains unpersuasive.  The section of the CCRs referenced by the

Grandes (Article XII, Section 2) requires the Association to give 30-day written

notice before initiating any enforcement action.  The record reflects that the

Association, either directly or through their attorneys, provided the Grandes with

numerous written notices of the violations at issue here.  (See Exhibits L through

U, attached to the Association's Second MSJ.)  With the exception of the last two,

all of these letters were sent to the Grandes more than 30 days before the initiation

of this suit in state court.

The Association argues that the Grandes are instead referencing

Article IX, Section 9.9 of the CCRs for their pre-litigation requirements argument.

Regardless, this section also affords the Grandes no relief.  The procedures in

Section 9.9 are triggered by owners submitting a notice of completion of all

16

framing and/or completion of all construction.  The Grandes have provided no

documentation establishing that they ever gave the Association such notice.

Neither did the Grandes request a hearing before NPH Board, as specified in

Section 9.9.3.  In sum, the Grandes' claim that unsatisfied administrative

requirements preclude the arguments raised in the instant motions is undermined

by the clear language of the CCRs.  Moreover, the Grandes had numerous

opportunities to address the violations of the Dwelling prior to this matter reaching

this stage of litigation.  The Grandes' pre-litigation requirements argument is

meritless.[4]

    B.  The Violations

        A court sitting in diversity applies state substantive law.  See Gee v.

Tenneco, Inc., 615 F.2d 857, 861 (9th Cir. 1980); Field v. Liberty Mut. Ins. Co.,

769 F. Supp. 1135, 1138 (D. Haw. 1991).  As a general rule, matters relating to

interests in land are governed by the local law of the *situs* of the land.  In re Grayco

Land Escrow, Ltd., 559 P.2d 264, cert. denied, 433 U.S. 910 (1977).

---

[4] The Grandes' additional arguments regarding the Association's allegedly insufficient administrative processes are similarly unavailing.  The record reflects the Association's extensive efforts to rectify the problems with the Dwelling. Here, the Grandes essentially attempt to cut and paste disparate sections of the CCRs to create procedural requirements that simply do not exist as the Grandes construe them.

As a general rule, the construction and legal effect to be given a contract is a question of law to be decided by the court.  <u>Bishop Trust Co., Ltd. v. Central Union Church</u>, 656 P.2d 1353, 1356 (Haw. App. 1983).  Hawai`i courts have recognized that in construing restrictive covenants governing the use of land, they are guided by the same rules that are applicable to the construction of contracts.  <u>Pelosi v. Wailea Ranch Estates</u>, 876 P.2d 1320 (Haw. App. 1994), <u>recon. denied</u>, 879 P.2d 591 (Haw. App. 1994), <u>cert. denied</u>, 884 P.2d 1149 (Haw. 1994).

The CCRs and Guidelines are the Governing Documents of the dispute between the parties here.  As restrictive covenants, the law is clear as to their interpretation and application:

> In construing restrictive covenants, a court must interpret the covenant or restriction based upon the entire context of the provision, with words interpreted in accordance with the intention of the parties, and in their ordinary and popular sense.

<u>DeMund v. Lum</u>, 690 P.2d 1316 (Haw. App. 1984) (citing 20 Am. Jur. 2d <u>Covenants</u>, Sec. 186 (1965)), <u>cert. denied</u> 744 P.2d 781 (Haw. 1984); <u>Pelosi</u>, 876 P.2d at 1326-27.

1.  Mootness

The Court first addresses the alleged violations that have since been corrected, presumably since the issuance of the 2006 Order.  The parties acknowledge that the Grandes have corrected the following non-compliant sections of the Dwelling and that these items now comply with the Governing Documents: (1) the skylights (but not the skylight frames), (2) the roof exhaust vents, and (3) the exterior light fixtures.  While the Court is cognizant of the Association's contention that the Grandes' remedial work on these items was performed without approval of the ARC and therefore violated the Governing Documents, this does not change the fact that the above three items now meet the Association's standards.  In short, these items are no longer in controversy.  Thus, this Court DENIES AS MOOT the Association's claims as to the skylights (but not the non-compliant framing), the roof exhaust vents, and the exterior light fixtures.

2.  The Remaining Violations

The Court addresses each of the remaining alleged violations and makes its ruling as to summary judgment as follows:[5]

a.  Skylight Framing

---

[5] The Court notes that, while the Grandes have in the past opposed the alleged violations discussed herein, they do not do so here.

Article III, Section 3.2.3(i) of the Guidelines states:

Skylights are to be designed as an integral part of the roof. Skylight glazing must be clear, solar bronze or gray; white or reflective glazing is prohibited. Skylight framing material must be bronze anodized or colored to match adjacent roof. Natural aluminum is prohibited. No bubble or plastic skylights will be allowed and skylights facing the streets shall be non-operable and subject to the approval of the Architectural Review Committee.

As stated above, the Association acknowledges that the skylights themselves are now in compliance with the Governing Documents. However, the frames of the two skylights, including flashing, still does not match the adjacent roof.

This allegation is not disputed by the Grandes, whose motion in opposition consists of the arguments dismissed by the Court above and statements to the effect that they are financially unable to perform additional work on the Dwelling.[6] While the Court is sympathetic to the Grandes' financial plight, it is irrelevant for purposes of a ruling on summary judgment. The record reflects that the skylight framing is still not in compliance with the Guidelines. (Ex. Q ¶ 3, attached to the Association's Second MSJ.) Accordingly, because the Association

---

[6] In their opposition, the Grandes assert that, following the 2006 Order, Mr. Grande offered to repaint the skylight frames and roof vent a color of the Association's choosing, even providing paint chips to the Association for its approval. The Association, however, never agreed to a color. This argument is irrelevant to the question of whether the skylight frames violated the Governing Documents for purposes of the instant motion for summary judgment.

has met their burden as the moving party and because the Grandes offer no specific

facts in opposition, there is no remaining issue of material fact as to the current

compliance of the framing. The Court therefore GRANTS the Association's

Second MSJ on the skylight framing issue.

    b.  <u>Air Conditioning Equipment</u>

    Article III, Section 3.2.14 of the Guidelines states:

> <u>Mechanical Equipment</u>.  All air conditioning, heating
> equipment and soft water tanks must be screened from view and
> be insulated for sound attenuation.  Air conditioning units are
> not permitted on roofs.

More specifically, Article III, Section 3.2.14(a) of the Guidelines states:

> <u>Air Conditioning System</u>.  Prior to the installation of the air
> conditioning systems, Owner shall secure the written
> concurrence of the [ARC] a to the location and type of system.
> Such air conditioning system shall be sound-treated to prevent
> noise nuisance.

    The Association argues that the Grandes violated these provisions by

(1) installing air conditioning equipment that was not shown on the original,

Approved Plans and, (2) after the filing of this action, the Grandes installed lattice

screening around the air conditioning equipment without requesting approval from

or notifying the ARC.  Lattice work is a prohibited material under the Guidelines.

The record reflects that the external air conditioning equipment was not part of the Approved Plans (Ex. Q ¶ 4) and that the current lattice-enclosed equipment violates the Guidelines (Ex. B § 3.2.7.).  As such, the Association has met its initial burden as the moving party for purposes of summary judgment.  The Grandes do not provide any facts in rebuttal.  As such, the Court GRANTS the Association's Second MSJ as to the air conditioning violation.

c.  <u>The Garage</u>

Section 4.3.7 of the CCRs states, in relevant part, that "Garages shall be used only for the parking or repair of personally owned motor vehicles, storage, and workshop purposes." Additionally, Article III, Section 3.2.4(b) of the Guidelines states:

> Every garage, whether attached or detached, which has a vehicular entrance facing a street shall contain not less than an additional one hundred (100) square feet of enclosed and covered area for service and storage facilities.

The Association contends that the Grandes, instead of following the Approved Plans, which reflected a storage area of approximately 125 square feet, built a garage that included a toilet room and an area of enclosed storage space far less than 100 square feet.

In its 2006 Order, the Court found that whether the term "service facilities" included a toilet room in the context of the Guidelines was an issue of fact. Such a determination is not required here. The garage as constructed is substantially different from the garage in the Approved Plans. (Compare Ex. AA-1 – 4 to Ex. AA-5 & 6). Regardless of whether the garage as constructed meets the 100 square foot minimum, even with the disputed toilet room, it is undisputed that the garage was built in marked variance from the Approved Plans. This alone is sufficient to constitute a violation of the Guidelines.

The Association has once again met its burden as the moving party and the Grandes offer no facts in opposition. As such, the Court GRANTS the Association's Second MSJ as to the garage violation.

d. <u>Exterior Fenestrations</u>

As previously set forth, Section 6.3.4 of the Guidelines requires approval of the ARC before changes are made to the Approved Plans. The Association avers that the Grandes violated this provision by deviating from the Approved Plans in numerous respects.

The record indicates that the exterior of the Dwelling differed from the Approved Plans in the following ways: (1) roof eyebrow is missing; (2) garage

wall opening is squared-off at the top corners;[7] (3) the arched clerestory window

was deleted and replaced by a decorative window; (4) the living room windows are

lower than the Approved Plans; (5) exterior planters were eliminated; (6) the roofs

over the entry and master bedroom are not constructed as separate and distinct

elements; (7) Again, the Grandes do not oppose this argument.  As such, the Court

GRANTS the Association's Second MSJ as to the exterior fenestrations violation.

### e.  Concrete Pad Between Trash Area and Garage

The Approved Plans called for a concrete pad at the trash area

between the driveway and trash storage area.  This concrete pad has not been

constructed.  (See Exs. Y, Z, and Q.)  This fact is not disputed by the Grandes.  The

Court therefore GRANTS the Association's Second MSJ as to the concrete pad

violation.

For the reasons stated above, the Court GRANTS the Association's

motion for summary judgment on the remaining claims related to the violations of

the Dwelling.

---

[7] In their opposition, the Grandes aver that neither the eyebrow roof nor the
rounding of the upper corners of the garage wall was "deleted."  Rather, the
Grandes claim that their contractor walked off the job before completing these
items.  Again, this argument is irrelevant as to the question of whether the failure
to complete these items in accordance with the Approved Plans violated the
Governing Documents.

II.  <u>Counterclaim MSJ</u>

        Counterclaim Defendants request summary judgment on the Grandes'
Counterclaim on the following grounds: (1) the Grandes, and not Counterclaim
Defendants, violated the Governing Documents; (2) the Grandes built their home
from a different set of plans than the ones approved by the ARC; (3) the Grandes
refused to submit revised plans to the ARC for approval because Mr. Grande did
not want to pay the submittal fee; (4) Counterclaim Defendants did not act
unreasonably or beyond the scope of their powers; and (5) the CCRs immunize Mr.
Awa from personal liability.

        Initially, this Court finds that summary judgment is appropriate on
Counterclaim Defendants' first two arguments because the 2006 Order as well as
the discussion above establishes that the Grandes (1) violated the Governing
Documents and (2) built the Dwelling from non-Approved Plans.  While these
findings of fact are sufficient in of themselves to obviate the underlying basis for
the Grandes' Counterclaim, the Court nonetheless addresses Counterclaim
Defendants' additional arguments.

        With regard to Counterclaim Defendants' argument regarding the
Grandes' refusal to submit revised plans, the record shows that Mr. Grande
admitted that he never submitted revised plans to the ARC because he did not want

to pay the required $500 fee.  (Ex. D at 15, lines 2-10, attached to Counterclaim

MSJ.)  The Grandes' claim that Mr. Awa refused to speak with them unless they

agreed to pay him $500 personally is not supported by any evidence and is

contradicted by the sworn testimony of Mr. Grande.  Counterclaim Defendants

have therefore satisfied their burden for purposes of their motion for summary

judgment.  As before, the Grandes do not offer any evidence to counter these facts.

As to Counterclaim Defendants' assertion that they did not act

unreasonably or beyond the scope of their powers, the Court agrees.  The burden of

compliance with the Governing Documents is on the owners, not on Counterclaim

Defendants.  (Ex. I at 9-10, attached to Counterclaim MSJ.)  Construction of any

improvement on a lot within NPH is prohibited until the owner first obtains

approval from the ARC and complies with all provisions of the Governing

Documents.  (Id.)  As has been clearly established, the Grandes built a non-

compliant Dwelling based on a different set of plans from the ones they submitted

to the ARC.  The Association has the duty to take action, including undertaking

legal action, as may be reasonably necessary to enforce the Governing Documents.

(Id. at 30-31, 35, 55-56.)

More specifically, the Grandes' allegation that the Association

declined to make a final decision about whether to allow a variance is not

26

supported by fact.  Mr. Grande's deposition testimony indicates that the request for a variance was denied on or about October 29, 2003.  (Ex. D at 35, lines 20-24; 38, lines 5-7; 39, lines 13-15.)  Pursuant to the CCRs, the ARC may, but is not required to, authorize variances under specified circumstances based on its sole discretion.  (Ex. I at 17.)  The allegation in the Grandes' Counterclaim that Counterclaim Defendants acted outside the scope of their authority is not supported by fact.  Additionally, the Grandes have not provided any evidence in opposition to that set forth in the instant motion.

Finally, the CCRs provide that members of the ARC shall not be personally liable to any owner for damage, loss, or prejudice suffered or claimed on account of issues related to the approval or disapproval of plans, construction, or improvements to lots within NPH.  (Ex. I at 48.)  As such, Mr. Awa, sued in his official capacity as a member of the ARC, is immunized from the Grandes' counterclaims.

For these reasons, the Court GRANTS the Counterclaim MSJ and hereby DISMISSES the Grandes' Counterclaim.

III.  <u>Motion for Permanent Injunction</u>

The Association requests this Court to issue a permanent injunction requiring the Grandes to undertake one of the following options: (1) strictly

comply with the Approved Plans and correct the building envelope encroachment[8] either by completing remedial work on the Dwelling to bring it into compliance with the Approved Plans[9] or by submitting revised plans to correct the building envelope encroachment to the ARC and obtaining approval of said plans; or (2) submit revised plans to the ARC and obtain approval of said plans, provided that such plans shall strictly conform with the requirements of the Governing Documents, and perform remedial work to correct all violations in strict conformance with these revised plans.  According to the Association, this proposed injunction provides the Grandes the option of constructing the Dwelling in accordance with the Approved Plans (while correcting the building envelope encroachment) or, in the alternative, submitting revised plans to correct the various violations.  In either event, the Grandes are required to correct the building envelope violation.

---

[8] The Court's 2006 Order granted summary judgment to the Association on this issue.

[9] This includes (1) removal of any items constructed on the property but not shown in the Approved Plans, (2) construction of any items shown on the Approved Plans but omitted without approval, (3) removal of any items shown on the Approved Plans but that deviate from the Approved Plans, and (4) correction of the front building envelope violation.

28

The Court finds that an injunction is appropriate here. This protracted litigation originates from the Grandes' construction of a house that differed, in many ways substantially, from the plans they had submitted to and which were approved by the ARC. The Grandes had numerous opportunities to address the violations discussed above but failed to do so. Furthermore, the record is clear that the Grandes agreed to be bound by the Governing Documents when they purchased their property in NPH. Based on relevant Hawai`i case law establishing the appropriateness of permanent injunctions when restrictive covenants are violated, the Court hereby ORDERS the Grandes to undertake one of the following two options:

1. The Grandes shall strictly comply with the Approved Plans and correct the front building envelope encroachment as follows:

   a. By no later than December 31, 2008, the Grandes shall fully complete any and all remedial work on the Dwelling as necessary to bring it into strict compliance with the Approved Plans (dated October 2000), as approved by the ARC, including: (a) removal of any items constructed on the property but not shown on the Approved Plans, (b) construction of any items shown on the Approved Plans but omitted without approval of the ARC, (c) removal of any items shown on the

Approved Plans but which deviate from the Approved Plans and construction of those items in accordance with the Approved Plans, and (d) correction of the front building envelope encroachment.

b.  By September 30, 2008, the Grandes shall submit revised plans to correct the front building envelope encroachment to the ARC and obtain the ARC's approval of said plans.  These plans shall strictly conform with the requirements of the Governing Documents.  By December 31, 2008, the Grandes shall perform remedial work to correct the front building envelope encroachment, in strict conformance with the revised plans approved by the ARC.

2.  Alternatively, by September 30, 2008, the Grandes may submit revised plans to the ARC and obtain the ARC's approval of said plans, provided that said plans shall strictly conform with the requirements of the Governing Documents, and resolve the various violations of the Governing Documents described above.  In the event that the Grandes elect for this option, by December 31, 2008, the Grandes shall fully complete remedial work to correct all violations of the Governing Documents in strict conformance with the revised plans approved by the ARC.

<u>CONCLUSION</u>

For the reasons stated above, the Court GRANTS IN PART and

DENIES IN PART AS MOOT Plaintiff's Motion for Summary Judgment and

Permanent Injunction, GRANTS Counterclaim Defendants' Motion for Summary

Judgment, and ORDERS the Injunction described herein to issue effective

immediately.

IT IS SO ORDERED.

DATED:  Honolulu, Hawai`i, March 20, 2008.



_____

David Alan Ezra
United States District Judge

<u>Na Pali Haweo Community Association. v. Anthony Grande, et al.</u>, CV No. 04-
00413 DAE/BMK; ORDER GRANTING IN PART AND DENYING IN PART
AS MOOT PLAINTIFF NA PALI HAWEO COMMUNITY ASSOCIATION'S
MOTION FOR SUMMARY JUDGMENT; ORDER GRANTING
COUNTERCLAIM DEFENDANTS' MOTION FOR SUMMARY JUDGMENT;
AND ORDER SETTING PERMANENT INJUNCTION